IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., | ) ) ) | <u>CONSOLIDATED CASES</u> |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-2684-JWL |
| COMCAST CABLE COMMUNICATIONS LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| SPRINT COMMUNICATIONS COMPANY L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 11-2686-JWL |
| TIME WARNER CABLE, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

<u>**MEMORANDUM AND ORDER**</u>

These two patent cases, consolidated for pretrial purposes, brought by plaintiff

Sprint Communications Company L.P. ("Sprint"), come before the Court on various

motions for summary judgment.[1]  As more fully set forth below, the Court rules as

follows:

---

[1]The Court refers to the defendants in Case No. 11-2684 collectively as "Comcast" and the defendants in Case No. 11-2686 collectively as "TWC". Sprint's suit against Cable One, Inc., previously consolidated with these cases, has been resolved.

Sprint's motion in its case against Comcast (Doc. # 884 in Case No. 11-2684) is **granted in part and denied in part**. The motion is granted with respect to Sprint's claim of infringement of the '932 Patent as it relates to Comcast's accused systems other than those using the Cedar Point architecture. The motion is denied with respect to Comcast's defenses of equitable estoppel and implied license.

Sprint's motion in its case against TWC (Doc. # 146 in Case No. 11-2686) is **granted in part and denied in part**. The motion is granted with respect to TWC's defenses of express license, implied license, and exhaustion. The motion is denied with respect to Sprint's claim of infringement of the '932 Patent and TWC's defenses of equitable estoppel, acquiescence, and waiver.

Defendants' joint motion with respect to the issues of collateral estoppel and invalidity (Doc. # 870 in Case No. 11-2684; Doc. # 130 in Case No. 11-2686) is **denied**.

Comcast's motion (Doc. # 880 in Case No. 11-2684) is **granted in part and denied in part**. The motion is granted with respect to non-infringement of the '918 Patent. The motion is denied with respect to non-infringement of the '3,561 Patent and the '6,561 Patent, equitable estoppel, and laches.

TWC's motion with respect to non-infringement of the '3,561 Patent and the '6,561 Patent, equitable estoppel, and laches (Doc. # 140 in Case No. 11-2686) is **denied**.

## I.     <u>Summary Judgment Standards</u>

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient

3

evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## II.   **Invalidity**

By joint motion, defendants in both cases seek summary judgment on their affirmative defense that Sprint's patents are invalid. The Court cannot rule at this stage as a matter of law, and it therefore denies the motion.

### A.   *Collateral Estoppel*

Defendants argue that six of the patents-at-issue should be ruled invalid under the doctrine of collateral estoppel, based on an invalidity ruling involving the same patents by a district court in the District of Delaware in a case between Sprint and various Cox entities. As defendants concede, however, that argument no longer has merit in light of the Federal Circuit's recent opinion (issued September 23, 2016) reversing the district court. *See Cox Communications, Inc. v. Sprint Communication Co. LP*, 838 F.3d 1224 (Fed. Cir. 2016). The Court thus denies the motion to the extent based on collateral estoppel.

B.      *Application of Section 112(f)*

Defendants argue that six patents with a "processing system" claim element[2] are invalid as indefinite under 35 U.S.C. § 112(f). That statute provides that in the case of a means-plus-function claim element, the claim shall be construed to cover the corresponding structure described in the specification. *See id.* Although there is a presumption against applying Section 112(f) where the claim does not use the word "means" (as in this case), the presumption may be overcome "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *See Williamsom v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Defendants argue that Section 112(f) should apply here because the claims involving a "processing system" recite functions for that element without describing the structure of that element, and that the patents are invalid as indefinite because the patents' specifications do not adequately describe the structure of a "processing system." In its claim construction order, the Court rejected that same argument by defendants. *See Sprint Communications Co. L.P. v. Comcast Cable Communications LLC*, 2014 WL 5089402, at *3-4 (D. Kan. Oct. 9, 2014) (Lungstrum, J.).

Defendants ask the Court to revisit that ruling in light of the Federal Circuit's subsequent opinion in *Williamson*. In that case, in holding that construction of the term

---

[2]The six "Processing System" patents are the '3,561 Patent, the '6,561 Patent, the '052 Patent, the '932 Patent, the '429 Patent, and the '064 Patent.

"distributed learning control module" was governed by Section 112(f), the court noted that "module" was a well-known "nonce" word that did not provide any indication of structure, which word was used in a manner tantamount to using the word "means". *See Williamson*, 792 F.3d at 1350. Defendants argue that "processing system" similarly connotes no structure.

The Court concludes, however, that this argument is foreclosed by the Federal Circuit's recent opinion in *Cox*. In that case, in which the court rejected Cox's indefiniteness arguments, the parties agreed that "processing system" was not a means-plus-function term, *see Cox*, 838 F.3d at 1229, and defendants in the present case thus argue that *Cox* is not helpful. Nevertheless, the court in *Cox* commented on the application of Section 112(f) as follows:

> We note, however, that in the context of 35 U.S.C. § 112[(f)], we require that, if a patentee writes his claims in "means-plus-function" form, he must disclose the particular structure that is used to perform the recited function. This is intended to avoid pure functional claiming, where a patentee claims all possible means of achieving a function. However, by agreeing that "processing system" is not a means-plus-function term, Cox has already conceded that "processing system" itself recites sufficiently definite structure and there is no problem of pure functional claiming here. *See Williamson* . . . . Indeed, the claims specify that the claimed functions are achieved through the use of the "processing system," which the parties agree is, as used in the context of the patents here, a general purpose computer.

*See id.* at 1232 n.4 (internal quotations and additional citations omitted). Thus, although the parties agreed in that case that "processing system" was not a means-plus-function term, the Federal Circuit expressly agreed that, "indeed", Section 112(f) did not apply.

The concurrence in *Cox* also noted that the court was "agreeing with the parties that the claims before [it] [were] not in means-plus-function form." *See id.* at 1235 n.1. Thus, because the Federal Circuit has already expressed its opinion that Section 112(f) does not apply to these patent claims, this Court will not revise its earlier ruling to reach a different conclusion.

In the excerpt from *Cox* quoted above, the court noted the parties' agreed construction of "processing system" to mean a "general purpose computer," *see id.* at 1232 n.4, and defendants request that the Court adopt the same construction in this case.[3] In *Cox*, the court noted that the patented steps "would have to be performed on some kind of computing device," and it noted that its indefiniteness analysis would not change if "processing system" were replaced with "computer" in the claims. *See id.* at 1230-31. In its claim construction order, this Court declined to construe the term "processing system" (thereby following its ruling in the prior *Vonage* and *Big River* cases). *See Comcast*, 2014 WL 5089402, at *7. The Court concluded that defendants had not shown that the term would not be understood by one skilled in the relevant art, and it noted that defendants' expert had conceded that the term must refer to some kind of computer. *See id.* at *6. Thus, the Court's decision to rely on the ordinary meaning of "processing system" is consistent with the Federal Circuit's opinion in *Cox*, as a computer is

---

[3]Defendants further argue that Sprint is judicially estopped from endorsing any other construction in light of Sprint's adoption of that construction in oral argument before the Federal Circuit in *Cox*.

essentially a device that processes.  Defendants have not shown how "general purpose computer" has a different meaning or why the term "processing system" would not be understood by one skilled in the relevant art.  The construction of this term was litigated properly and fully in these cases' *Markman* proceedings, and the *Cox* opinion does not require revision of the construction that resulted from those proceedings.  The Court therefore denies defendants' request for a revised construction, and it denies defendants' motion for summary judgment of invalidity based on application of Section 112(f).

C.      <u>*Written Description Requirement*</u>

Defendants also argue that all of the patents-in-suit are invalid because they do not comply with Section 112(a)'s written description requirement.[4]  That provision requires that the specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  *See* 35 U.S.C. § 112(a).  "To overcome the presumption of validity of patents, the accused must show that the claims lack a written description by clear and convincing evidence."  *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011).  "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could

---

[4]The Court does not address TWC's untimely argument that the patents are invalid for violating the enablement requirement, as the supplemental briefing process permitted by the Court was not intended to allow for the assertion of new bases for summary judgment.

return a verdict for the non-moving party." *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). Defendants argue that these patents do not comply with this requirement because the claims are broader in scope than the inventions set forth in the patents' specifications. *See Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) ("The purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.").

With respect to the Group 1 patents (the '932 Patent, the '052 Patent, the '3,561 Patent, and the '6,561 Patent), defendants premise this argument on their contention that while the claims are broader in scope, the invention disclosed in the specification is the communication control processor (CCP). The Court concludes that this issue at least presents an issue of fact for trial. In its claim construction order, the Court rejected defendants' proposed construction that would have limited the claimed "processing system" to the CCP. *See Comcast*, 2014 WL 5089402, at * 3-7. The specification did not define the "processing system" as a CCP, and the Court rejected defendants' argument that the specification repeatedly and consistently described the invention as including a CCP. *See id.* at *7. In so ruling, the Court noted that the specification consistently described the CCP as an element of particular embodiments of the invention; that no language in the specification indicated that the overall invention involved use of a CCP; and that the specification contained language describing the CCP as "a" processing system and stating that the invention encompassed variations involving

9

the use of multiple devices to comprise the processing system. *See id.* Defendants also cite testimony by Sprint's patent expert concerning the CCP, but the expert did not testify that the invention disclosed in the specification was limited to the CCP.

Because defendants cannot establish the premise of their argument—that the disclosed invention was the CCP—summary judgment is not appropriate on this basis. Moreover, as noted by the Federal Circuit in *Cox*, the patents describe the claims' "processing system" in some detail. *See Cox*, 838 F.3d at 1232-33. Thus, defendants have not established this defense as a matter of law by clear and convincing evidence, a reasonable factfinder could find in Sprint's favor on this factual issue of whether the invention is adequately described in the specification, and the Court therefore denies summary judgment with respect to the Group 1 patents.

With respect to the remaining patents-in-suit (the Groups 2-4 patents), defendants similarly argue that the inventions disclosed by the specifications are limited to the use of ATM technology, while the claims are not so limited under the Court's constructions. The Court rejects this argument as well. First, the Court does not agree as a matter of law that the specifications limit the invention to the use of ATM technology generally. In its claim construction order, the Court construed "interworking unit," found in claims in all four patent groups at issue here, to mean "ATM interworking multiplexer," based on the specifications' consistent description of the inventions as involving such a device. *See Comcast*, 2014 WL 5089402, at *15-17. The Court declined, however, to construe the terms "route/routing", "identifier", and "communication system" as limited to ATM

technology, as the specifications did not similarly describe those elements or the inventions consistently as so limited. *See id.* at *8-9, 18-19. In construing the term "identifier", the Court noted that, based on its construction of "interworking unit", the claims were effectively limited to the use of ATM technology, and thus there was "no basis to repeat that limitation by grafting onto this particular term" in the absence of a proper basis in the specification. *See id.* at *18. Thus, under the Court's constructions, the scope of the claims match the patents' specifications, as a term is limited to ATM technology only if the specification has done so. The specifications do not make clear that the inventions are limited to ATM technology, other than by limiting the inventions to the use of an ATM interworking multiplexer. Thus, once again, the Court cannot conclude as a matter of law that the patent claims are broader in scope than the inventions described in the specifications.

Defendants have not explained exactly how they could infringe by using an ATM interworking multiplexer but not using ATM technology for other required elements, with such a possibility not adequately described in the specifications. Defendants are free to attempt such an argument at trial, but the Court cannot conclude that defendants have proved this defense as a matter of law by clear and convincing evidence. Because a reasonable factfinder could find that the patents satisfy the written description requirement, the Court denies defendants' motion for summary judgment with respect to that defense.

### III.   __Infringement__

#### A.   _The '3,561 Patent_

Both defendants seek summary judgment to the effect that they did not infringe independent claim 24 of the '3,561 Patent and certain related dependent claims. Claim 24 claims "[a] method of operating a processing system to control a packet communication system for a user communication, the method comprising" five steps, the first step of which is "selecting a network code that identifies a network element to provide egress for the user communication from the packet communication system to a narrowband communication system." In their sole argument for summary judgment with respect to infringement of this claim (and the related dependent claims), defendants argue that this claim requires the "processing system" actually to select the network code, instead of merely participating in the selection of the code; and that because Sprint's patent expert has only opined that defendants' processing systems participate in the selection, Sprint cannot offer evidence of infringement of the first step of the claim. Because the Court rejects defendants' construction of the claim, it denies defendants' motion for summary judgment on this basis.

Independent claim 1 of the '3,561 Patent claim has the same preamble as claim 24, but with different steps, one of which is "processing the signaling message to select a network code . . . ." In its claim construction order in this case, the Court construed the term "processing . . . to select" in claim 1 and in certain other patents' claims to mean _processing . . . to participate in the selecting. See Comcast_, 2014 WL 5089402, at *14-

12

15.  The Court reviewed the history of its consideration of this term and reasoned as follows:

The Court first considered this term in *Vonage*.  At the summary judgment stage, the Court rejected Vonage's argument that the processing system must not only process but must also select a network code; the Court held that the claim did not require that the system actually select the code, and it further held that a question of fact remained because a jury could conclude that the system processed signaling to select the code if it was involved in the selection.  *See* [*Sprint Communications Co. L.P. v. Vonage Holdings Corp.*], 500 F. Supp. 2d [1290, 1322-23 (D. Kan. 2007)].  Then, at the claim construction stage, Vonage proposed a construction requiring the processing element also to make the selection, while Sprint proposed construing the term to mean "processing to participate in the selection."  *See* [*Sprint Communications Co. L.P. v. Vonage Holdings Corp.*], 518 F. Supp. 2d [1306, 1320 (D. Kan. 2007)].  Because neither party supported its argument with citation to intrinsic evidence, the Court rejected both parties' arguments and declined to construe the term.  *See id.* at 1321.  The Court addressed this term again in *Big River*, in which the parties proposed the same constructions rejected in *Vonage*.  *See* [*Sprint Communications Co. L.P. v. Big River Tel. Co., LLC*], 2009 WL 1992537, at *17-18 [(D. Kan. July 8, 2009)].  The Court rejected the construction offered by Big River, as that party had again failed to support its construction sufficiently.  *See id.* at *18.  The Court then noted that the particular specification at issue did make clear that information from other elements may be used in selection, and it reaffirmed its conclusion from *Vonage* that the claim language did not require that the processing system actually select the element.  *See id.*  The Court further concluded that "the scope of the claims might be ambiguous on this issue, to the extent that someone might believe that the selection must be made without help from any other network element."  *See id.*  For that reason, the Court adopted Sprint's construction and construed the term "process[ing] . . . to select" to mean *process[ing] . . . to participate in the selecting.  See id.*

Like Vonage and Big River before them, defendants argue that the element that does the processing (such as the processing system) must also do the selecting.  Defendants argue that, although information from other sources may be considered, the processing element actually makes the decision about the selection.  Defendants cite to a couple of examples from one specification in support of their argument, but those examples relate

to particular embodiments, and defendants have not shown that the inventions are repeatedly and consistently described as having the processing element actually make the selection.   Defendants also analogize the situation to one in which the President makes decisions with input from advisors, but that analogy is not necessarily apt—these inventions might act more like a committee than a President with advisors, and the specifications do definitively choose one model over the other. Moreover, a human scenario seems to be a questionable model for understanding how decisions are made mechanically or electronically, and neither party has pointed to evidence concerning how decisions are physically made within this technology.   At any rate, the claims themselves do not require that the processing element also make the selection, but instead require only "processing . . . to select," and in the absence of sufficient evidence from the specifications, the Court will honor that distinction.

Accordingly, the Court will follow its construction from *Vonage* and *Big River*, and it construes "processing . . . to select" in these patents to mean *processing . . . to participate in the selecting*.

*See id.*

The Court has not construed the term "selecting" as used in the first step of claim 24 of the '3,561 Patent.  Defendants argue that because this step does not use the "processing . . . to select" construct, the claim requires that the processing system actually select the code, and that mere participation in the selection is not sufficient. Sprint argues that participation in the selection is enough.  The Court agrees with Sprint's construction.

The Court begins with the language of the claim itself.  The claim does not explicitly require that the processing system select the code; rather, claim 24 claims a method for *"operating* a processing system," one step of which is "selecting a network code."  The most straightforward reading of that language is that a selection must take

14

place in the context of operating a processing system, which means that the processing system must be involved although the selection may be made by some other element. Thus, the language of the claim does not support defendants' construction.

Defendants' construction is further undermined by the remaining steps in the claimed method, two of which appear to take place outside the processing system ("receiving the communication in the packet communication system . . ." and "transferring the user communication from the network element . . .").[5] As Sprint notes, the fact that the processing system mentioned in the preamble does not perform later steps logically supports the construction that neither is there a requirement that the processing system perform the "selecting" step.

Finally, the patent's specification support's Sprint's construction. As the Court noted in the above excerpt from its claim construction order, the specification does not consistently describe the invention as having the processing element actually make the selection, while making clear that information from other elements may be used in the selection. The specification thus supports the same limitation in both claims 1 and 24.

Defendants rely on the Court's summary judgment ruling in *Vonage*. *See* 500 F. Supp. 2d at 1321-23. In that case, although the Court denied summary judgment of non-infringement with respect to claim 1, it granted summary judgment with respect to claim

---

[5]After Sprint made this point in its response briefs, TWC stated in its reply brief (in responding to Sprint's additional statement of facts) that it does not dispute the interpretation that the later steps are not necessarily performed by the processing system. Comcast failed to address this point at all in its reply brief.

24. *See id.*  In doing so, the Court stated: "As to [claim 24], then, the processing system must do more than merely process the signal to select the network code; it must actually select the network code." *See id.* at 1323.  The Court made clear in that order, however, that it was not engaging in claim construction, and the Court did not consider, nor had the parties presented, the arguments based on the actual text of claim 24 that the Court has addressed herein.  As noted, the text of the entire claim 24, supported by the specification, compels the Court's present construction.  Nor did the Court in *Vonage* consider the difficulty in deciding which element actually makes a decision in the context of this technology, as discussed by the Court in the above excerpt from its claim construction order in this case.

In this case, the Court squarely confronts these issues relating to the proper construction of the term "selecting" as used in claim 24 of the '3,561 Patent, and it concludes that defendants' construction, with the additional limitation that the processing system actually select the network code, must be rejected, for the reasons stated.  Thus, to eliminate possible juror confusion, the Court construes this term to mean that *the processing system has participated in the selection*.  Accordingly, there is no basis to find non-infringement as a matter of law based on the opinions of Sprint's expert, and the Court denies defendants' motions for summary judgment of non-infringement with respect to these claims of the '3,561 Patent.

## B.   *The '6,561 Patent*

Both defendants seek summary judgment of non-infringement with respect to

independent claim 11 and related dependent claims of the '6,561 Patent.  Claim 11 states

as follows:

> 11.  A method of operating a communication network, the mehtod comprising:
>> in a processing system, **processing** one of a Signaling System #7 (SS7) signaling message and a Q.931 signaling message for a call **to select packet routing information** for the call and transferring a control message indicating packet routing information; and
>> in a communication system, receiving a user communication for the call and the control message, and in response, converting the user communication into a packet format including **the packet routing information selected by the processing system** and transferring the user communication in the packet format to a packet system that routes the user communication based on **the packet routing information selected by the processing system**.

(Emphasis added.)  In its claim construction order in this case, the Court construed the

term "processing . . . to select" in the first step of claim 11 to mean *processing . . . to*

*participate in the selecting*.  Defendants noted that the second step of claim 11 does not

use the "processing . . . to select" construct, but instead refers to packet routing

information "selected by the processing system."  Defendants thus argue that the second

step adds the limitation that the packet routing information actually be selected by the

processing system, and that the processing system's mere participation in the selection

is not sufficient.  Defendants thus again argue that Sprint's expert's opinion that

defendants' processing systems participate in the selection of the packet routing

information does not create a triable issue of fact on the issue of infringement of this

claim.

17

Once, again, however, the Court rejects defendants' interpretation. The Court concludes that the most logical and reasonable reading of claim 11 is that the processing system need only process a message to select the packet routing information—i.e., it need only participate in the selecting—as made clear in the first step; and that the second step's references to the packet routing information "selected by the processing system" refers back to the antecedent selection required by the first step, in which the processing system need only participate in the selecting. Again, the specification supports that construction by making clear that other elements may be involved in the selection process.

Defendants suggest that a later step may add a limitation not present in an earlier step, just as a dependent claim adds a limitation to the independent claim to which it relates. That analogy is not apt, however, as a dependent claim is designed to add a limitation. In this case, the second step's references to the selection is most reasonably read to refer to (and thus share the same scope as) the selection referenced in the first step, in which the processing system must merely participate.

Accordingly, in light of this construction by the Court, Sprint's expert's use of the "participation" standard in referring to this claim is not improper, and there is no basis for a finding of non-infringement as a matter of law on that basis. The Court thus denies the motions for summary judgment on these claims of the '6,561 Patent.

### C.   *The '918 Patent*

Defendant Comcast seeks summary judgment of non-infringement with respect

to independent claim 11 and dependent claim 12 of the '918 Patent.  Comcast asserts, and Sprint does not dispute, that proof of infringement of these claims requires a showing that "a control system" "transfer[s] call routing data from the control system data tables to call processor data tables."  Sprint alleges that Comcast's STARS database constitutes the required "control system" and that Comcast's IRDBs and other elements constitute "call processors".  Comcast argues that the STARS database does not "transfer" any data to the IRDBs or its other potential call processors as matter of law, based on its evidence of the following process that takes place in its systems:  the STARS database holds routing data; STARS does not perform any automated transmission of data to any other element in the network; to transfer data from STARS to other systems, Comcast's engineers search the STARS database for the correct data and format that data into a script; the script, similar to a small computer program, is generally in the form of a text file, and it contains commands to be executed by another program; the engineers then review the data and manually import the scripts onto the systems requiring updated routing information (including the accused call processors); finally, the engineers run the scripts on the target system, thereby executing the commands in the script to cause the modification of data in the target system.  Comcast submitted further evidence that although the system could be set up to allow STARS automatically to transfer data to another system, Comcast did not want such an automated transfer and so did not implement such a system.

The Court agrees with Comcast that a reasonable juror could not find that use of

such a process involves a transfer of data *by the STARS database* to the other elements, as required for infringement of these claims.  The Court further agrees that Sprint has failed to rebut this evidence to create a material issue of fact with respect to this claim. First, Sprint cites the testimony of one Comcast employee that information is "propogated" to the IRDBs; it appears, however, that the witness was discussing the transfer of information *between* IRDBs, and not from STARS to the IRDBs, and the witness did not testify that STARS transfers the data to the IRDBs.  Second, Sprint cites testimony by Comcast's Rule 30(b)(6) witness, including testimony that data is "pushed" to the IRDBs; that witness made clear in his testimony, however, that no data is directly transferred from STARS to the other elements, and that the data is actually transferred by Comcast's engineers.  Third, Sprint cites various documents that suggest that STARS is an "automated" system.  Those documents do not contain evidence, however, that any such automation is used to transfer data from STARS to the accused call processors or any other elements.  Fourth, Sprint cites testimony by Paul Min, Comcast's patent expert, but he made clear his opinion that STARS does not transfer data to the accused call processors.  Finally, Sprint cites the report of its own expert, but that expert (relying on the sources already discussed) opined only that Comcast "uses" STARS to transfer data to the call processors, without opining that STARS does the transferring.

The Court concludes that Sprint has not cited evidence from which a reasonable jury could find that Comcast's STARS database transfers data to the accused call processors.  Accordingly, Comcast is entitled to summary judgment of non-infringement

with respect to claims 11 and 12 of the '918 Patent, and the Court grants Comcast's motion to that extent.[6]

   D.   *The '932 Patent*

Sprint seeks summary judgment of infringement against both defendants with respect to independent claim 1 and dependent claims 8 and 16 of the '932 Patent.[7] Claim 1 claims the following:

> 1.   A method for handling a call having a first message and communications, the method comprising:
>> receiving and processing the first message in a processing system external to narrowband switches to select one of the narrowband switches;
>> generating a second message in the processing system based on the selected narrowband switch and transmitting the second message from the processing system; and
>> receiving the second message and the communications in an asynchronous communication system and transferring the communications to the selected narrowband switch in response to the second message.

As explained below, the Court grants the motion with respect to Comcast, but it denies the motion with respect to TWC.

   1.   COMCAST

In its response to Sprint's motion for summary judgment of infringement with

---

[6]Sprint has not asserted a claim for infringement of this patent under the doctrine of equivalents.

[7]In its reply brief, Sprint withdrew its motion as it relates to Comcast's Cedar Point architecture; thus, Sprint seeks summary judgment of infringement only with respect to Comcast's other accused systems.

respect to this patent, Comcast makes three arguments. <u>First</u>, Comcast argues that it did not infringe this patent claim because its accused "processing systems" (CMS softswitches and the IMS MGCF) are part of the accused "asynchronous communication system" (Comcast's VoIP network). As explained by Comcast's patent expert in his report:

> This means that Comcast's CMS and IMS networks cannot transfer control messaging "from" the processing system "to" the asynchronous communication system, as those same processing systems are within the asynchronous communication system. As a result, it is my opinion that Comcast's CMS and IMS Networks do not meet this element of claim 1 of the '932 patent, and therefore cannot infringe it or claims 8 and 16 which depend from this claim.

The Court addressed this argument in its claim construction order. *See Comcast*, 2014 WL 5089402, at *27-28. Defendants asked the Court to construe the terms "transmitting", "transferring", and "receiving" in various patents to include the limitation that the transmitting element cannot be "part of" the receiving element (and vice-versa). *See id.* at *27. The Court noted that a statement from the Group 1 specification that a processing system could be integrated into the packet-based network "suggest[ed] an intent not consistent with defendants' 'not part of' limitation." *See id.* at *28. The Court concluded as follows:

> In light of that suggestion from the specification and in the absence of any intrinsic or extrinsic evidence supporting defendants' position, the Court is unwilling to impose such a limitation. Nor does the Court agree with defendants that, under the plain meaning of these terms, one device could not transfer or transmit or send something to an element contained in the device or to an element of which that device is a part. (As one simple example, one's smartphone might send itself an e-mail or text.)

> Without a more specific argument, based not on the general meaning of these terms but based instead on the specific transferring and receiving elements—an analysis not undertaken by defendants here—the Court cannot conclude that the plain meaning of these terms in these patent claims requires the limitation urged by defendants.  Moreover, it is not clear what it means if one system or element "is not part of" another in the context of this technology, and thus defendants' construction could cause confusion for the jury.  Accordingly, the Court rejects this proposed construction by defendants.

*See id.*

Comcast argues that the Court's prior ruling, in which it addressed these terms in the abstract, does not foreclose its present argument based on the specific elements in Comcast's accused system.  The argument by Comcast and its expert, however, does not go beyond merely arguing as a conceptual matter that a message to the asynchronous communication system (ACS) must be outside of the ACS at some point (as would occur in the Court's example of a smartphone sending itself an e-mail or text), and that it cannot infringe because the accused Comcast processing system is a part of the accused Comcast ACS.

The Court rejects this argument once again.  The evidence is undisputed that in Comcast's system, the accused "second message" is sent from the accused processing system to a particular element (media gateway) within the VoIP network (the accused ACS).  Thus, Comcast's system meets the plain language of the claim, which does not require transmission "to" the ACS or recipt "by" the ACS (as Comcast's expert seems to assume), but rather requires only receipt of the message "in" an ACS.  There is no basis in the text for requiring that the message come from outside the ACS in Comcast's

case, and as previously noted by the Court, the patent's specification supports a construction that allows the processing system to be part of the ACS. Thus, the Court rejects this asserted basis for non-infringement as a matter of law.

Second, Comcast argues that it does not infringe claim 1 of the '932 Patent because its accused processing system does not process to select a narrowband switch, as required in the first step of the claim; and because no such switch is selected by its system, its second message cannot be "based on the selected narrowband switch," as required in the second step of the claim. Specifically, Comcast's expert opined in his report that although Comcast's accused processing systems select a media gateway and trunk group, the network has no actual knowledge of the switch on the other end of the connection in outbound calls from Comcast's system.

The Court rejects this argument as well. It is undisputed that in Comcast's system, the accused processing system selects a trunk group, and that trunk group is associated with a media gateway and a destination point code (DPC). Comcast's Rule 30(b)(6) witness conceded in his deposition that the DPC identifies and correlates to a switch on the PSTN (the end point for the call), that the PSTN switches are narrowband, and that all outbound calls leave the media gateway and go to a narrowband switch. Comcast argues that its system does not know which switch will be on the other end, and that the system therefore does not select the switch. According to Comcast's witness, however, the selection of the trunk group means that a particular narrowband switch will be used on the other end. Thus, the selection of a trunk group inevitably results in a

particular narrowband switch being chosen for use.  There is no requirement in the claim that the processing system must have a certain knowledge of the selected narrowband switch.  Indeed, the specification is not consistent with any such limitation, as it makes clear that  the selection of an element and the selection of a connection may be synonymous if the selection of one inevitably means the selection of the other, and that the selection process may be distributed among the processing system and the elements.  ('932 Patent, at 7:10-21.)  In Comcast's case, the selection of the trunk group inevitably means the selection of a narrowband switch; thus, Comcast's processing system at least participates in the selection of a narrowband switch.  *See Comcast*, 2014 WL 5089402, at *15 (construing "processing . . . to select" to mean "processing . . . to participate in the selecting").  The Court thus rejects this argument for non-infringement by Comcast as a matter of law.[8]

Third, Comcast argues that it cannot infringe these claims because the accused ACS identified by Sprint's expert—Comcast's VoIP network—is not actually asynchronous.  Comcast did not timely make such an argument for non-infringement of these claims, however.  Comcast's expert confirmed in his deposition that his opinions

---

[8]Comcast also submits one page of the report by Sprint's expert, in which, in distinguishing prior art (in giving an opinion concerning invalidity), he noted that selection of a narrowband switch and selection of an element for egress is not the same thing.  That may certainly be the case, for instance if the element is associated with a number of switches.  In this case, Comcast's corporate witness confirmed that the selection of a trunk group necessarily results in the selection of a particular narrowband switch.

concerning non-infringement of the '932 Patent were limited to the two arguments addressed above, and Comcast did not state such a position in response to Sprint's interrogatory requesting Comcast's non-infringement contentions. Comcast notes that in its interrogatory answer it stated that Sprint had not identified an ACS in its infringement contentions. Comcast has not indicated that it supplemented this answer after learning of the accused ACS from Sprint's expert, however. The Court will not permit the parties to make infringement arguments at this stage that it did not make during discovery; accordingly, the Court will not consider this argument for non-infringement relating to the ACS.[9]

Because the Court rejects Comcast's non-infringement arguments, and because Sprint has provided evidence supporting its infringement claims, no issue of material fact remains for trial, and the Court therefore grants Sprint's motion for summary judgment of infringement by Comcast of the accused claims of the '932 Patent, specifically with respect to Comcast's systems other than the Cedar Point architecture.

## 2. TWC

Sprint also seeks summary judgment against TWC, arguing that TWC's system infringes these claims of the '932 Patent as a matter of law. The Court concludes that questions of fact remain for trial with respect to infringement of particular parts of these claims, and it therefore denies the motion.

---

[9]The Court does note that Comcast's expert testified that Comcast's VoIP network is asynchronous.

26

TWC argues that the accused ACS—TWC's VoIP network—is not asynchronous. In its claim construction order, the Court (as it did in *Vonage* and *Big River*) declined to construe the term "asynchronous communication system." *See Comcast*, 2014 WL 5089402, at *20. The Court noted that in *Vonage* it had stated that one skilled in the art would understand an "asynchronous" communication to be "one in which the transmitting and receiving devices do not share a common clock." *See id.* (citing *Vonage*, 500 F. Supp. 2d at 1318-19). TWC's expert has opined that the VoIP network is not an ACS because at least some portions of that network use synchronous communication.

Sprint takes issue with TWC's expert's opinion that, for a network to be an ACS, every link in the path used by a communication must be synchronous. The parties have not cited any intrinsic or extrinsic evidence to support a particular construction, however, and thus the Court does not treat this issue as one of claim construction. TWC has provided evidence, in the form of expert opinion, to support the position that one skilled in the art would not consider the accused ACS in fact to be asynchronous. That evidence is sufficient to create a question of fact for trial on the issue, and therefore Sprint is not entitled to summary judgment of infringement of this patent.[10]

---

[10]Sprint characterizes TWC's argument concerning the existence of a common clock throughout TWC's VoIP network as "new". TWC's expert discussed the use of a common clock in at least one portion of the network, and he stated that at least portions of the network include the use of synchronous communications. Thus, TWC clearly preserved the right to assert that the accused ACS is not asynchronous. Sprint did not

(continued...)

The Court also concludes that a question of fact remains for trial with respect to TWC's argument that its system does not transfer communications to the narrowband switch "in response to" the second message, as required in the third step of claim 1. In declining to construe this term in this case, the Court rejected defendant's proposed limitation requiring the action to have been taken immediately. *See id.* at *25. The Court stated:

> Defendants only argument is that immediacy is implied by the claims because otherwise the claims could have stated merely that one action precedes another, and that the use of the phrase "in response to" suggests that something more is required. Under the plain and ordinary meaning of this phrase, however, that "something more" is the concept of causation. There is no basis to add any temporal limitation to these claims.

*See id.*

TWC's expert opines that the voice communications are not sent in response to the messaging in TWC's system. Sprint cites evidence that the transfer cannot occur without information from the second message. The Court agrees with TWC, however, that the requirement of a second message as a predicate act does not necessarily mean that the communications were transferred "in response to" the message, in the sense of requiring some element of causation. Thus, the fact that a message must be received first does not establish the requisite causation as a matter of law. TWC has provided

---

[10](...continued)
cite to TWC's answer to a contention interrogatory, and thus the Court cannot determine the extent to which any specifics of that argument were not raised previously.

evidence that there is no such causation here.  Therefore a question of fact remains for trial on this issue, and summary judgment is not appropriate for that reason as well.

The Court briefly addresses TWC's other non-infringement arguments asserted in response to Sprint's motion.  Like Comcast, TWC argues that its system does not infringe because the accused processing system is part of the accused ACS, and the Court rejects that argument for the same reasons stated above.  Like Comcast, TWC also argues that although its processing system selects a trunk group, there is no selection of a narrowband switch.  As it did with respect to Comcast, the Court rules that such a selection does take place if the selection of the trunk group inevitably results in the selection of a narrowband switch.  The Court leaves for trial whether such a result is inevitable in TWC's case.  Finally, the Court rejects TWC's summary argument that because its accused processing system (BTS access tandems) are in fact narrowband switches, they are not "external to narrowband switches" as required in the first step of claim 1.  In its claim construction order, the Court rejected defendants' argument (relating to indefiniteness) that it was "not clear whether the processing system must be external to *all* narrowband switches, or whether the processing system may be contained in one narrowband switch and select from other switches to which it is external."  *See id.* at *24.  The Court held that the claim was "clearly limited to a processing system (wherever located) that is in a location external to the switches (those forming the network) from which the processor chooses."  *See id.*  Thus, as previously ruled, the fact that the accused processing system may be a narrowband switch does not mean that there

29

can be no infringement here.

## IV.   Equitable Estoppel

In both cases, both sides seek summary judgment on defendants' affirmative defense of equitable estoppel.  Because it concludes that genuine issues of material fact remain for trial, the Court denies all of the motions with respect to the defense of equitable estoppel.

A patent infringement suit may be barred if the following three elements are established by the defendant:

> (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*See High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) (quoting *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013)).  The alleged infringer bears the burden of proof on this defense.  *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 767 F.3d 1339, 1343 (Fed. Cir. 2014) (alleged infringer must prove elements by a preponderance of the evidence), *aff'd after reh'g en banc*, 807 F.3d 1311 (Fed. Cir. 2015) (adopting reasoning of panel concerning equitable estoppel), *cert. granted*, 136 S. Ct. 1824 (2016) (on issue relating to defense of laches).  "[E]quitable estoppel is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules."  *See A.C. Aukerman Co. v. R.L. Chaides*

*Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (*en banc*).  The elements of equitable

estoppel present questions of fact.  *See SCA Hygiene*, 767 F.3d at 1344.

> A.   *Misleading Conduct*

With respect to the first element, defendants must show that Sprint engaged in

misleading conduct from which they reasonably inferred that Sprint did not intend to

enforce its patents against them.  The Federal Circuit discussed this element as follows

in *Aukerman*:

> The first element of equitable estoppel concerns the statements or
> conduct of the patentee which must communicate something in a
> misleading way.  The "something" with which this case, as well as the vast
> majority of equitable estoppel cases in the patent field[,] is concerned[] is
> that the accused infringer will not be disturbed by the plaintiff patentee in
> the activities in which the former is currently engaged.  The patentee's
> conduct must have supported an inference that the patentee did not intend
> to press an infringement claim against the alleged infringer.  It is clear,
> thus, that for equitable estoppel the alleged infringer cannot be
> unaware—as is possible under laches—of the patentee and/or its patent.
> The alleged infringer also must know or reasonably be able to infer that
> the patentee has known of the former's activities for some time.  In the
> most common situation, the patentee specifically objects to the activities
> currently asserted as infringement in the suit and then does not follow up
> for years.   . . . Judge Learned Hand noted that estoppel was regularly
> based on no further assurance that a known competitor would not be sued
> than the patentee's long inaction.  There is ample subsequent precedent
> that equitable estoppel may arise where, coupled with other factors, a
> patentee's "misleading conduct" is essentially misleading *inaction*.
> However, plaintiff's inaction must be combined with other facts respecting
> the relationship or contacts between the parties to give rise to the
> necessary inference that the claim against the defendants is abandoned.

*See Aukerman*, 960 F.2d at 1042 (footnote, citations, and internal quotations omitted).

"[S]ilence alone will not create an estoppel unless there was a clear duty to speak, or

somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *See id.* at 1043-44 (citation omitted). "If the record indicates silence alone, mere silence must be accompanied by some *other* factor which indicates that the silence was sufficiently misleading as to amount to bad faith." *See High Point*, 817 F.3d at 1330 (internal quotations omitted) (quoting *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992)). "To justify summary judgment of equitable estoppel, any inference that a patentee made a misleading communication by omission or acquiescence must be the *only* possible inference from the evidence." *See SCA Hygiene*, 767 F.3d at 1350 (quoting *Aukerman*, 960 F.2d at 1044).

In *SCA Hygiene*, in which the Federal Circuit reversed a summary judgment of equitable estoppel in favor of the defendant, the court discussed and distinguished two of its prior patent cases in which equitable estoppel had been found. *See id.* at 1349-50 (citing *Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469 (Fed. Cir. 1998), and *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305 (Fed. Cir. 2010)). The court noted that in *Scholle*, the patentee did not respond to direct requests for an opinion on the product, and the parties had discussed the particular patents; and that in *Aspex*, the parties had been involved in a related patent litigation, the patentee threatened to enforce its patent rights under four patents after the accused infringer began marketing a redesigned product, the accused sought specific infringement contentions, and the patentee responded only concerning two of the four patents. *See id.* The Federal Circuit

then distinguished the prior cases by noting that the interactions between the parties in its case were "meager" compared to those in the prior cases, being limited to six terse letters; that the accused infringer had not solicited comment from the patentee (which made it less likely that a reasonable juror would infer that the subsequent silence misled the accused infringer); that the parties had not engaged in serious discussions involving the products or the patent at issue or any related patent; and that the parties had not been adversaries in prior related litigation or had any other close relationship. *See id.* at 1350.

The Court first addresses Sprint's motions for summary judgment on this defense. In those motions, Sprint attacks only this first element requiring misleading conduct. Sprint argues as a matter of law that defendants cannot establish this element because its contracts with those defendants stated that no patent rights were being given by Sprint. Sprint also cites a 2002 bid to Comcast in which it stated that no patent rights would be transferred, and cites references to its patents in comments to TWC in 2010.

The Court rejects this argument. Although the language in the contracts and the bid might provide relevant evidence on whether Sprint misled defendants, the Court cannot conclude that such language is dispositive. The relevant inquiry here is not whether Sprint intended to transfer patent rights, but rather whether Sprint intended to enforce those rights against defendants. Sprint has not cited any authority that would support summary judgment in its favor based solely on such language, and the Court concludes that a reasonable factfinder could find misleading conduct despite the contracts and bid. In addition, the 2010 comments were vague, and a question of fact

remains concerning whether TWC had already relied on Sprint's misleading conduct by that time. The Court therefore denies Sprint's motions for summary judgment on this defense.

In opposition to defendants' summary judgment motions, Sprint argues that equitable estoppel may be found only in an extraordinary case, usually involving a threat of enforcement action followed by a failure to act for a long time. The Court agrees with defendants that the Federal Circuit has not required such a threat, as that court has noted only that the most common example of equitable estoppel involves a threat or objection to the allegedly infringing activities. *See SCA Hygiene*, 767 F.3d at 1349 (citing *Aukerman*, 960 F.2d at 1042). Nevertheless, defendants have not provided evidence that Sprint, prior to a period of inaction, specifically threatened an infringement action or raised a particular objection, and the absence of any such threat or objection does distinguish this case from the usual estoppel case, and makes it less likely that defendants were actually misled by Sprint into believing that Sprint would not enforce its patents against them. In each case, the Court concludes that that absence supports the conclusion that a reasonable factfinder could find in favor of Sprint on this element. Moreover, in *SCA Hygiene*, the court relied on the fact that the contacts in that case were more meager than in the prior cases, which had involved specific communications concerning the patents; similarly, the absence of any such communications in this case suggests that the present facts are also more meager than in the prior cases and weighs against resolving this element in defendants' favor as a matter of law at this stage. The

Court cannot conclude that the facts of these cases regarding the conduct of Sprint is so compelling as to warrant a ruling as a matter of law on this defense.

Defendants rely heavily on *High Point*, in which the Federal Circuit upheld a summary judgment of equitable estoppel granted by another judge in this district. Equitable estoppel is a fact-specific inquiry, however, and that ruling therefore does not compel summary judgment in this case. *High Point* may certainly be distinguished, as in that case the parties had previously executed a license that covered the patents-in-suit, and the patentees provided the defendant with the allegedly infringing equipment. *See High Point*, 817 F.3d at 1330-31. Those facts are more compelling than those in the present cases, and the Court concludes that in each case before it, questions of fact preclude summary judgment.

The Court briefly addresses each particular case. In addition to Sprint's silence, TWC cites its VoIP-related contracts with Sprint; Sprint's assistance and encouragement related to TWC's VoIP activities; evidence suggesting Sprint's knowledge of activities that (under Sprint's infringement position in this case) constituted infringement by TWC many years prior to this suit; and testimony by Sprint employees that it delayed suit in the hope of conducting business with TWC. The Court cannot conclude, however, that the only possible inference from the evidence is that Sprint misled TWC. Sprint did not threaten an infringement action or object to TWC's activities, and the parties did not discuss the patents. Sprint also disputes the extent of its encouragement and the business it conducted with TWC, as well as its awareness of possible infringement by TWC, and

the Court concludes that such issues present questions of fact for trial. Sprint also cites its contracts with TWC (in which no intellectual property rights were transferred), its press releases, and a 2007 statement sent to TWC regarding Sprint's infringement litigation, in which Sprint indicated that companies would need licenses and that Sprint would enforce its patents.

Comcast relies on its business relationship with Sprint from 2003 to 2010, including with respect to VoIP services; the fact that Sprint sued others but not Comcast; and that Sprint won two bids with Comcast without revealing any potential infringement issues. The parties did not discuss the patents, however, and although one bid asked Sprint to identify any patent issues with particular vendors, it did not ask about patent issues with Comcast. Sprint again points to its contracts (which did not grant patent rights), its press releases, the fact that it was suing cable companies for infringement, and evidence that Comcast was monitoring that litigation between Sprint and others (which could suggest a belief that Sprint might sue Comcast as well). Viewing the evidence in Sprint's favor, a reasonable factfinder could find that Comcast was not actually misled by Sprint's conduct. Accordingly, defendants' motions for summary judgment on this defense are denied.

B.   _Reliance_

The Court denies summary judgment also because fact questions remain with

respect to the other elements of equitable estoppel.[11]  "The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action." *See Aukerman*, 960 F.2d at 1042-43.  The accused infringer's reliance must be reasonable.  *See SCA Hygiene*, 767 F.3d at 1351.  In *High Point*, the defendant's testimony that it would have acted differently if litigation had been possible was sufficient to establish reliance, but only because of the absence of any evidence that the defendant's proposed solutions to avoid infringement would have been unrealistic or infeasible.  *See High Point*, 817 F.3d at 1331-32.  In *SCA Hygiene*, the court concluded that the defendant's testimony that it would not have made certain investments if suit had been filed earlier did not necessarily establish that it acted after considering the implications of the patentee's silence; and that a fact question remained as to whether the defendant relied on that silence or instead ignored the patent or relied on its own opinion that the patent was invalid.  *See SCA Hygiene*, 767 F.3d at 1351; *see also Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 879 (Fed. Cir. 1991) (accused infringer did not rely on patentee's silence, but instead relied on the existence of its own patents).

---

[11]In its own motion for summary judgment in its case against TWC, Sprint conclusorily states that TWC cannot show reasonable reliance in light of 2010 discussions between the parties.  Those discussions do not foreclose reasonable reliance as a matter of law, however, particularly in light of TWC's argument that it had already relied to its detriment by that date.  The Court rejects Sprint's summary argument on this element.  In its summary judgment reply brief in *Comcast*, Sprint argues this element of reliance, but it failed to challenge this element in its initial summary judgment brief, and the Court therefore will not consider such argument.

Defendants argue that they have satisfied this element as a matter of law, based on their evidence that they had other options or alternatives to pursue if Sprint had alleged infringement earlier. The Court concludes, however, that issues of fact remain for trial concerning this element of reliance. First, if defendants did not actually believe that Sprint would forego enforcement of its patents, they may not have relied on anything Sprint did in deciding whether and how to conduct its business; thus, the same evidence supporting an inference that defendants were not misled supports the reasonable inference that defendants did not take any action specifically in reliance on Sprint's silence. In addition, the Court concludes that the likelihood and feasibility of defendants pursuing other alternatives present questions of fact concerning whether defendants relied to their detriment, particularly in light of Sprint's argument that many of the proffered alternatives would have involved payment to Sprint (just as the present suit seeks a royalty paid to Sprint).

Defendant-specific facts also support denial of summary judgment on this element. For instance, in TWC's case, fact questions remain concerning whether the parties had discussed the patents before TWC's 2010 Go It Alone launch. Sprint has also cited evidence that TWC believed that its contracts with Sprint gave it the right to act as it did, and that TWC prepared for a possible suit by Sprint, in part by monitoring Sprint's litigation against Vonage. Such evidence supports an inference that TWC did not rely on Sprint's conduct concerning its intent to enforce its patents. Similarly, Sprint cites evidence that Comcast's in-house counsel did not believe that it infringed any

38

patents, which could mean that Comcast relied on that opinion instead of on Sprint's conduct. Sprint also cites concessions by at least some Comcast employees that they did not consider any patent issues in deciding how to act. The Court agrees with Comcast that such concessions are not fatal to its equitable estoppel defense; such concessions do raise a question of fact precluding summary judgment on that defense, however.

### C.   *Material Prejudice*

"Equitable estoppel requires that material prejudice to the accused infringer be caused by his reliance on the patentee's misleading communication." *See SCA Hygiene*, 767 F.3d at 1350 (citing *Aukerman*, 960 F.2d at 1028, 1041-42). This prejudice "may be a change of economic position or loss of evidence." *See Aukerman*, 960 F.2d at 1043. Because questions of fact remain concerning reliance, whether defendants suffered detrimental economic impacts that resulted from reliance on Sprint's conduct also presents a question of fact for trial. Defendants also claim evidentiary prejudice, including in the form of lost documents, witnesses who could not recall facts, and the deaths of witnesses. The Court concludes, however, that the extent to which any such loss of evidence resulted from a delay caused by Sprint and the extent to which that loss is material cannot be determined as a matter of law.

### D.   *Weighing of Equities*

"Finally, the trial court must, even where the three elements of equitable estoppel are established, take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the

defense of equitable estoppel to bar the suit." *See Aukerman*, 960 F.2d at 1043; *see also*

*SCA Hygiene*, 767 F.3d at 1343 (quoting *Aukerman*).  Although neither of the defendants

addressed this additional requirement in its motion for summary judgment, or explained

why the equities weigh in its favor as a matter of law, Sprint did address this issue in its

opposition to TWC's motion.  Sprint cites allegedly inequitable conduct by TWC,

including TWC's alleged recruitment of key Sprint employees and allegedly misleading

statements by TWC in certain negotiations.  TWC disputes that evidence.  The Court

concludes, however, that the equities are best weighed after consideration of all of the

evidence at trial.  Thus, the required weighing of equities provides another basis for the

denial of TWC's motion for summary judgment on its equitable estoppel defense.


### V.    Laches

In both cases, defendants seek summary judgment in their favor on the affirmative

defense of laches.  The Court concludes that questions of fact remain for trial in each

case with respect to this defense, and it therefore denies the motions for summary

judgment on the issue of laches.

In *SCA Hygiene*, the Federal Circuit summarized its law on this defense as

follows:

> Laches is an equitable defense to patent infringement that may arise
> only when an accused infringer proves by a preponderance of evidence
> that a patentee (1) unreasonably and inexcusably delayed filing an
> infringement suit (2) to the material prejudice of the accused infringer.  If
> these prerequisite elements are present, a court must then balance all

pertinent facts and equities, including the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability before granting relief.    When found, laches bars retrospective relief for damages accrued prior to filing suit but does not bar prospective relief.

Delays exceeding six years give rise to a presumption that the delay is unreasonable, inexcusable, and prejudicial.  Under this presumption, the burden of evidentiary production shifts from the accused infringer to the patentee.    Both of these presumptions disappear if the patentee can identify evidence sufficient for a reasonable jury to conclude either that the delay was excusable or not unreasonable, or that it was not materially prejudicial.  If the patentee meets this burden of production, the accused infringer must prove both elements of laches by a preponderance of evidence.

*SCA Hygiene*, 767 F.3d at1343 (citations and internal quotations omitted).[12]

Defendants argue that the laches presumption arises here because Sprint delayed for more than six years before filing these suits in December 2011.  As an initial matter, Sprint argues that, because the laches period with respect to a particular patent does not begin until the patent has issued, *see Aukerman*, 960 F.2d at 1032, no presumption arises with respect to the '6,561 Patent, which issued in 2007.  Defendants point out, however,

---

[12]In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014), the Supreme Court held that, in the face of a statute of limitations enacted by Congress, the defense of laches was not available to bar legal relief in a copyright suit.  *See id.* at 1974.  The Court noted that it had not had occasion to review the Federal Circuit's position that laches is an available defense in a patent suit despite the application of a statute of limitations.  *See id.* at 1974 n.15 (citing *Aukerman*, 960 F.2d at 1029-31).  In *SCA Hygiene*, in a 6-5 decision upon rehearing *en banc*, the Federal Circuit held that laches remains a defense to legal relief in a patent suit, in spite of the decision in *Petrella.  See SCA Hygiene*, 807 F.3d at 1315.  Thus, the Court considers defendants' laches defense in this case.  The Court notes, however, that the Supreme Court has granted certiorari in *SCA Hygiene* and thus will review the Federal Circuit's decision to recognize laches as a valid defense in patent infringement actions.  *See* 136 S. Ct. 1824 (2016).

that that patent is a continuation patent, with a priority date based on the issuance of a prior patent. The Court agrees with the reasoning of those courts that have held that, because laches is intended to prevent a patentee from sleeping on its rights, fairness requires use of the original issuance date for purposes of laches as applied to a continuation patent. *See LendingTree, LLC v. Zillow, Inc.*, 2014 WL 1309305, at *12 (W.D.N.C. Mar. 31, 2014); *Medinol Ltd. v. Cordis Corp.*, 15 F. Supp. 3d 389, 403-04 (S.D.N.Y. 2014); *see also SCA Hygiene*, 767 F.3d at 1345 & n.4 (reexamination proceedings did not "toll" laches period, but were better considered as a justification that could excuse the delay). Thus, for purposes of applying the presumption, all of the relevant patents were issued more than six years before these suits were filed.

Sprint also argues that any period of delay should be deemed ended when it told defendants that a license would be required. The Court rejects this argument, however, as the Federal Circuit has been clear that the presumption arises in the event of a delay of six years prior to filing suit. *See Aukerman*, 960 F.2d at 1035 (discussing the "presumption of laches arising for a more than six-year delay in filing suit"); *SCA Hygiene*, 767 F.3d at 1343, 1345 (laches element is delay in filing suit; presumption applied there because of six-year delay in filing infringement claims); *Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1003 (Fed. Cir. 2016) (relevant inquiry for laches turns on the time litigation is initiated).

The Court then considers whether the presumption should be applied in these cases at this stage. The presumption arises "upon proof that the patentee delayed filing

suit for more than six years after actual or constructive knowledge of the defendant's infringing activity." *See Aukerman*, 960 F.2d at 1035-36.

> As an initial response to the defendant's evidence of at least a six-year delay, a patentee may offer proof that the delay has not in fact been six years—that is, that the time it first learned or should have known of the infringement after the patent issued was within six years. If a patentee is successful on this factual issue, no presumption arises.

*See id.* at 1038 (footnote and citation omitted); *see also Wanless v. Fedders Corp.*, 145 F.3d 1461, 1464 (Fed. Cir. 1998) (reversing summary judgment of laches; district court erred in applying the presumption because there were issues of fact as to whether the patentee knew or reasonably should have known of the defendant's allegedly infringing activity before the critical date).

The Court concludes in both cases that application of the presumption at this stage is precluded by factual issues concerning when the defendant first infringed and when Sprint knew or should have known of such infringement. The technology is complex in these cases, and it would not be a simple matter to determine whether these defendants' activities infringed particular patent claims. *See Wanless*, 145 F.3d at 1464 n.2, 1467 (noting that infringement could not be determined based solely on a particular diagram, and that the accused product would need to be tested to determine if it actually infringed; distinguishing case in which infringement was apparent from simply looking at the accused device). A reasonable trier of fact could find that Sprint did not have actual or constructive knowledge of infringement before December 2005 in any of these cases.

In its particular case, TWC argues in a single sentence in its initial brief that

Sprint had actual knowledge of infringement by TWC in 2003 or 2005; the Court concludes, however, that fact questions remain concerning the similarly of TWC's 2010 Go It Alone product to previous products, whether the previous products actually infringed, and whether Sprint knew or should have known of any such infringement. Similarly, the Court the cannot conclude as a matter of law that Sprint knew or should have known of actual infringement by Comcast prior to December 2005.

Accordingly, the Court will not apply the presumption at this stage. Even if it did apply here, however, the Court would conclude that Sprint has produced evidence to rebut the presumption.

> Once a presumption of laches arises, the patentee may offer proof directed to rebutting the laches factors. Such evidence may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both. By raising a genuine issue respecting either factual element of a laches defense, the presumption of laches is overcome.

> Thus, the presumption of laches may be eliminated by offering evidence to show an excuse for the delay or that the delay was reasonable, even if such evidence may ultimately be rejected as not persuasive. Such evidence need only be sufficient to raise a genuine issue respecting the reasonableness of the delay to overcome the presumption. . . .

> A patentee may similarly eliminate the presumption with an offer of evidence sufficient to place the matter of defense prejudice and economic prejudice genuinely in issue.

*See Aukerman*, 960 F.2d at 1038 (citations omitted). Sprint has produced evidence to support its arguments that its delay was reasonable and that defendants did not suffer material prejudice. Whether or not it ultimately proves persuasive at trial, such evidence

is sufficient to rebut any presumption at this stage.  Moreover, if no presumption applies (as is the case here), such evidence prevents defendants from being able to establish the elements of laches as a matter of law at this stage.

With respect to the reasonableness of the delay, a patentee's excuses might include other litigation, negotiations with the accused, or the extent of the infringement. *See id.* at 1033; *see also SCA Hygiene*, 767 F.3d at 1345 ("Reasonable explanations for delay include attempts to enforce the patent, such as filing suit against another infringer . . . .").  "The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant."  *See Aukerman*, 960 F.2d at 1033.

> However, there can be no rigid requirement in judging a laches defense that such notice *must* be given.  If a defendant is, for example, aware of the litigation from other sources, it would place form over substance to require a specific notice.  Where there is prior contact, the overall equities may require appropriate notice . . . .  However, a notice requirement is not to be rigidly imposed . . . .

*See id.* at 1039; *see also SCA Hygiene*, 767 F.3d at 1346 ("A patentee is not required in all cases to provide notice of related proceedings involving the asserted patent to show its delay was not unreasonable.") (citing *Aukerman*); *Lismont*, 813 F.3d at 1005 (with respect to the defendant's notice of other litigation by the patentee, what is important is whether the defendant had reason to believe it was likely to be sued or was in fear of suit by the patentee).

In this case, it is undisputed that Sprint was involved in litigation from 2005 to 2009 in which it attempted to enforce various patents, including patents at issue in these

suits, against various companies, including Vonage and Big River.  Those suits were widely publicized, and Sprint issued press releases about the suits and its intent to enforce its patents against infringers.  Sprint has submitted evidence that defendants actually monitored the prior cases, and a reasonable factfinder could infer from the evidence that those defendants prepared for and anticipated suits against them. Defendants argue that their prior contacts with Sprint required Sprint to provide specific notice to them that it intended to enforce its patents against them at the conclusion of the other lawsuits.  As the Federal Circuit has made clear, however, there is no rigid rule requiring a specific notice, and in light of the facts (as viewed in Sprint's favor) concerning defendants' actual knowledge of the prior cases and concerning Sprint's press releases, the Court cannot conclude that any other notice was required as a matter of law.  Again, this justification for delay need not ultimately carry the day at trial; Sprint's evidence concerning such litigation is sufficient to rebut any presumption and to create a fact question concerning the laches defense.

The same is true with respect to the element of material prejudice.  "Such prejudice may be either economic or evidentiary."  *See Aukerman*, 960 F.2d at 1033.

> Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.  Such damages or monetary losses are not merely those attributable to a finding of liability for infringement.  Economic prejudice would then arise in every suit.  The courts must look for a *change* in the economic position of the alleged infringer during the period of delay.

*See id.* (citations omitted).  A nexus is required between the economic prejudice and the

46

delay—the prejudice must have resulted from the delay. *See SCA Hygiene*, 767 F.3d at 1347. "[E]conomic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve." *See Aukerman*, 960 F.2d at 1033. The Court concludes in this case that a fact question remains concerning defendants' claims of prejudice. For example, a reasonable factfinder could find that defendants acted purely for business reasons, such that they would not likely have abandoned the allegedly infringing activities or engaged in non-infringing alternatives. The Court also concludes that fact questions remain concerning whether any loss of evidence resulted from the delay and whether any such loss is material.

Finally, even if a defendant establishes the factual prerequisites of the defense of laches, relief is not automatic; rather, "courts should grant relief for laches only after balancing all pertinent facts and equities, including the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability." *See SCA Hygiene*, 767 F.3d at 1348 (internal quotations omitted) (quoting *Aukerman*, 960 F.2d at 1034). In these cases, even if defendants had established the factual elements for laches, the Court in its discretion would not grant relief at this stage, in view of its obligation to weigh all facts and equities. Those matters are best considered after presentation of all evidence at trial. For all of these reasons, summary judgment is not appropriate in favor of defendants on the affirmative defense of laches, and the Court thus denies their motions to that extent.

## VI.    **Express License**

Sprint seeks summary judgment on TWC's affirmative defense of an express license.  The Court grants the motion.

TWC argues that Sprint granted it an express license to practice the technology covered by the patents-in-suit in a 2006 agreement between Sprint and TWC (which superseded a 2003 agreement between the parties with substantially similar terms).  In that agreement, Sprint agreed to provide certain services, including PSTN interconnect services, to facilitate telephony services provided by TWC to its customers.  TWC argues that those telephony services facilitated by the 2006 agreement are the same services that are the target of Sprint's infringement claims.  TWC particularly relies on Section 5.2   of the 2006 agreement, which provided that upon expiration of the agreement, Sprint would reasonably assist TWC in transitioning all aspects of Sprint's services to TWC itself or to another vendor, for a period no longer than 18 months.  Under that provision, TWC would continue to pay Sprint for its contract services and would also pay for additional transition assistance at a consulting rate.  TWC argues that by that provision, Sprint effectively authorized TWC to "go it alone" without Sprint—which it did after expiration of the agreement in 2010 in offering its "Go It Alone" services to customers.  TWC argues that nothing in the 2006 agreement allows Sprint to prevent TWC from Going It Alone, including by way of a patent infringement

suit.[13]

The Court concludes as a matter of law, however, that the 2006 agreement did not grant TWC an express license to practice Sprint's patents. There is no language in the agreement stating or even suggesting that Sprint was granting TWC a patent license. TWC essentially seeks to infer a license from the transition services provisions, which it argues authorized it to practice this technology without Sprint. Those provisions, however, did not actually authorize TWC to do anything, but rather required Sprint to provide certain services during the transition to another vendor or to TWC itself. Thus, *another* inference is required to reach the licensing intent argued by TWC. While the reasonableness of such inferences may be relevant to an implied license defense, they represent the antithesis of an express license. The 2006 agreement is unambiguous in the sense that it did not *expressly* grant TWC a license. TWC has provided no authority suggesting that an express license may arise from language that does not actually grant a license. *Cf. State Contracting & Eng'g Corp. v. State of Fla.*, 258 F.3d 1329, 1339-40 (Fed. Cir. 2001) (reversing summary judgment based on express license defense; "[m]ost significantly, the section [in the contract] did not explicitly convey any patent rights . .

---

[13]Although it did not identify any other provisions in its answer to Sprint's contention interrogatory concerning this defense, TWC also now relies on the agreement's exclusivity exemptions, to show the parties' understanding that TWC was already going it alone without Sprint in certain areas; and on the agreement's statement that no license was granted to Sprint's trademarks or name, to show that the parties knew how to deny a license in the agreement. Consideration of these additional bases for its defense, however, does not alter the Court's conclusion that the agreement does not provide an express license here.

.").  The Court therefore rejects this defense as a matter of law, and it grants Sprint summary judgment on TWC's affirmative defense of express license.

## VII.  Implied License

Sprint moves for summary judgment on the affirmative defense of implied license asserted by both TWC and Comcast.  The Court grants the motion with respect to TWC, but it denies the motion with respect to Comcast.

### A.  *TWC*

"An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel."  *See Winbond Elec. Corp. v. ITC*, 262 F.3d 1363, 1374 (Fed. Cir. 2001) (citing *Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997)), *opinion corrected*, 275 F.3d 1344 (Fed. Cir. 2001).  In this case, TWC has specifically asserted the defense of implied license by legal estoppel.  In *Wang*, after discussing implied license by equitable estoppel, the Federal Circuit defined this doctrine as follows: "Legal estoppel refers to a narrower category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted."  *See Wang*, 103 F.3d at 1581; *accord TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1279 (Fed. Cir. 2009) (quoting *Wang*).  The court in *Wang* further noted that "judicially implied licenses are rare under any doctrine."  *See Wang*, 103 F.3d at 1581.

TWC argues that Sprint is legally estopped to deny an implied license because in

the parties' contracts Sprint granted TWC the right to go it alone without Sprint, and by its patent infringement suit Sprint now seeks to derogate from that right. The Court rejects this argument. As concluded above, Sprint did not grant an express license to TWC in the contracts, and in fact the transition services provisions did not contain any affirmative grant of authority to TWC. Thus, TWC cannot meet this doctrine's requirement of a license or assignment of a particular right to the defendant. The cases from the Federal Circuit indicate that a patent license or assignment is required for application of this defense. For instance, in *Wang*, the jury found that the plaintiff had granted the defendant a right to use the invention, for which the defendant supplied valuable consideration, but the court allowed only an implied license by equitable estoppel, stating that such conduct "falls short of the express licenses or assignments usually discussed in conjunction with legal estoppel." *See id.* at 1582. In *Winbond*, the court rejected a defense of implied license through legal estoppel because no license under the patent had been granted. *See Winbond*, 262 F.3d at 1375. In *Endo Pharmaceuticals Inc. v. Actavis, Inc.*, 746 F.3d 1371 (Fed. Cir. 2014), the Federal Circuit confirmed the limited scope of the doctrine under *Wang* and *TransCore*, and it rejected such a defense where there was no direct relationship between an expressly licensed patent and the patent asserted in the suit. *See id.* at 1378.

TWC has not cited any authority suggesting that this defense may apply without an express patent license or assignment, and in the absence of such authority, the Court will not expand the defense beyond the narrow circumstances in which the Federal

Circuit has applied the doctrine. Accordingly, the Court grants Sprint's motion for summary judgment on TWC's implied license defense.

### B. *Comcast*

Comcast, on the other hand, asserts the defense of implied license based on equitable estoppel. The Federal Circuit has set forth the elements of that defense as follows:

> An implied license by equitable estoppel requires proof that: (1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim.

*See Winbond*, 262 F.3d at 1374 (citations omitted). In arguing that it did not impliedly grant a license to Comcast as a matter of law, Sprint makes two arguments, which the Court addresses in turn.

### 1. CONTRACTUAL PROVISIONS

Comcast asserts an implied license arising from conduct by Sprint, including conduct in the negotiation and performance of various contracts between the parties. Sprint argues that those contracts preclude a claim for implied license by equitable estoppel here. Sprint argues that seven such contracts expressly disclaimed any such implied license, but the language is not always so clear. For instance, two 2004 contracts stated that Comcast did not "acquire any claim or right of ownership . . . to any Sprint patents;" a 2005 confidentiality agreement provided that the disclosure of confidential

52

information "shall not constitute any . . . license;" 2005 interconnection agreements for Minnesota and other states granted a limited license to use intellectual property, but provided that "no license in patent . . . is granted to the other Party or shall be implied or arise by estoppel;" and a 2005 alliance agreement provided that the parties did not grant any rights to intellectual property. Comcast responds that none of these contracts stated that no implied license could arise from Sprint's conduct; that it does not claim ownership in any patents; that the confidentiality agreement and alliance agreements did not relate to Comcast's VoIP service (the allegedly infringing service); and that it is not asserting an implied license arising from the interconnection agreements. Sprint relies most heavily on a 2005 services agreement, which provided that "[n]o other right or license to use the . . . patents[] is granted or implied by this Agreement." Comcast points out, however, that there are no patents identified in that agreemeent, and it argues that it could not have bargained away any particular patent licenses at that time because it had no knowledge of Sprint's patents then.

In citing these agreements, Sprint relies on a statement by the Federal Circuit that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *See Atlas Corp. v. U.S.*, 895 F.2d 745, 754-55 (Fed. Cir. 1990). Sprint argues that Comcast has not shown that these agreements are entirely unrelated to the asserted implied license, which license is therefore precluded by its absence from the agreements. The Court is not persuaded, however, that that statement from *Atlas* bars

Comcast's implied license defense. *Atlas* was not a patent case, and it involved a claim for breach of an implied-in-fact contract. *See id.* In that case, the parties' express contract addressed the pay the plaintiff was to receive, and thus the court held that the parties could not have had an implied-in-fact contract addressing the same subject, namely, some element of pay to the plaintiff for work under the contract. *See id.* The court thus addressed a legal claim; it did not address the equitable defense of an implied license arising from equitable estoppel. *See id.* Therefore, *Atlas* does not compel the conclusion that the presence of an express contract precludes assertion of this defense.

Sprint also cites *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201 (D. Del. 2001), in which the court cited the above statement from *Atlas* in rejecting an implied patent license claim. *See id.* at 213 (citing *Atlas*, 895 F.2d at 754-55). That court, however, did not apply the Federal Circuit's analysis for the defense of an implied license based on equitable estoppel. *See id.* In that case, one section of the parties' agreement included an express patent license, and the court therefore rejected the defendant's argument that another section of the same agreement implicitly contained a broader license. *See id.* There is no such express license in this case that would preclude the assertion of a broader implied license arising from the same contract.

Thus, the Court is not persuaded that the mere existence of other contracts that may deal with the same subject necessarily precludes the assertion of an implied license by equitable estoppel, arising from Sprint's conduct, as a matter of law. *See Ortho Diagnostic Sys. Inc. v. Miles Inc.*, 865 F. Supp. 1073, 1080 (S.D.N.Y. 1994) (denying

plaintiff's motion for JNOV on implied license defense despite an express license agreement stating that no other license was granted under any other patent).  Moreover, even if the *Atlas* rule did apply here, a question of fact would remain for trial concerning whether the parties' contracts addressed the same subject as the asserted implied license.

Sprint also relies on the contracts' integration clauses, arguing that such clauses extinguished any prior statements or conduct on which Comcast may rely for its defense.  Again, however, Sprint has failed to identify any authority from the Federal Circuit that would preclude as a matter of law the assertion of this equitable defense in the face of such a clause.  Sprint cites only *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500 (D. Del. 2008), *aff'd*, 389 F. App'x 1000 (Fed. Cir. 2010), in which the court rejected an implied license defense based in part on an integration clause in a contract between the parties.  *See id.* at 522.  That case is distinguishable, however, as there the defendant asserted an implied license arising from an open license offer and a particular representation, both of which were extinguished by the integration clause.  *See id.*  In this case, Comcast relies on an entire course of conduct by Sprint over a long period of time, including the period after the execution of the parties' contracts.  Moreover, and most significantly, the court in *TruePosition* rejected the implied license defense only after considering the facts as presented at trial; thus, the case does not support rejection of the defense at this stage, when all facts must be weighed in Comcast's favor.  The Court cannot conclude that Comcast's defense is precluded as a matter of law by integration clauses in contracts that do not involve the licensing of any patents.  Accordingly, the

55

Court denies the motion for summary judgment on this defense.

### 2.      KNOWLEDGE OF PATENTS

As an alternative basis for summary judgment on this defense with respect to three patents, Sprint cites the Federal Circuit's requirement that the alleged infringer "have knowledge of the patentee and its patent." *See Winbond*, 262 F.3d at 1374 (citing *Aukerman*, 960 F.2d at 1042.  Sprint argues that Comcast had no knowledge of the '224 Patent, the '918 Patent, and the '6,561 Patent prior to suit, and that Comcast therefore cannot prevail on this defense with respect to those patents.  The Court rejects this argument.

First, in support of this argument, Sprint has cited only an interrogatory answer in which Comcast failed to state that it had knowledge of these patents prior to suit.  The interrogatory at issue was not a contention interrogatory, however; instead the interrogatory asked Comcast to identify when it first learned of the patents-at-issue, and Comcast's answer addressed only certain other patents.  Thus, Comcast's answer was incomplete.  That failure may or may not have been a discovery violation (Comcast claims that it supplemented that answer by a letter sent the same day, although it has not provided that letter), but it does not provide any evidence on the issue of when Comcast learned of these three patents.  Thus, Sprint has not met its initial burden to show an absence of a question of material fact on this issue.

In addition, the '6,561 Patent was a continuation of a patent of which Comcast did have knowledge, and Comcast has provided evidence that it knew generally about

Sprint's portfolio of related patents, even if it did not know all of the particular patents. Thus, a reasonable factfinder could find that Comcast had knowledge of Sprint's patents sufficient to support Comcast's reasonable reliance on conduct by which Sprint allegedly granted Comcast permission to use the technology at issue. Sprint has not cited any authority suggesting that such knowledge is insufficient to satisfy this requirement. *Cf. High Point Sarl v. Sprint Nextel Corp.*, 67 F. Supp. 3d 1294, 1313-14 (D. Kan. 2014) (in addressing equitable estoppel defense, relying on fact that defendant was aware of a portfolio of patents, even if it did not know the patents-in-suit by name or number), *aff'd*, 817 F.3d 1325 (Fed. Cir. 2016). The Court therefore denies summary judgment on this basis.

## VIII.  Acquiescence and Waiver

In summary fashion, Sprint seeks summary judgment on TWC's affirmative defenses of acquiescence and waiver. Sprint argues that, for the same reasons it argued with respect to TWC's license defenses, Sprint did not represent that TWC could practice Sprint's patents and did not relinquish its patent rights. TWC has provided evidence, however, that Sprint engaged in a course of conduct from which TWC reasonably inferred that it could engage in the accused activity. That evidence, when viewed in TWC's favor, is sufficient at least to create a question of fact concerning whether Sprint's conduct supports the defenses of acquiescence and waiver. Accordingly, the Court denies Sprint's motion for summary judgment on these

defenses.[14]

## IX. __Exhaustion__

Sprint seeks summary judgment on TWC's defense of exhaustion. "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *See Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 625 (2008). Thus, "[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *See id.* at 638. TWC argues that Sprint's patent rights have been exhausted with respect to the accused services sold by TWC to its customers because Sprint authorized that sale, both when TWC sold the services with Sprint (with Sprint providing services under the parties' contract) and when TWC sold the services without Sprint (with Sprint providing contractual transition services after termination of the contract).

The Court does not agree, however, that the doctrine of patent exhaustion applies in this situation. In this case, Sprint and TWC had a business relationship in which Sprint provided certain services, and Sprint has accused TWC of infringing its patents

---

[14]In its reply brief, Sprint notes that TWC did not cite a case in its opposition in which the defense of acquiescence has been applied in the patent context. The Court will not address any new argument that the defense is not available in a patent case, however, as Sprint did not make any such argument in its initial brief. Moreover, the Court notes that the Federal Circuit has recognized, as a defense to patent infringement, that an implied license may arise through acquiescence. *See Winbond*, 262 F.3d at 1374.

in providing certain services to customers. Thus, Sprint has accused the party with whom it had the relationship; and in the course of that relationship, Sprint either consented to or authorized the allegedly infringing conduct (as TWC contends, through license, estoppel, laches, acquiescence, or waiver) or it did not. If Sprint did so consent, then those to whom TWC sold products might be protected by patent exhaustion, but this suit does not involve any assertion by Sprint of its patent rights against such downstream parties.

Thus, in *Quanta*, the Supreme Court rejected the patent holder's position that would have allowed downstream purchasers to be liable for patent infringement and would have allowed patent holder to extend their rights to all downstream purchasers. *See id.* at 630-31. TWC cites *In re Katz Interactive Call Processing Patent Litigation*, 2009 WL 8635161 (C.D. Cal. May 1, 2009), in arguing that exhaustion may apply to the sale of services as well as articles. *See id.* at *4-5. In that case, however, the plaintiff patent holder had authorized a third party to sell services to the defendant, who invoked the defense of exhaustion. *See id.* Thus, the defense was not asserted by the party that allegedly received the authorization from the patent holder.

TWC has not responded to this argument, raised by Sprint in its motion, that this doctrine applies only to protect downstream parties, and thus TWC has not explained how the doctrine can apply here to the direct relationship between Sprint and TWC. Nor has TWC cited any case in which the doctrine has been so applied. In the absence of such authority, the Court will not extend the doctrine to circumstances beyond those in

which it has been recognized. Accordingly, the Court grants Sprint's motion for summary judgment on this defense of exhaustion as asserted by Time Warner.

IT IS THEREFORE ORDERED BY THE COURT THAT Sprint's motion for summary judgment in its case against Comcast (Doc. # 884 in Case No. 11-2684) is **granted in part and denied in part**. The motion is granted with respect to Sprint's claim of infringement of the '932 Patent as it relates to Comcast's accused systems other than those using the Cedar Point architecture. The motion is denied with respect to Comcast's defenses of equitable estoppel and implied license.

IT IS FURTHER ORDERED BY THE COURT THAT Sprint's motion for summary judgment in its case against TWC (Doc. # 146 in Case No. 11-2686) is **granted in part and denied in part**. The motion is granted with respect to TWC's defenses of express license, implied license, and exhaustion. The motion is denied with respect to Sprint's claim of infringement of the '932 Patent and TWC's defenses of equitable estoppel, acquiescence, and waiver.

IT IS FURTHER ORDERED THAT defendants' joint motion for summary judgment with respect to the issues of collateral estoppel and invalidity (Doc. # 870 in Case No. 11-2684; Doc. # 130 in Case No. 11-2686) is **denied**.

IT IS FURTHER ORDERED THAT Comcast's motion for summary judgment (Doc. # 880 in Case No. 11-2684) is **granted in part and denied in part**.  The motion is granted with respect to non-infringement of the '918 Patent.  The motion is denied with respect to non-infringement of the '3,561 Patent and the '6,561 Patent, equitable estoppel, and laches.

IT IS FURTHER ORDERED THAT TWC's motion for summary judgment with respect to non-infringement of the '3,561 Patent and the '6,561 Patent, equitable estoppel, and laches (Doc. # 140 in Case No. 11-2686) is **denied**.

IT IS SO ORDERED.

Dated this 5th  day of December, 2016, in Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge