1                   UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

SPRINT COMMUNICATIONS
3 COMPANY, LP,
                                    Docket No. 11-2686
4    Plaintiff,

5    v.
                                    Kansas City, Kansas
6 TIME WARNER CABLE, INC.,          Date:  2/28/2017
ET AL.,
7                                   Volume 11 - AM Session
   Defendants.
8 ........................

9                   TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE JOHN W. LUNGSTRUM
10         SENIOR UNITED STATES DISTRICT COURT JUDGE

11

   APPEARANCES:
12

   For the plaintiff:
13

   B. Trent Webb
14 Peter E. Strand
   Robert H. Reckers
15 Jordan T. Bergsten
   Lauren Douville
16 Ryan Schletzbaum
   Shook, Hardy & Bacon, L.L.P.
17 2555 Grand Boulevard
   Kansas City, MO 64108
18

   For the Defendant:
19

   Terrence J. Campbell        Ron E. Shulman
20 Barber Emerson, LC          Latham & Watkins, LLP
   1211 Massachusetts St.      140 Scott Drive
21 Lawrence, KS 66044          Menlo Park, CA 94025

22 Daniel L. Reisner           Lawrence J. Gotts
   Arnold & Porter Kaye        Latham & Watkins, LLP
23   Scholer, LLP              555 Eleventh Street, N.W.
   250 West 55th Street        Suite 1000
24 New York, NY 10019          Washington D.C. 20004

25

1   APPEARANCES:
    (continued)
2
    Stephanie Grace
3   Jake Ryan
    Latham & Watkins, LLP
4   12670 High Bluff Drive
    San Diego, CA 92130
5

6                         I N D E X

7   Defendant's Witnesses:                                      Page

8    ROBERT DELARGY
       Direct Examination By Ms. Grace                          2402
9      Cross Examination By Mr. Bergsten                        2416
       Redirect Examination By Ms. Grace                        2426
10
     JOSEPH JOHN BANYAS
11     Direct Examination By Ms. Grace                          2430
       Cross Examination By Ms. Douville                        2444
12     Redirect Examination By Ms. Grace                        2454

13   JONATHAN DOUGLAS PUTNAM, Ph.D.
       Direct Examination By Mr. Gotts                          2458
14

15                     E X H I B I T S

16   Plaintiff's
     Exhibits              Offered            Received
17
          628                2453
18
     Defendant's
19   Exhibits              Offered            Received

20      2689                2413                2413
        2860                2408                2408
21      3160*               2443                2443
        3161*               2458                2458
22
    * Denotes demonstrative purposes only.
23

24

25

1                    (Court called to order.)

2                    THE COURT:  All right.  If we're ready to

3     proceed, we'll bring in the jury.

4                    (The jury entered the courtroom, after which

5     the following proceedings were had.)

6                    THE COURT:  You may be seated.  Welcome

7     back, members of the jury.  Time Warner Cable, you may

8     call your next witness.

9                    MS. GRACE:  Thank you, Your Honor.  Time

10    Warner Cable calls Robert Delargy.  Mr. Delargy was

11    TWC's senior director of finance from 2008 to 2016.

12    He's going to testify about TWC's investment in its

13    voice business and Go It Alone.

14                    THE COURT:  All right.  Please turn, face me

15    and raise your right hand.

16                        ROBERT DELARGY,

17    called as a witness on behalf of the Defendant, having

18    first been duly sworn, testified as follows:

19                    THE COURT:  Please state your full name.

20                    THE WITNESS:  Robert Delargy.

21                    THE COURT:  Please spell your full name for

22    the record.

23                    THE WITNESS:  R-O-B-E-R-T, D-E-L-A-R-G-Y.

24                    THE COURT:  Thank you very much.

25    Miss Grace, you may proceed.

11-2686 - Sprint v TWC   2.28.2017 AM Session                    2402

```
 1              MS. GRACE:  Thank you.
 2                   DIRECT EXAMINATION
 3  BY MS. GRACE:
 4      Q.  Please introduce yourself to the jury.
 5      A.  Hello.  I'm Robert Delargy.
 6      Q.  Mr. Delargy, have you ever worked at Time Warner
 7  Cable?
 8      A.  Yes, I have.
 9              THE COURT:  Pardon me a second, Mr. Delargy.
10  That microphone is adjustable.  Get it pretty close to
11  your mouth, please.
12  BY MS. GRACE:
13      Q.  When did you work at Time Warner Cable?
14      A.  February 2008 through December 2016.
15      Q.  What was your title when you worked at Time
16  Warner Cable?
17      A.  Financial director and senior financial director
18  of finance.
19      Q.  What did you do?
20      A.  I did financial planning and analysis for the
21  engineering teams and the information technology teams.
22      Q.  Did you have any responsibilities related to
23  TWC's voice product?
24      A.  Yes.
25      Q.  Do you have any degrees related to your work in
```

1    finance?

2        A.  Yes.

3        Q.  What is your educational background related to

4    finance?

5        A.  I have a degree in accounting from the University

6    of Missouri.

7        Q.  What did you do after you graduated?

8        A.  I worked in public accounting for about three and

9    a half years.

10       Q.  Prior to joining Time Warner Cable, did you have

11   any experience in the telecommunications industry?

12       A.  Yes.  I worked for MCI for about eight years.

13       Q.  I'd like to focus now on your work with respect

14   to TWC's voice business.  What were your day-to-day

15   responsibilities related to voice?

16       A.  I track the head count and the costs related to

17   the head count for the voice engineering and voice

18   planning teams.

19       Q.  Focusing on your work in the 2008 to 2010 time

20   frame, did you track TWC's vendor-related expenses?

21       A.  Yes.

22       Q.  What kind of vendors did TWC have for the phone

23   business?

24       A.  They had vendors that worked on the interconnect

25   connections and connecting TWC to the PSTN, such as

1    Sprint, MCI and Pine Tree.  And then they had vendors

2    that did equipment that was needed for TWC's voice

3    network.  And then they had other vendors that did

4    expenses around providing support for the voice business

5    and doing marketing and strategy for the voice business.

6        Q.  Did there come a time when TWC stopped using

7    interconnect service providers like Sprint?

8        A.  Yes.

9        Q.  When was that?

10       A.  October 2010.

11       Q.  Have you heard that referred to as Go It Alone?

12       A.  Yes, I have.

13       Q.  Okay.  I'd like to talk first about the period of

14   time before TWC went it alone.  As part of your work as

15   financial director in the 2008 to 2010 time frame, did

16   you become familiar with the kinds of investments that

17   TWC made to be able to provide a voice service?

18       A.  Yes, I did.

19       Q.  Can we bring up the demonstrative.

20           Can you explain to the jury what this slide

21   shows?

22       A.  It shows TWC's investments in voice in four

23   categories.

24       Q.  And the first thing bulleted out there is Network

25   Hardware.  Can you explain what you mean by that?

1    A.  That is servers and other network equipment that

2   would be placed into TWC's network for TWC to be able to

3   manage and run its voice business.

4    Q.  If Sprint was providing TWC with voice services,

5   why would TWC have to buy network hardware?

6    A.  Because there was additional network that TWC had

7   outside of what they used with Sprint.

8    Q.  What about Software, what is that?

9    A.  That would be costs for licenses and voicemail

10  costs that were needed for TWC to provide voice services

11  to its customers.

12   Q.  Would that include things like billing software?

13   A.  Yes.

14   Q.  And the network software that you're talking

15  about, is that something that Sprint provided to TWC?

16   A.  Not in the examples we just gave.  Those would be

17  investments outside of the Sprint arrangement with TWC.

18   Q.  What is Facilities Build-Out?

19   A.  That would be where TWC had to augment

20  facilities, add things in the facilities to be able to

21  provide voice services in the geographies that TWC did

22  business in.

23   Q.  And what about Customer Premise Equipment?

24   A.  That would be equipment that would go into

25  customer's homes that was needed to be able to provide

1    the customers with voice services.  So it would be a

2    technician putting equipment into a customer's home so

3    they can connect to TWC and have phone service.

4        Q.  Did Sprint have any role in providing this

5    customer premise equipment or going out to customer's

6    homes to set it up?

7        A.  No.

8        Q.  And in addition to these financial investments

9    that we've talked about, were there other costs

10    associated with TWC's voice product prior to going it

11    alone?

12        A.  Yes.

13        Q.  Can you describe those costs?

14        A.  There were teams within TWC that were engineering

15    and planning teams that reviewed, managed and -- the

16    day-to-day voice network for TWC.  And there were also

17    other teams that worked on strategy for the voice

18    business and developing new strategies on TWC's voice

19    strategy.

20        Q.  Now, I'd like to move to the 2010 Go It Alone

21    project that you referenced earlier.  Did you have any

22    involvement with respect to TWC's Go It Alone project?

23        A.  Yes.

24        Q.  What was your role?

25        A.  I helped keep track of the costs and the related

1    activities that drove costs for the Go It Alone

2    analysis.

3        Q.   Who did you work with on this Go It Alone

4    financial analysis?

5        A.   I worked heavily with Vicki Fiala and her team.

6        Q.   Can you turn to the exhibit marked 2860 in your

7    binder.  Do you recognize this document?

8        A.   Yes, I do.

9        Q.   What is it?

10       A.   It's a annual projection for the Go It Alone

11   project.

12       Q.   Who created this document?

13       A.   I did.

14       Q.   When was it created?

15       A.   Initially it was created in 2010, and then it was

16   refined as time went on.

17       Q.   And what's the date of this particular iteration

18   of -- of the financials?

19       A.   April 7th, 2015.

20       Q.   Did you see this document at or around the time

21   it was created?

22       A.   Yes.

23       Q.   Did you create it in the ordinary course of TWC's

24   business?

25       A.   Yes.

11-2686  - Sprint v TWC   2.28.2017 AM Session                2408

1      Q.   Were the figures in the spreadsheet updated at or

2   near the time the expenses occurred?

3      A.   Yes.

4      Q.   Does TWC keep copies of financial schedules like

5   this in the ordinary course of business?

6      A.   Yes.

7      Q.   And how does TWC save financial documents like

8   this one?

9      A.   These would be saved on a network server on TWC's

10   internal network.

11      Q.   Was it a regular practice of TWC, in this 2015

12   time frame, to make and keep financial documents like

13   this one on its servers?

14      A.   Yes.

15           MS. GRACE:  Move to admit 2860 into

16   evidence.

17           MR. BERGSTEN:  No objection, Your Honor.

18           THE COURT:  All right.  Exhibit 2860 is

19   admitted.  I would say that on the exhibit list this

20   shows this as -- this exhibit as supplemental responses

21   to interrogatories.  Is this part of that, or is this

22   not labeled right or...

23           MS. GRACE:  So this is not part of an

24   interrogatory response.

25           THE COURT:  And it is 2816?

11-2686  - Sprint v TWC   2.28.2017 AM Session                2409

1                    MS. GRACE:  60.

2                    THE COURT:  Awe, see, it's -- I just wanted

3    to get that straight because I just missed it from what

4    you said.  Thank you.  2860.

5                    MS. GRACE:  Yes, thank you.

6                    THE COURT:  Very good.  I thought I listened

7    carefully but not carefully enough.  My apologies.  All

8    right.  2860 is admitted.

9    BY MS. GRACE:

10   Q.  If you look at the top left-hand corner where it

11   says, GIA results 2010 to 2014?

12   A.  Yes.

13   Q.  Can you explain what this spreadsheet is?

14   A.  It's tracking the Go It Alone project yearly --

15   the status of the migrations off of the Sprint network

16   onto the TWC network, and then it's tracking the related

17   costs for that project.

18   Q.  And about halfway down the page do you see the

19   line that says, Total GIA Capital?

20   A.  Yes.

21   Q.  What does that line describe?

22   A.  Those are capital expenditures that were made

23   related to this project.

24   Q.  What's a capital expenditure?

25   A.  It would be an investment in something like

11-2686 - Sprint v TWC   2.28.2017 AM Session                2410

1   equipment that has long-term value more than one year.

2      Q.   Can you give an example of something that would

3   be a capital expenditure?

4      A.   Servers, network equipment, software equipment.

5      Q.   How much did TWC invest in capital expenditures

6   for the Go It Alone project in 2010?

7      A.   23.9 million.

8      Q.   What about in 2011?

9      A.   22.1 million.

10     Q.   Now, do these figures include all of TWC's

11  investments in its voice business for these years?

12     A.   No, it does not.

13     Q.   Why not?

14     A.   Because there's other investments that were made

15  in the voice business that are not part of this Go It

16  Alone project.

17     Q.   Can you give an example of a cost that would be

18  for voice but is not included in this Go It Alone

19  analysis?

20     A.   It would be equipment that TWC needed for its

21  voice network.  There would be software licenses that

22  TWC needed to run its voice network that wouldn't be

23  related to this Go It Alone project.

24     Q.   And if we could pull up Hammer demonstrative 24.

25  So this is a demonstrative that Miss Hammer talked about

 1   last week.  She's Sprint's accountant.  And she

 2   testified that in executing TWC's actual free cash flows

 3   for Go It Alone, she relied on Exhibit 2860, which is

 4   the document that we've been looking at.  As part of

 5   your job at TWC, did you do an analysis of TWC's total

 6   costs for a Go It Alone phone business?

 7       A.  Yes.

 8       Q.  And how did the analysis that you did compare to

 9   the costs that are reflected in red in Miss Hammer's

10   figure?

11       A.  There were additional costs that would be part of

12   a voice customer base cost that aren't included on the

13   analysis we looked at previously.

14       Q.  Did you understand that TWC's costs for providing

15   a Go It Alone phone business are higher or lower than

16   the ones reflected here?

17       A.  Yes.

18       Q.  Were they higher?

19       A.  Yes.

20       Q.  Okay.  So does Miss Hammer's free cash flow

21   analysis here include all the necessary incremental

22   costs for TWC's Go It Alone phone business?

23       A.  No, it does not.

24       Q.  And as the person responsible for tracking TWC's

25   actual costs for Go It Alone, do you understand that

 1   Time Warner Cable's actual incremental free cash flows

 2   for Go It Alone were $32.96 per subscriber per month?

 3       A.   No, I do not.

 4       Q.   Can you please turn to Exhibit 2689 in your

 5   binder.  Do you recognize this document?

 6       A.   Yes.

 7       Q.   What is it?

 8       A.   It's a capital review.

 9       Q.   What's the date of this document?

10       A.   July 2nd, 2013.

11       Q.   Do you recognize the names of the people on the

12   cover e-mail?

13       A.   Yes, I do.

14       Q.   Who are those people?

15       A.   They were financial executives at Time Warner

16   Cable.

17       Q.   Did you work with these people?

18       A.   Yes.

19       Q.   And do you see that there is an attachment to the

20   e-mail starting on the second page?

21       A.   Yes.

22       Q.   Were you personally involved in reviewing

23   portions of this presentation?

24       A.   Yes, I was.

25       Q.   Would you have seen this attachment at or around

11-2686  - Sprint v TWC   2.28.2017 AM Session                2413

1    the time it was made?

2        A.  Yes.

3        Q.  Was it created at or near the time of this e-mail

4    in July 2013?

5        A.  Yes.

6        Q.  Was it -- was this document created in the

7    ordinary course of TWC's business?

8        A.  Yes.

9        Q.  Does TWC keep copies of e-mails and presentations

10   like this in the ordinary course of business?

11       A.  Yes.

12       Q.  And was it a regular practice of TWC in this 2013

13   time frame to make and keep financial presentations like

14   this one?

15       A.  Yes.

16            MS. GRACE:  Move to admit Exhibit 2689 into

17   evidence.

18            MR. BERGSTEN:  No objection.

19            THE COURT:  Exhibit 2689's admitted.

20   BY MS. GRACE:

21       Q.  Can you please turn to the first page of the

22   attachment.

23       A.  Okay.

24       Q.  And can you explain what this presentation is?

25       A.  It is a capital review for TWC that was done mid

11-2686 - Sprint v TWC   2.28.2017 AM Session                    2414

1   year in 2013.

2      Q.  And if we could turn to the page entitled

3   Infrastructure Spending on page 22.  What does this

4   slide show?

5      A.  This shows TWC capital spending on the

6   infrastructure for its various business lines.

7      Q.  And if we look at the chart in the middle of the

8   page, what does this chart show?

9      A.  It breaks down the infrastructure spend into

10  three business categories and a shared category.

11     Q.  Is there a particular period of time that these

12  costs are reflected for?

13     A.  2009 to 2012.

14     Q.  If we look at the first line, Video, what is

15  Video?

16     A.  That is spend supporting the capable TV business.

17     Q.  What about HSD?

18     A.  That's spend supporting the high-speed data or

19  Internet business.

20     Q.  I see.  And the third line down says, Voice.

21  What is that?

22     A.  That's spend that supports the voice or the

23  telephone business.

24     Q.  And how much did TWC actually spend on its voice

25  infrastructure in the 2009 to 2012 time frame?

1    A.   89.5 million in 2009, 101.8 million in 2010,

2    147.8 million in 2011, 177.9 million in 2012.

3    Q.   And why are these infrastructure spending costs

4    on this chart higher than the 20-ish million dollar

5    figure we saw in Exhibit 2860?

6    A.   These spends are for the entire voice business,

7    whereas the previous example was just spend that was

8    related to the Go It Alone initiative.

9    Q.   Can you give an example of a cost that would be

10   included in this voice line spending here that would not

11   be included in Exhibit 2860?

12   A.   There would be network hardware and equipment and

13   licenses to run the voice network that would be not part

14   of the Go It Alone initiative but would be included

15   here.  There would also be customer premise equipment

16   that would be included in this category that would not

17   be included in the previous example.

18   Q.   Moving to the fourth line down, what does the

19   Shared line mean?

20   A.   That's spend that spans across multiple

21   categories and it's unable to be broken out into one of

22   the three categories.  It has benefits across multiple

23   product lines.

24   Q.   Can you give an example of a shared cost that

25   could be used for cable, Internet, or telephone?

11-2686  - Sprint v TWC   2.28.2017 AM Session       2416

1    A.   Spend on the TWC's backbone network or spend on

2  network equipment that has both applications for

3  Internet and voice on it.

4    Q.   Moving back to the voice line, in light of these

5  shared costs, does the voice line include all of the

6  necessary costs to be able to provide a telephone

7  service?

8    A.   No.

9    Q.   Are any of these shared costs included in

10  Miss Hammer's free cash flow analysis?

11    A.   No.

12    Q.   How would you characterize TWC's investment in

13  its voice services business?

14    A.   TWC spent a substantial amount on its voice

15  business from 2009 to 2012.

16         MS. GRACE:  If I could have just a moment.

17  No further questions.

18         THE COURT:  Very well.  Thank you.  Counsel,

19  you may cross examine.  And because I think this may be

20  the first time we've heard from you, if you'd identify

21  yourself for the court reporter, please.

22         MR. BERGSTEN:  Absolutely.  Jordan Bergsten

23  for Sprint.

24              CROSS EXAMINATION

25  BY MR. BERGSTEN:

11-2686  - Sprint v TWC   2.28.2017 AM Session           2417

1      Q.  Mr. Delargy, you talked a little bit on your

2  direct examination about something called shared costs;

3  right?

4      A.  Yes.

5      Q.  All right.  And you said during your direct that

6  you believed that Exhibit 2860 might not include some of

7  these shared costs; correct?

8      A.  Correct.

9      Q.  Now, shared costs are costs that Time Warner

10  Cable has to spend for something that it needs for its

11  voice business, but it also needs that thing for some

12  other aspect of its business; right?

13     A.  It's really a cost that Time Warner Cable needs

14  that spans across multiple product lines.

15     Q.  So if Time Warner Cable stopped offering voice,

16  it would still need to spend those costs because it --

17  those costs also support its other product lines; right?

18     A.  Yes.

19          MR. BERGSTEN:  Can we bring up Exhibit 2860,

20  please.

21  BY MR. BERGSTEN:

22     Q.  Now, the point of this document is to keep track

23  of the Sprint contract rate versus the spend under the

24  new Time Warner Cable managed services under Go It

25  Alone; right?

11-2686  - Sprint v TWC   2.28.2017 AM Session                2418

1       A.  Yes.

2       Q.  And I believe you said on your direct that Time

3  Warner Cable started keeping track of this document in

4  2010; right?

5       A.  Yes.

6       Q.  And this particular document is a 2015 version of

7  that; right?

8       A.  Correct.

9       Q.  And as of 2015, Time Warner Cable was updating

10 this report on a quarterly basis; right?

11      A.  Yes.

12      Q.  Does Time Warner Cable still keep updating this

13 document today?

14      A.  No.

15      Q.  Okay.  When did it stop updating this document?

16      A.  Probably around the mid 2015 time.

17      Q.  Okay.  So from 2010 to 2015, Time Warner Cable

18 kept this document; right?

19      A.  Yes.

20      Q.  And at least as of 2015, it was updating it

21 quarterly; right?

22      A.  Correct.

23      Q.  Time Warner Cable was taking the numbers in this

24 document and folding it into budget information;

25 correct?

1     A.  Not necessarily.  This was more to track the

2  status of the Go It Alone project itself.  It wasn't

3  necessarily used to formulate budget projections.

4     Q.  But these numbers were used in budgets, weren't

5  they?

6     A.  Well, it's sort of the other way around.  It was

7  -- the budget was done, and those numbers flowed into

8  this spreadsheet.

9     Q.  Let me put -- phrase it this way:  Time Warner

10  Cable used the numbers in this document as an estimate

11  to track Go It Alone that was rolled into an overall

12  larger budget; correct?

13     A.  Yes, that's correct.

14     Q.  And you needed to track this information for your

15  job at Time Warner Cable because there are expenses in

16  here that were going to be in the budget area that your

17  team and your group managed, so you needed to keep track

18  of those; right?

19     A.  We kept track of the expenses on this sheet.  We

20  didn't necessarily use this sheet to keep track of the

21  expenses.  We kept track -- we had other methods of

22  projecting the costs that we'd use to do the budget, and

23  then we -- once we had those costs, we put them into

24  this analysis.

25     Q.  You kept track of these because you needed to

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2420

1   keep track of these; right?

2      A.   Yes, we had to keep track of the costs that we

3   were budgeting for.

4      Q.   And because of that, Time Warner Cable endeavored

5   to make this as accurate as possible; right?

6      A.   Yes.

7      Q.   All right.  Now I want to look at the row just

8   below the row you looked at during your direct

9   examination.  It's the bottom row on the screen right

10  now, labeled, Net GIA Cash Flow Costs/Savings.  Do you

11  see that?

12     A.   Yes.

13     Q.   Now, this row compares costs to savings; right?

14     A.   This row is the savings versus the original

15  Sprint contract rate.

16     Q.   It's the savings of Time Warner Cable's Go It

17  Alone project over that contract rate; correct?

18     A.   Yes.

19     Q.   And there's a number in that row for every year

20  from 2010 to 2014; right?

21     A.   Correct.

22     Q.   And 2680 is a 2015 document; right?

23     A.   Yes.

24     Q.   So all the numbers in those rows, those are all

25  numbers; right?

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2421

1      A.   That's right.

2      Q.   They're not projections; right?

3      A.   They're not projections.

4      Q.   And those numbers represent dollars in the

5   millions; correct?

6      A.   Yes.

7      Q.   And now I notice to the left it says -- Costs is

8   not in parentheses, and Savings is in parentheses;

9   right?

10     A.   Correct.

11     Q.   So if the number in that row is not in

12   parentheses, it's a cost for Time Warner Cable to Go It

13   Alone compared to the Sprint contract rate; right?

14     A.   Yes.

15     Q.   But if it's in parentheses, then it's money that

16   Time Warner Cable saved by going it alone over the

17   Sprint contract rate; right?

18     A.   Right.

19     Q.   And, again, that number's in the millions; right?

20     A.   Right.

21     Q.   So looking to the first one, 2010 results in that

22   row, the number is 31.7; right?

23     A.   Right.

24     Q.   And it's not in parentheses; correct?

25     A.   Correct.

11-2686 - Sprint v TWC   2.28.2017 AM Session                    2422

1       Q.  So that year Time Warner Cable -- it actually

2   cost Time Warner Cable $31.7 million to Go It Alone

3   rather than pay the Sprint contract rate; right?

4       A.  That's right.

5       Q.  And now in 2011, the number's 97.5; right?

6       A.  Correct.

7       Q.  And that is in parentheses; right?

8       A.  Yes.

9       Q.  Okay.  So as of 2011, Time Warner Cable saved

10  $97.5 million through its Go It Alone project over the

11  Sprint contract rate; right?

12      A.  That's right.

13      Q.  Right.  Now, so you would add 97.5 to the 31.7 to

14  find out the total amount of savings that Time Warner

15  Cable would have had as of 2011; correct?

16      A.  You -- you'd have to say you would have that

17  savings over the contract rate, not, you know,

18  savings --

19      Q.  Okay.

20      A.  -- on the P&L.

21      Q.  So as of 2011 -- so in 2011, Time Warner Cable

22  saved $97.5 billion; right?

23      A.  $97.5 million.

24      Q.  $97.5 million; right?  But the previous year they

25  -- it would cost them an extra $31.7 million; right?

11-2686  - Sprint v TWC   2.28.2017 AM Session          2423

1      A.   From the contract rate, right.

2      Q.   So as of the end of 2011, we would subtract 31.7

3  from 97.5 to find out that as -- as of the end of 2011,

4  Time Warner Cable had saved a cumulative amount of

5  $65.8 million; correct?

6      A.   From the contract rate, yes.

7      Q.   Okay.  Now, the next year says 1. -- 189.4 in

8  parentheses; right?

9      A.   Yes.

10      Q.   So in 2012 alone, Time Warner Cable saved

11  $189.4 million by Go It Alone over the Sprint contract

12  rate; correct?

13      A.   That's right.

14      Q.   And if we add that to the 65.8 million that they

15  had saved as of 2011, does it sound about right that as

16  of the -- as of the end of 2012, Time Warner Cable had

17  saved $255.2 million by Go It Alone over the Sprint

18  contract rate?

19      A.   From the contract rate, that's correct.

20      Q.   So at the end of 2012, Time Warner Cable had

21  saved a quarter billion dollars; correct?

22      A.   They saved that from the original contract rate,

23  yes.

24      Q.   All right.  Now, 2013 says 289.5; right?

25      A.   Yes.

11-2686 - Sprint v TWC   2.28.2017 AM Session                2424

1      Q.   That's in parentheses; right?

2      A.   Correct.

3      Q.   So in 2013 alone, Time Warner Cable saved another

4   $289.5 million by going it alone over the Sprint

5   contract rate; right?

6      A.   Yes.

7      Q.   So if we add that to the $255.2 million that it

8   had saved as of 2012, we know that by the end of 2013,

9   Time Warner Cable had saved $544.7 million by going it

10  alone over the Sprint contract rate; right?

11     A.   From the original Sprint contract rate, that's

12  correct.

13     Q.   The final number on -- in this row under 2014, it

14  says 573.6; right?

15     A.   Yes.

16     Q.   And that number is also in parentheses; right?

17     A.   Uh-huh.

18     Q.   So we know that in 2014 alone, Time Warner Cable

19  saved $573.6 million by going it alone over the Sprint

20  contract rate; right?

21     A.   Yes.   From a contract rate.

22     Q.   If we add that to the $544.7 million, they had

23  saved as of 2013, we know that by the end of 2014, Time

24  Warner Cable had cumulatively saved $1.1183 billion by

25  going it alone over the Sprint contract rate; correct?

11-2686 - Sprint v TWC   2.28.2017 AM Session          2425

1     A.   Yes, from the contract rate, that's right.

2     Q.   Okay.  Now, this document wasn't created by

3   Sprint; right?

4     A.   No.

5     Q.   It was created by Time Warner Cable; right?

6     A.   Yes.

7     Q.   And, to your knowledge, this document wasn't

8   created for litigation; right?

9     A.   No.

10     Q.   It was created for business purposes; correct?

11     A.   It was created to keep track of the status of

12   this project.

13     Q.   And the line that we've been looking at, it says,

14   Net GIA Cash Flow Costs and Savings; right?

15     A.   Yes.

16     Q.   There's not some footnote off the word "costs"

17   that says, warning, not reliable, doesn't include shared

18   costs; right?

19     A.   No.  It's -- it's -- it was -- it's called GIA

20   results because it's specific to the GIA project.

21     Q.   Right.  But there's -- there's no disclaimer on

22   the word "cost" at all; right?

23     A.   Disclaimer as in --

24     Q.   Putting limitations on how to use the

25   information.

11-2686 - Sprint v TWC   2.28.2017 AM Session                2426

1      A.   It's just costs for this specific project.

2      Q.   And it just says "costs;" right?

3      A.   Yes.

4           MR. BERGSTEN:   Thank you.   No further

5   questions.

6           THE COURT:   All right.   Miss Grace.

7                    REDIRECT EXAMINATION

8   BY MS. GRACE:

9      Q.   If we could pull up page 22 of Exhibit 2689.

10          If you go back to your black binder that I handed

11   you -- you can either look at it on the screen or find

12   it there.   The shared costs line in this chart here, are

13   any of those costs incremental?

14     A.   Yes.

15     Q.   What does that mean?

16     A.   That means you'd have to spend them based on

17   network capacity growth, customer growth, you know,

18   things that drove additional capacity needs for your

19   business.

20     Q.   So if TWC didn't offer a phone service, what

21   would happen to those shared costs?

22     A.   They should go down because you wouldn't need as

23   much capacity.

24     Q.   So is it fair to say that those shared costs

25   would be spent whether or not TWC offered a phone

1    product?

2       A.  No, they would be -- they would be spent whether

3    or not TWC offered a phone product or not.  It -- they

4    may be smaller if TWC did not offer a phone product.

5       Q.  And if we can go back to Exhibit 2860.  What was

6    the purpose for which this document was created?

7       A.  It was created to keep track of the -- the Go It

8    Alone migrations as they migrated off of the Sprint

9    network to the TWC network, to help track, you know, how

10   much costs are coming off as subs migrate from Sprint

11   network to TWC's network.

12      Q.  And what do you mean when you say that it was

13   intended to track the costs change as lines migrated

14   from Sprint to Go It Alone?

15      A.  Typically what would happen is the -- the flat

16   fee that was being -- per sub that was being paid to

17   Sprint was in the schedule on the row called, Region

18   Costs Without GIA, and then what would happen is those

19   costs would come off the -- those costs would come off

20   -- that was kind of the costs, what it would be if you

21   stayed on the old contract.

22          The line below it would be the costs that you

23   have -- you actually had for the subs that were on the

24   Sprint network.  And then you -- that differential was

25   what you were saving or, you know, not paying Sprint

1    anymore.

2         And then the section below is the costs that TWC

3    was encumbered with as they operated this part of the

4    business themselves.

5       Q.  Is it fair to say that this document reflects the

6    change in costs only for the services that Sprint was

7    providing?

8       A.  Yes.

9       Q.  Does it include all of the costs that TWC would

10   have to spend, say, to add another Go It Alone customer?

11      A.  No, it does not.

12      Q.  Would that have been understood by people who

13   were using and reviewing this document at the time?

14      A.  Yes.

15      Q.  And I think you talked a little bit on cross

16   examination about the Sprint GIA savings?

17      A.  Yes.

18      Q.  And I think you mentioned that it was compared to

19   the Sprint contract price?

20      A.  Correct.

21      Q.  Did any of the figures that we've reviewed today

22   compare how much TWC thought it was going to save or

23   actually saved by going it alone compared to Sprint's

24   final and best offer?

25      A.  No, it did not.  For this analysis we always

11-2686 - Sprint v TWC   2.28.2017 AM Session                    2429

1    compared to the original Sprint contract price.

2              MS. GRACE:  No further questions.

3              THE COURT:  Mr. Bergsten.

4              MR. BERGSTEN:  Nothing, Your Honor.

5              THE COURT:  All right.  Very well.  You may

6    step down, Mr. Delargy.  And may he be excused,

7    Miss Grace?  Miss Grace, may he be excused?

8              MS. GRACE:  Yes.

9              THE COURT:  And, Mr. Bergsten, may he be

10   excused?

11             MR. BERGSTEN:  Yes.

12             THE COURT:  Very well.  You are excused.

13             THE WITNESS:  Thank you.

14             THE COURT:  All right.  Time Warner, you may

15   call your next witness.

16             MS. GRACE:  Time Warner Cable calls as its

17   next witness Mr. Joseph Banyas, who is TWC's vice

18   president of revenue planning.  Mr. Banyas will testify

19   regarding TWC's cost analyses for Go It Alone.

20             THE COURT:  Come right up here if you would,

21   please.  Turn, face me and raise your right hand.

22                     JOSEPH JOHN BANYAS,

23   called as a witness on behalf of the Defendant, having

24   first been duly sworn, testified as follows:

25             THE COURT:  Please state your full name.

 1                 THE WITNESS:  Joseph John Banyas.

 2                 THE COURT:  And adjust that microphone so

 3     that -- there you go.  Then spell your full name, if you

 4     would, please, for the record.

 5                 THE WITNESS:  J-O-S-E-P-H, J-O-H-N,

 6     B-A-N-Y-A-S.

 7                 THE COURT:  Thank you very much.

 8                 MS. GRACE:  Your Honor, may I?

 9                 THE COURT:  Certainly.

10                      DIRECT EXAMINATION

11     BY MS. GRACE:

12       Q.  Mr. Banyas, is this in a place where you can see

13     it, this easel here?

14       A.  Yes.

15       Q.  Please introduce yourself to the jury.

16       A.  Good morning.  My name is Joseph Banyas.

17       Q.  What company do you work for?

18       A.  Charter Communications.

19       Q.  What did you do before that?

20       A.  I worked for Time Warner Cable.

21       Q.  What did you do at Time Warner Cable?

22       A.  I was in the corporate financial planning

23     analysis group where, in no particular order, my role,

24     scope of responsibility was month-end close, long-range

25     planning and forecasting, budgeting, M and A, and

1  decision support and special projects.

2      Q.  When did you start working at TWC?

3      A.  In January of 2007.

4      Q.  When did you join Charter?

5      A.  May of 2016.

6      Q.  Do you have any degrees that relate to your work

7  in finance?

8      A.  I do.  I have an undergraduate in finance and an

9  MBA in finance.

10     Q.  Did you do any work with respect to TWC's Go It

11 Alone initiative?

12     A.  I did.

13     Q.  What involvement did you have?

14     A.  My -- my role was primarily designing and

15 building the financial model for Go It Alone.

16     Q.  And the jury just heard from Mr. Delargy.  How

17 does your work with respect to Go It Alone compare to

18 what Mr. Delargy was doing?

19     A.  My role is only financial modeling.  So it began

20 and ended with the design and construction of the

21 financial model.

22     Q.  Are those forward-looking projections?

23     A.  Part of the analysis was forward projections,

24 yes.

25     Q.  When did you do this modeling?

1      A.  Over a period of years from 2007 through 2009.

2      Q.  Was Go It Alone cost modeling your full-time job

3  in this time frame?

4      A.  No, strictly part-time.

5      Q.  If we could pull up Hammer demonstrative 21.  I'd

6  like to show you on the screen a demonstrative that

7  Sprint's accountant, Miss Hammer, used to calculate

8  TWC's expected incremental free cash flows from GIA.  Do

9  you have an understanding of what a free cash flow is?

10     A.  I do.

11     Q.  What is it?

12     A.  It's a way -- it's a means to express value

13  creation or profitability over a given period of time.

14     Q.  And now I'd like you to turn to page 11 of

15  Exhibit 230 in your binder, which I believe has already

16  been admitted into evidence.  This is the document that

17  Miss Hammer testified she used to calculate TWC's

18  expected incremental free cash flows.  Can you explain

19  what this GIA P and L summary is?

20     A.  Yes.  It's comparison -- on the surface it's a

21  comparison of two views of Go It Alone, an original view

22  which was the original original assumptions associated

23  with the planning, and then a new view that had, you

24  know, slightly different assumptions.  It's a -- just a

25  comparison of the two alternatives or the two views.

2433

1    Q.  Does this P and L summary include all the

2  incremental costs for TWC to operate a phone business?

3    A.  No.

4    Q.  What's missing?

5    A.  Lots of things are missing.  Customer

6  acquisition, retention, care, billing, capital to

7  support the network, and a whole list of shared costs.

8    Q.  Could you deduct the incremental costs that are

9  reflected here from revenue to execute an incremental

10  free cash flow from TWC's Go It Alone voice business?

11    A.  Not directly.

12    Q.  And going back to Miss Hammer's Slide 21, the

13  costs reflected in red here, do those include all the

14  incremental costs of providing a Go It Alone voice

15  service?

16    A.  They don't appear to, no.

17    Q.  Let me turn to another topic.  You mentioned

18  earlier that you were involved in doing cost modeling

19  for Go It Alone?

20    A.  Correct.

21    Q.  If you could turn to Exhibit 400 in your binder

22  which has already been admitted.  What is this e-mail?

23    A.  This is an e-mail that provides a view of the

24  economics around Go It Alone.

25    Q.  Is there an attachment to this e-mail?

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2434

1     A.  Yeah, there is.

2     Q.  If we could turn to the first page.

3     A.  All right.

4     Q.  What is the date of this presentation?

5     A.  April 20th of 2009.

6     Q.  And what was this presentation, generally

7   speaking?

8     A.  It was just a summary of Go It Alone, what the

9   projected savings would be over a period of time.

10     Q.  Is this one of the cost models that you talked

11   about earlier?

12     A.  Yes, it is.

13     Q.  Okay.  So we're going to go through a few of

14   these.  So I'm going to keep track of them on that

15   board.  And I'll try to speak up while I move around

16   from the microphone.

17                THE COURT:  Thank you.

18   BY MS. GRACE:

19     Q.  And if we could turn to page 7 of this document.

20   Do you see in the sort of subheading on the top it says,

21   2.6 billion in cumulative pre-tax savings are projected

22   to be realized under GIA?

23     A.  I do.

24     Q.  What did that figure mean?

25     A.  It's the cumulative cost savings operating in

1    capital costs that Time Warner Cable could expect to

2    achieve under the -- under the scenario that we

3    modelled, under the assumptions that we used, if it were

4    to go Go It Alone versus remain on Sprint with the

5    original contract terms.

6       Q.   And why were you using the Sprint old contract

7    price as part of this analysis?

8       A.   Those were the terms and conditions in place at

9    the time the analysis was conducted.

10      Q.   Is it okay if I write GIA versus old Sprint

11   contract?

12      A.   Sure.

13      Q.   I'm going to put the 2.6 billion underneath so we

14   can keep track.  Can you turn to page 10 of the

15   PowerPoint entitled, Per Line Cost of Service

16   Comparison?

17      A.   Uh-huh.

18      Q.   What does this page show?

19      A.   It lays out the cost of service under original

20   Sprint and Go It Alone.  It compares the two.

21      Q.   And what is this slideshow that TWC was using as

22   the costs per line under Sprint?

23      A.   The costs per line changes every year but,

24   generally speaking, the price -- the costs that we would

25   incur is -- ranges anywhere from 9.46 in 2010, projected

1   to change to $9.65 per month per line in 2018.

2      Q.   And are these -- are these numbers derived from

3   the original Sprint contract?

4      A.   They are.

5      Q.   And moving to the right side, what did TWC

6   believe its costs per line would be under a Go It Alone

7   model?

8      A.   Again, it varies by year but, generally speaking,

9   we were projecting $10.23 per line in 2010, and that

10  would decline to $5.10 by 2018.

11     Q.   So if Sprint were able to offer a $6 or $5.50 per

12  line price, how would that affect TWC's expected cost

13  savings from Go It Alone under this model?

14     A.   Our cost savings would be reduced because Sprint

15  would have lowered the price, and our price points here,

16  you could see for the first several years were above

17  that $6 price point you just mentioned.

18     Q.   Would there be any cost savings from 2010 to

19  2014?

20     A.   No.

21     Q.   Can you now turn to Exhibit 230 in your binder,

22  which has been admitted.  What is this document?

23     A.   It's another Go It Alone analysis.  Just probably

24  an update.

25     Q.   And what's the date of this one?

11-2686  - Sprint v TWC   2.28.2017 AM Session                2437

1      A.   May 28th, 2009.

2      Q.   And can you turn to page 6 of this presentation.

3      A.   Uh-huh.

4      Q.   What does the Sprint proposal summary slide

5   reflect?

6      A.   It represents -- it's a comparison of the

7   original agreement and pricing new -- a new proposal

8   Sprint had provided earlier in May.

9      Q.   Did you understand that Sprint had offered to

10  drop its price between April 20th, 2009 and the time of

11  this presentation on May 28th, 2009?

12     A.   Sprint provided a new proposal, so yes.

13     Q.   What was that new proposal?

14     A.   They would lower the price -- say if we were to

15  stick with residential, they would lower the price from,

16  give or take, 9.40 per line per month to $6, beginning

17  in 2012.

18     Q.   Is it okay if I refer to this as the $6 proposal,

19  for simplicity?

20     A.   Sure.

21     Q.   And if you could turn to page 3 of the

22  presentation.  What does this chart show?

23     A.   It illustrates the comparative economics of the

24  new Sprint proposal versus new Go It Alone.

25     Q.   Is it okay if I write Go It Alone versus $6 offer

1   here?

2       A.   Sure.

3       Q.   And what were the results of that analysis?

4       A.   When you rolled it all up over the period of 2010

5   through '14, so four-five year window, the savings

6   projection was $273 million.

7       Q.   And how does the amount of expected savings under

8   this $6 offer compare to the savings that you calculated

9   on April 20th?

10      A.   Well, they're very different.

11      Q.   If you could turn to the next page.  Did you also

12  do an analysis of what the $273 million number would be

13  on a net present value basis?

14      A.   Yes.

15      Q.   What does net present value mean?

16      A.   It's a way to equivalize future cash flows into

17  present day terms.  So it takes projected revenues and

18  cash flows and brings them back and states them and

19  expresses them in current dollar terms.

20      Q.   And why would you express numbers in current

21  dollar -- dollar value terms?

22      A.   Money is worth more today than it is in the

23  future, given inflation and interest rates.

24      Q.   And what did you compute the net present value of

25  the expected savings from Go It Alone compared to the $6

11-2686  - Sprint v TWC   2.28.2017 AM Session

1    offer to be?

2       A.  Well, the net present value of the 273

3    equivalized out to about $128 million.

4       Q.  I'm going to write that below the 273 here.

5       A.  Sure.

6       Q.  Now, are there assumptions built into this model

7    about the number of lines that TWC would have in

8    service?

9       A.  There are.

10      Q.  What are those assumptions?

11      A.  That ending 2010, there would be five and a half

12   million lines in service, and by 2014, that line count

13   would grow to 8.3 million lines.

14      Q.  Did TWC meet these projections?

15      A.  No.

16      Q.  Why not?

17      A.  Lots of reasons.  Wireless substitution,

18   competition, cord-cutting and the like.

19      Q.  What is wireless substitution?

20      A.  Well, if you have a landline, you might have a

21   cell phone and you might say why am I paying -- why am I

22   paying a provider to provide the same service, why am I

23   paying twice for it.

24      Q.  How does TWC's failure to meet these projected

25   line count numbers affect the cost savings analysis?

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2440

 1     A.   It has a material impact -- it would have a

 2  material impact.

 3     Q.   What would happen to the savings that are

 4  reflected here?

 5     A.   They would go down.   They would -- they would

 6  decrease.

 7     Q.   Would there be any savings at all?

 8     A.   Depending on how -- how lines change, there could

 9  be or there may not be.   It's a function of what the

10  line count looks like.

11     Q.   At the 5 million subscriber or line count number,

12  did TWC expect that there would be savings from Go It

13  Alone compared to Sprint?

14     A.   No.   No.   You could see here we projected

15  $35 million loss in savings.   So we wouldn't -- we

16  wouldn't save anything.   We would be underwater.

17     Q.   If you could move to Document 229 in your binder,

18  which is already admitted.   Do you recognize this

19  e-mail?   Maybe if we could blow it up.

20     A.   Yes.

21     Q.   Who drafted this e-mail?

22     A.   It was me.   I did.

23     Q.   And what's the date of it?

24     A.   May 28th, 2009.

25     Q.   Is this the same date as the PowerPoint

1    presentation we just looked at?

2        A.   Yes, it is.

3        Q.   And what is the analysis that's described in this

4    e-mail?

5        A.   It's a revised cost of service savings analysis.

6        Q.   And do you see the sentence, the second sentence

7    of the second paragraph that says, To achieve present

8    value savings neutrality to GIA, EG economic

9    indifference, Sprint would need to reduce their line

10   charge by about 8 percent or $0.50 per line starting in

11   2011 and continuing through 2014?

12       A.   I see that, yes.

13       Q.   What did you understand that sentence to mean?

14       A.   Well, what we were trying to do was say how much

15   Sprint would have to -- as part of the whole decision,

16   support buildup of the analysis, what Sprint would have

17   to lower their price to in order for Time Warner Cable,

18   only purely from a financial perspective, to be

19   economically indifferent, meaning you would be

20   equivalent cost-wise with remaining with Sprint or going

21   it alone.

22       Q.   And if you could go back to page 5 of

23   Exhibit 230, what does this page reflect?

24       A.   It just lays out what -- you know, it expresses

25   that 8 percent decline that they would have to provide

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2442

 1   in order to be economically indifferent.

 2       Q.   And if you see on the right-hand side of the page

 3   where the 5.51 figure is, and it says, Sprint rate

 4   required to achieve neutral present value savings versus

 5   new GIA?

 6       A.   I see that, yeah.

 7       Q.   What is that $5.50 -- $0.51 figure mean?

 8       A.   That's the price Sprint would have to pay.  You

 9   know, where before we were paying in the 9s and 10s,

10   they would have to lower the price to this point over

11   this period of time for our Time Warner Cable to be

12   financially neutral between both alternatives.

13       Q.   Is it okay if I refer to this as the Go It Alone

14   versus $5.50?

15       A.   Sure.

16       Q.   And how much did TWC expect to save by going it

17   alone compared to a $5.51 price?

18       A.   You would be -- savings would be varied.  You

19   would be economically indifferent.  You would be cost

20   neutral.

21       Q.   And if we could go back to the cover e-mail on

22   this, the first page.  Oh, I'm sorry.  That's actually

23   Document 229.  And how does that graph that we just saw

24   that compared Go It Alone to the $5.50 price, how does

25   that relate to what you're talking about in the cover

1  e-mail here?

2     A.  Well, they're one and the same because the slide

3  we just looked at and the third sentence state they --

4  they're the same thing.

5     Q.  So are you explaining in this cover e-mail to

6  Miss Fiala and others at TWC that Sprint would have to

7  reduce its charge -- its per line charge to about $0.50

8  from where they were at at that point, in order for it

9  to cost the same to Go It Alone versus stay with Sprint?

10     A.  That's the nature of the analysis, yes.

11          MS. GRACE:  I'd like to mark this

12  demonstrative as Exhibit 3160.

13          THE COURT:  3160.

14          MS. DOUVILLE:  Objection, Your Honor.

15          THE COURT:  And what is your objection?

16          MS. DOUVILLE:  No objection.

17          THE COURT:  All right.  Very well.  Thank

18  you.  With that then, Exhibit 3160 is admitted for

19  demonstrative purposes only.

20          MS. GRACE:  Thank you.  No further

21  questions.

22          THE COURT:  All right.  Sprint may cross

23  examine.  And if you would introduce yourself for the

24  court reporter, please, and for the jury, I expect.

25          MS. DOUVILLE:  My name is Lauren Douville.

```
 1                    CROSS EXAMINATION
 2   BY MS. DOUVILLE:
 3       Q.   Good morning, Mr. Banyas.
 4       A.   Good morning.
 5       Q.   You mentioned you were hired in 2007; correct?
 6       A.   I did.
 7       Q.   And one of the people who interviewed you was
 8   Gerry Campbell; is that right?
 9       A.   Gerry interviewed me.
10       Q.   And when you started, it was your job to create
11   the model that created the cost estimates for GIA?
12       A.   Part of my job.
13       Q.   You first started creating that model in 2007;
14   correct?
15       A.   Correct.
16       Q.   And as part of that model, you needed to
17   calculate cost savings under a Sprint environment and a
18   GIA environment; is that right?
19       A.   Yes.
20       Q.   And that was so that Time Warner Cable could
21   evaluate the implications of going it alone; correct?
22       A.   The financial implications.
23       Q.   In other words, determining costs under a Sprint
24   environment versus costs under a GIA environment could
25   inform the Time Warner Cable management about whether it
```

1    wanted to Go It Alone; correct?

2        A.   From a financial perspective.

3        Q.   And so you were asked to provide cost savings

4    information to inform the decision of whether Time

5    Warner Cable would Go It Alone; isn't that right?

6        A.   Can you repeat the question?

7        Q.   So you were asked to provide cost savings

8    information to inform the decision of whether Time

9    Warner Cable would Go It Alone; correct?

10       A.   I was asked -- I was asked to create a financial

11   model.

12       Q.   And some of the Time Warner Cable employees you

13   presented to on the economics of Go It Alone were Glenn

14   Britt, Rob Marcus and Landel Hobbs; correct?

15       A.   Those were our executives -- chief or C-level

16   executives at the time.

17       Q.   And those were the same Time Warner Cable

18   employees who, in your opinion, had an executive level

19   understanding of the decision to Go It Alone; correct?

20       A.   They probably had an understanding.

21       Q.   Glenn Britt was the CEO?

22       A.   He was the CEO.

23       Q.   Rob Marcus was the CFO?

24       A.   At the time, yes.

25       Q.   And Landel Hobbs was the COO?

1    A.   Chief operating officer.

2    Q.   And when you presented to three of the highest

3    ranking officers at Time Warner Cable on the economics

4    of Go It Alone, you wanted to be as accurate as possible

5    in your cost savings analysis; correct?

6    A.   Well, I'll say this, that when you build a model,

7    you want one and one to equal two.  But the accuracy of

8    the model could describe a number of different ways.  So

9    the sales you want to produce the right outcome.  If you

10   add one and one, you want to get to two.  But it's all

11   dependent on the assumptions that you're provided.  So

12   if those assumptions were faulty, well, you're -- the

13   accuracy of the model technically is accurate, but the

14   assumptions made feeding into it could be flawed or

15   faulty.

16   Q.   Understood.  And, Mr. Banyas, you have no reason

17   to suspect the assumptions that you were provided in

18   order to do your cost savings analysis that you later

19   presented to these high-ranking officials -- officers at

20   Time Warner Cable was inaccurate; correct?

21   A.   I'll say that they were preliminary and subject

22   to change.

23   Q.   Could we please turn to PTX-400, which is in the

24   binder.

25   A.   I'm there.

11-2686 - Sprint v TWC   2.28.2017 AM Session                2447

 1            MS. DOUVILLE:  Okay.  Dylan, could you

 2   please bring it up.  I believe it's admitted into

 3   evidence.

 4            THE COURT:  Yes, it is.

 5            MS. DOUVILLE:  Thank you.

 6   BY MS. DOUVILLE:

 7     Q.  And the date on this document is April 2009; is

 8   that correct?

 9     A.  Two dates actually, the 17th of April 2009 and

10   Friday, April 24th, 2009.

11     Q.  And there's a presentation that's attached to

12   this document; is that right?

13     A.  Yes, there is.

14     Q.  And that presentation relates to the economics of

15   Go It Alone; correct?

16            MS. GRACE:  Objection.

17            THE COURT:  What is your objection?

18            MS. GRACE:  This is cumulative to the

19   deposition that was already played last week in Sprint's

20   case in chief.

21            MS. DOUVILLE:  Your Honor, the witness just

22   testified as to this document, and if I have an

23   opportunity to at least --

24            THE COURT:  Yeah, if you have something that

25   is based on his testimony today that wasn't something

```
 1    that you anticipated to begin with when Sprint played
 2    his deposition in your case in chief, you may pursue it
 3    here.  So to that extent, I'll overrule the objection.
 4    BY MS. DOUVILLE:
 5       Q.  And on page 3 of that PowerPoint presentation
 6    there's a slide entitled, Rationale for GIA; is that
 7    correct?
 8       A.  Yeah.
 9       Q.  And the financial rationale that is listed for
10    GIA cites $2.6 billion in savings; correct?
11       A.  Projected savings, yes.
12               THE COURT:  Miss Grace.
13               MS. GRACE:  Objection, Your Honor.  Before
14    we go too far down this path, this is the same testimony
15    that was --
16               THE COURT:  That does seem cumulative.
17               MS. DOUVILLE:  Your Honor, I'm moving on
18    now.
19               THE COURT:  Very well.
20    BY MS. DOUVILLE:
21       Q.  And then if you turn back to the e-mail attaching
22    this document, you see Paul Lang forwards the PowerPoint
23    to Gerry Campbell, asking if Gerry wants Paul to cover
24    any of the -- any of the information in here in the
25    meeting.  Do you see that?
```

```
 1                 THE COURT:  Pardon me, Mr. Banyas.
 2   Miss Grace.
 3                 MS. GRACE:  Objection.  This is continuing
 4   down the same line that they've already played.
 5                 MS. DOUVILLE:  Your Honor, this portion of
 6   this e-mail was never discussed during Mr. Banyas'
 7   deposition.
 8                 THE COURT:  And I don't remember one way or
 9   the other about him.  Miss Grace, do you contend that it
10   was?
11                 MS. GRACE:  Well, certainly this document
12   was used.  The e-mail was displayed, and the
13   $2.6 billion number was discussed.
14                 THE COURT:  Right.  I don't know what
15   Miss Douville is wanting to do with this.  We have an
16   exhibit that has multiple aspects to it.  There may be
17   room to bring this up now.  I'm going to let her
18   proceed, but please remain vigilant.  That's fine.
19                 MS. GRACE:  Thank you.
20   BY MS. DOUVILLE:
21      Q.  My last question on this point, Gerry responds to
22   Paul's request about what to cover in the meeting, and
23   he says, "$2.6 billion in savings...."  Do you see that,
24   Mr. Banyas?
25      A.  I see it.
```

11-2686  - Sprint v TWC   2.28.2017 AM Session          2450

1      Q.  And this was based on your cost modeling for GIA;

2   correct?

3      A.  It was based on the preliminary initial view of

4   GIA, yes.

5      Q.  And cost modeling that was going to be used to

6   inform the decision of high-ranking officers at Time

7   Warner Cable as to whether they would Go It Alone; is

8   that right?

9      A.  It was going into part of the decision-making

10   process.

11      Q.  You mentioned on direct that if Time Warner Cable

12   had accepted Sprint's new proposal to drop its line

13   price, Time Warner Cable's cost savings would be

14   reduced.  Do you remember that?

15      A.  I remember saying that, yes.

16      Q.  But you know that Time Warner Cable never

17   accepted any reduced price by Sprint to lower its line

18   pricing; correct?

19      A.  I guess.

20      Q.  So Sprint's proposed reduction in line pricing

21   never affected any sort of cost savings that Time Warner

22   Cable achieved through Go It Alone; isn't that right?

23      A.  Say -- state the question again.  I wasn't quite

24   sure what you meant.

25      Q.  So Sprint's offer to reduce its line pricing

1   never actually affected Time Warner Cable's cost savings

2   with respect to Go It Alone; isn't that right?

3       A.   I'm not aware of any savings, no.

4       Q.   Can you please turn your attention to what's

5   labeled in your binder as PTX-628.  You there?  Okay.

6   Do you recognize PTX-628?

7       A.   Not really, no.  It's 1,237 pages long.

8       Q.   Turn your attention to page 42.  Do you recognize

9   page 42?

10      A.   Okay.

11      Q.   Is this part of the model that you created for

12  GIA in April of 2010?

13      A.   It could be.

14      Q.   Is it?

15      A.   I mean, I don't know.  I've never seen a model

16  printed out this way before, but it says "GIA Summary"

17  on it.

18      Q.   Does this appear to be a pdf printout of the GIA

19  model estimates that you created in April of 2010?

20      A.   It's a printout.

21      Q.   Okay.  So you agree that this is the model that

22  you helped develop for Time Warner Cable relating to the

23  economics of Go It Alone in April of 2010?

24      A.   Helping develop it and modeling it, working on it

25  after a certain date.  I don't know whatever happened to

1    it.

2        Q.   And this is a document that was prepared based on

3    information created and maintained by Time Warner Cable

4    in the ordinary course of business?

5        A.   It was a project, so how do you -- how do you say

6    -- what do you mean by ordinary course of business?

7        Q.   As part of your job responsibility, was this --

8    does this document reflect information that you prepared

9    in the ordinary course of your business at Time Warner

10   Cable with respect to GIA modeling?

11       A.   It could have.  It could have, sure.

12       Q.   And Time Warner Cable relies on information such

13   as this which is maintained in its system to operate its

14   business; correct?

15       A.   Yeah, sure.

16       Q.   And this is a document that would be one that was

17   routinely made and kept in the ordinary course of

18   business; is that right?

19       A.   I don't know.

20       Q.   It was made by someone with knowledge or

21   information, transmitted by a person with knowledge,

22   this document?  You created this document?

23       A.   You'll have to restate the question.  There

24   was --

25       Q.   Sure.  Was this document created by you and

1   maintained in the ordinary course of business at Time

2   Warner Cable?

3      A.   The original GIA -- I'll answer that -- I'll try

4   to answer your question, if I understand it correctly.

5   I created the GIA model.  But as far as maintaining it

6   after my role in the project ended, I don't know who did

7   that.

8      Q.   Was it a regular practice for Time Warner Cable

9   to keep documents such as this?

10     A.   We had a document retention policy.  So, I guess,

11  maybe.

12          MS. DOUVILLE:  Sprint would move to admit

13  into evidence PTX-628, Your Honor.

14          MS. GRACE:  Objection.  Lacks foundation.

15  The witness has no personal knowledge.

16          THE COURT:  I agree based upon the questions

17  and answers so far that he has not identified this as

18  something that he actually says is something he created

19  or is familiar with.  So based upon the testimony so

20  far, I would sustain the objection.

21  BY MS. DOUVILLE:

22     Q.   One more question.  Mr. Banyas, is this a

23  document that reflects the GIA modeling that you did in

24  April of 2010?

25     A.   I mean, it's 1,200 pages.

1      Q.  Yes or no, Mr. Banyas?

2      A.  So I don't know.

3          MS. DOUVILLE:  Okay.  Your Honor, no further

4   questions.

5          THE COURT:  All right.  Very well.  Any

6   redirect?

7          MS. GRACE:  Yes, Your Honor.

8          THE COURT:  You may proceed.

9                  REDIRECT EXAMINATION

10  BY MS. GRACE:

11     Q.  Will you please pull up Exhibit 400.  This is the

12  e-mail that Ms. Douville showed you in her examination?

13     A.  It is.

14     Q.  And what's the date of Mr. Campbell's e-mail to

15  the other two people at TWC?

16     A.  Friday, April 24th.

17     Q.  Of what year?

18     A.  2009.

19     Q.  And is that before or after Sprint dropped its

20  price?

21     A.  It's after.

22     Q.  If we go back to this timeline here, do you

23  recall April 20th was when the $2.6 billion estimate was

24  made?

25     A.  Oh, I'm sorry.  Right.  You're right.  It was

1    May, not February.  My mistake.

2        Q.   Okay.  Let me ask the question again.

3        A.   Sure.  I apologize.

4        Q.   So this April 24, 2009 e-mail, was this before or

5    after Sprint offered to drop its price?

6        A.   April is before May, so it was before, yeah.

7        Q.   And the $2.6 billion in savings, was that

8    compared -- what was that compared to?

9        A.   That was a 10-year view of Go It Alone comparing

10   our preliminary assumptions of Go It Alone to the

11   original Sprint contract.

12       Q.   And the assumptions upon which the model was

13   based that got you to the $2.6 billion savings number,

14   did they prove to be inaccurate?

15       A.   Yeah, they did.

16       Q.   And how were those assumptions inaccurate?

17       A.   Well, the service provider costs changed, and

18   then, you know, our -- our line forecast just, you know,

19   didn't materialize anywhere close to where we -- where

20   we thought.

21       Q.   Now, by the time that TWC actually started going

22   alone in October of 2010, would TWC have known that it

23   wasn't going to make those forecasted line projections?

24       A.   I'm -- I mean, likely there's a chance someone

25   knew.

 1    Q.  Well, once you're most of the way through 2010,
 2 would TWC have known that the projected line count for
 3 2010 was incorrect?
 4    A.  Yeah.  How far -- depending how far you are in
 5 the year, you know you're not going to make it.  It's a
 6 subscription-based business.  You're not a manufacturer.
 7 So you're can only sell so much, and you know you're
 8 going to churn.  So, yeah, there comes a point of no
 9 return where you just know regardless of what you have
10 tried to do, you're just not going to make it.
11    Q.  So as of October of 2010, would Time Warner Cable
12 have known that even compared to the Sprint contract
13 price, this $2.6 billion number was wrong?
14    A.  Yes.  Likely.
15             MS. GRACE:  No further questions.
16             MS. DOUVILLE:  None from Sprint, Your Honor.
17             THE COURT:  All right.  Very well,
18 Mr. Banyas.  You may step down.
19             THE WITNESS:  Thank you.
20             THE COURT:  May he be excused, Miss Grace?
21             MS. GRACE:  Yes.
22             THE COURT:  Miss Douville?
23             MS. DOUVILLE:  Yes.
24             THE COURT:  Very well.  You are excused.
25 All right.  All right.  Time Warner Cable, you may call

 1   your next witness.

 2              MR. GOTTS:  Thank you, Your Honor.  If we

 3   could please take a moment to set a few things up here.

 4        In the meantime, Time Warner Cable calls Mr. John

 5   Putnam, who is their economic expert on the issue of

 6   damages in this case.

 7              THE COURT:  Please turn, face me and raise

 8   your right hand.

 9              JONATHAN DOUGLAS PUTNAM, Ph.D.,

10   called as a witness on behalf of the Defendant, having

11   first been duly sworn, testified as follows:

12              THE COURT:  Please be seated.  Please state

13   your full name.

14              THE WITNESS:  My name is Jonathan Douglas

15   Putnam.

16              THE COURT:  And if you can make that

17   microphone closer to you or higher or whatever you need

18   to do to speak directly into it.  It adjusts several

19   different ways.  Up that.  There you go.

20        Please spell your full name for the record, if

21   you would, please.

22              THE WITNESS:  Yes.  Jonathan,

23   J-O-N-A-T-H-A-N, Douglas, D-O-U-G-L-A-S, Putnam,

24   P-U-T-N-A-M.

25              THE COURT:  Thank you very much, Mr. Putnam.

1    Mr. Gotts, you may proceed.

2              MR. GOTTS:  Thank you, Your Honor.  Before

3    we get going, so we don't forget, I'd like to mark for

4    demonstrative purposes only Defendant's Exhibit 3160,

5    which is the demonstrative we will be using with

6    Dr. Putnam.

7              THE COURT:  We actually used that exhibit

8    number in the previous exhibit marking by -- for

9    Mr. Banyas, so we'll need to come up with a different

10   number.

11             MR. GOTTS:  3161.

12             MR. SHULMAN:  Good.  Yeah.

13             THE COURT:  Well done, Mr. Gotts.

14             MR. GOTTS:  That's my partner, Your Honor.

15             THE COURT:  Teamwork.

16             MR. GOTTS:  There you go.

17             THE COURT:  Is there any objection to the

18   Exhibit 3161 for demonstrative purposes only?

19             MR. STRAND:  No, Your Honor.  Thank you.

20             THE COURT:  All right.  Then it is so

21   admitted.

22             MR. GOTTS:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. GOTTS:

25     Q.  Good morning, Dr. Putnam.

 1    A.   Good morning.

 2    Q.   Could you please introduce yourself for the jury.

 3    A.   Yes.  My name is Jonathan Putnam.  I'm an expert

 4  in the economic intellectual property and competition.

 5    Q.   What do you do, sir?

 6    A.   I own and operate a firm called Competition

 7  Dynamics, which is located in the Boston area, and we

 8  specialize in economic issues related to patents and

 9  other intellectual property, and then how that affects

10  the competition between firms.

11    Q.   And could you summarize for the jury, please,

12  your education post high school?

13    A.   Sure.  I have a bachelor's and master's degree in

14  economics from Yale University.  I then attended Yale

15  Law School on a fellowship, and also Columbia Law School

16  on a fellowship, and then received my Ph.D. in economics

17  from Yale in 1996.

18    Q.   And what was the subject of your Ph.D.

19  dissertation?

20    A.   I wrote something called, The Value of

21  International Patent Rights, and basically the project

22  was to value all the patents in the world, and so that

23  was what I had to accomplish, and I did.

24    Q.   Okay.  And you mentioned a -- a fellowship.  What

25  was the nature of your fellowships?

 1      A.  So in the fellowships I was studying patent law,

 2    antitrust law, competition law, international trade law

 3    and other legal matters related to the economic issues

 4    that I was covering in my dissertation.

 5      Q.  And, sir, have you ever taught courses at the

 6    university level?

 7      A.  Yes.  At Yale I taught the economics of

 8    technology and economic theory.  At Vassar College I

 9    taught the economics of finance and industrial

10    organization, which is the study of how firms compete

11    with each other.  I was a professor.  I had a chair for

12    five years at the University of Toronto Law School.  I

13    had a chair in the law and economics of intellectual

14    property.  I taught at Boston University, the

15    intellectual property management.

16      Q.  Okay.  Thank you.  Have you published any

17    articles or books in your career?

18      A.  Yes.  I was the editor of a volume published in

19    2006 called Intellectual Property Rights and Innovation

20    in the Knowledge-Based Economy.  If you look in the

21    leading encyclopedia of economics under the entry for

22    patent valuation, then I wrote that.  And my most

23    research concerns the valuation of intellectual property

24    in complex devices like a smartphone or a phone network.

25      Q.  Does that relate to sort of the apportionment of

1    the value in such devices?

2        A.  Yes.  If you've got a complex device like your

3    iPhone or something like that, it's got thousands of

4    inventions in it.  And so in cases like this, people are

5    trying to figure out the value of one small part of your

6    iPhone and what one invention is worth.  And so I've

7    been doing research on how you go about doing that

8    reliably.

9        Q.  Have you received any research grants for your

10   work related to valuation of patents?

11       A.  Yes.  After my dissertation, I received a grant

12   from the National Science Foundation to apply the

13   methods that I had developed for valuing the patent

14   portfolios of large firms.

15       Q.  Do you currently have any affiliation with any

16   universities or economic institutions?

17       A.  Yes.  I'm a scholar in intellectual property at

18   George Mason University located in Washington, D.C.

19       Q.  Now, I understand you're also an economic

20   consultant; is that right?

21       A.  Yes, that's right.

22       Q.  Can you tell us about your consulting background?

23       A.  Sure.  After I got my Ph.D. in 1996, I joined

24   Charles River Associates, which is a consulting firm

25   located in Boston.  I was promoted to vice president in

1    2000.  In 2012, I left Charles River to start my own

2    firm, Competition Dynamics.  And that's where I am now.

3        Q.  Okay.  And, sir, have you served as an expert

4    witness in trial matters relating to patents or

5    intellectual property in the past?

6        A.  Yes.  All of the work I do as an expert is on

7    intellectual property, particularly patents.  I've

8    worked on more than a hundred cases, and I've testified

9    in proceedings like these about 30 times, I think.

10       Q.  Do you tend to represent or work more with patent

11   holders or defendants, or what's the mix of that?

12       A.  I would say it's about 50/50.  I work -- about

13   half for patent holders and half for accused infringers.

14       Q.  All right.  So why don't we turn now to your

15   analysis in the case.  Before we get into the details,

16   can you tell me what opinions have you prepared in

17   connection with this case?

18       A.  Well, there's really three.  The first is I think

19   it's important to talk about the hypothetical

20   negotiation between the parties, how TWC and Sprint

21   would have bargained for the right to use Sprint's

22   patents had they negotiated instead of found themselves

23   in court.

24           The second is, I want to talk about the

25   real-world evidence, about how Sprint valued its patents

 1    and how you might go about setting a value on them, and

 2    particularly in relation to Time Warner Cable.

 3         And then finally I want to respond to Dr. Rao's

 4    opinions and what he said that Sprint's patents are

 5    worth.

 6    Q.   So as part of your analysis -- and we'll

 7    obviously drill down deeper, but have you developed --

 8    developed an opinion regarding the range of the

 9    appropriate royalty in this case, if liability were to

10    be found?

11    A.   Sure.  When you look at the real-world evidence,

12    the highest level that you can possibly assign to this

13    is $10 million.  And most of the evidence is that it's

14    substantially less.  So I would say that's the range and

15    -- and probably significantly less than 10 million.

16    Q.   Okay.  So you understand that Sprint is only

17    entitled to damages if the jury were to agree that the

18    patents are valid and infringed; is that correct?

19    A.   Yes.

20    Q.   So -- so -- so what is your understanding as to

21    why, in proceedings like this, we address damages now

22    before that determination has been made?

23    A.   So in a -- in a criminal trial, you know, from

24    watching TV, the jury watches the defendant and passes

25    judgment on whether the defendant is guilty or not, and

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2464

1    then later on the judge imposes a sentence and decides

2    whether the person has to go to jail and for how long.

3            This isn't a criminal trial.  It's a civil trial,

4    and in a civil trial --

5                    MR. STRAND:  Excuse me, Doctor.  It's

6    outside the scope of his report and invades the province

7    of the court, and therefore I object.

8                    THE COURT:  Sustained.

9    BY MR. GOTTS:

10    Q.  Dr. Putnam, I take it, in terms of your analysis,

11   do you make any assumptions for purposes of your

12   analysis regarding validity and infringement?

13    A.  Sure.  So the point of it is that for these

14   purposes I have to assume that the jury finds that the

15   patents are valid and infringed, even though the jury

16   hasn't decided that yet.  I operate on the assumption

17   that they have decided that and that therefore there are

18   damages.

19    Q.  Okay.  So you were here when Dr. Rao testified;

20   is that right?

21    A.  Yes.

22    Q.  He testified regarding something called the

23   hypothetical negotiation; right?

24    A.  Yes.

25    Q.  Can you remind the jury what the hypothetical

1    negotiation is, please?

2       A.   So in a hypothetical negotiation, we imagine that

3    Time Warner and Sprint are sitting down to bargain over

4    the right to use Sprint's patents instead of litigating

5    in court.  And then at the outcome of that hypothetical

6    negotiation would be the price that Time Warner and

7    Sprint would have agreed to if they were trying to

8    figure out the royalty for Time Warner's use of the

9    Sprint patents.

10      Q.   So as an economist, do you use hypothetical

11   negotiations to value things other than patents?

12      A.   Sure.  It happens all the time.  There's lots of

13   times when you want to know the value of something but

14   it's not actually traded in the marketplace, and so you

15   have to imagine how it would have been traded.

16           So one example would be the value of your house.

17   Your town wants to know what your house is worth when

18   they -- so they can figure out how much of a tax bill to

19   send you.  It's based usually on the value of the house.

20           They don't make you sell your house in order to

21   figure out its value.  They assign something called fair

22   market value to your house.  And fair market value is

23   the value that your house would sell for if you had sold

24   it in a negotiation that was willing; in other words, if

25   you were willing to sell it, and if you were -- the

1    person buying it was informed about the value of your

2    house so they weren't deceived, and they weren't your

3    family member because they were somebody you were

4    dealing with at arm's length, and if you actually sold

5    it to them, what would it sell for.

6         So that's a hypothetical negotiation, and that's

7    what we're doing here.  But instead of valuing a house,

8    we're valuing patents.

9    Q.  And in doing the hypothetical negotiation

10   analyses, is it relevant or pertinent what happened in

11   any actual negotiations?

12   A.  Yes.

13   Q.  Could you explain that?

14   A.  Sure.  So the -- there's a couple of reasons.

15   One is -- for example, when you take a house, one of the

16   things you look at is what did houses actually sell for

17   in the neighborhood, houses that are similar to my

18   house.  So I want to look at the results of actual

19   transactions when I'm trying to figure out a

20   hypothetical value.

21        And the second reason for looking at actual

22   negotiations is that if you know the behavior of one of

23   the parties in another negotiation, if you know how they

24   did -- actually did behave, then like I say, Time Warner

25   or Sprint, then you can better predict how they would

 1  have behaved in this hypothetical negotiation that we

 2  imagine them having with each other.

 3      Q.  Okay.  And did you look at actual negotiations

 4  here in connection with your analyses?

 5      A.  I did.

 6      Q.  Okay.  Now, in this case, did you reach any --

 7  did you formulate an opinion as to who would be

 8  participating, who would be the parties to the

 9  hypothetical negotiation?

10      A.  It's Time Warner, of course, and Sprint as the

11  patentee and the licensee of these patents.

12      Q.  Are there actual negotiations that occurred

13  between Time Warner Cable and Sprint that helped you to

14  understand how the parties would behave in any

15  hypothetical negotiation?

16      A.  Yes.

17      Q.  So -- and what is -- can you elaborate what

18  particular actual negotiations and agreements you have

19  in mind that you believe informed your hypothetical

20  negotiation here?

21      A.  Yes.  So I think the jury has already heard a lot

22  about this.  But in particular on the timeline, we see

23  that in 2003, Time Warner and Sprint actually negotiated

24  for the services agreement that began their relationship

25  that ended eventually in March 2014.  And that's, you

 1   know, I think, by far the most relevant actual agreement

 2   that we should analyze in trying to figure out how they

 3   would have bargained in the hypothetical negotiation.

 4       Q.  So you're referring on this timeline, which is

 5   demonstrative Exhibit 3156, to the agreement which is in

 6   evidence as Exhibit 1439, which is -- I'm sorry, which

 7   is in evidence as Exhibit 1437, which is TWC's agreement

 8   with Sprint in 2003?

 9       A.  Yes.

10       Q.  Okay.  So, Dr. Putnam, in your experience, is it

11   typical for the jury to have at its disposal agreements

12   like this to facilitate the hypothetical negotiation

13   analysis?

14       A.  No.  This is actually a very unusual circumstance

15   that we have here because in most cases if you've got a

16   patent and you want to prevent your competitor from

17   using your invention, then you sue them.  And the whole

18   point is that there isn't an agreement between the two

19   people because one party is using the other party's

20   invention.

21           It's highly unusual to have a situation where the

22   parties themselves actually negotiated and we can make

23   reference to how they did behave when we were trying to

24   figure out how they would behave.

25       Q.  Is there anything else in your mind that makes

 1    this case unusual relative to the typical case you

 2    analyze?

 3      A.   Sure.   So there's actually a couple things.   One

 4    of them is that, as I said, in a typical -- in a common

 5    case, you sue your competitor for using your invention.

 6    That's a common practice.   You know, Chevrolet might sue

 7    Ford for using an invention.

 8         It's also quite common for somebody who has an

 9    invention to sue another person who's -- they're not

10    competing with but they don't want them using their

11    invention.   So you have a -- like for an iPhone, you

12    don't make iPhones and you're not competing with Apple

13    in selling iPhones, but you patented something that has

14    to do with the iPhone screen, let's say, and so you

15    might sue Apple because they're using your invention.

16    Those are common situations.

17         This is an uncommon situation because in this

18    case Sprint is suing its customer.   It's not suing a

19    competitor.   It's not suing somebody who's using its

20    invention independently.   It's suing somebody it has a

21    business relationship with.

22         And then the really uncommon thing about this is

23    that Sprint is suing its customer while Time Warner is

24    paying Sprint hundreds of millions of dollars for the

25    services that Sprint is providing.   So the parties have

1    a relationship, and there's a lot of money flowing back

2    and forth.  But in the context of that, Sprint is suing

3    Time Warner.

4        Q.  And is the relationship between the parties

5    something that economists such as you are supposed to

6    take into account in connection with the hypothetical

7    negotiation?

8        A.  Yes.

9        Q.  And how do we know that?

10       A.  Well, when Dr. Rao testified, he mentioned

11   something called the *Georgia-Pacific* factors, and he

12   didn't really explain that, but *Georgia-Pacific* was a

13   case back from the 1960s where a judge sat down and

14   said, here's a list of all the things that experts

15   should take into account when they're trying to figure

16   out the value of a patent.

17           And it's mostly commonsense, things like how

18   important was the invention, what were its advantages,

19   how profitable was it, you know, were there other

20   licenses to the patent that you can reference, and that

21   sort of thing.  It's just kind of a checklist that you

22   should go through.

23           And one of the things that -- on that list is the

24   commercial relationship between the parties.  In other

25   words, are they competitors, are they like an inventor

1   and somebody who's trying to promote the person's

2   invention, something like that.  If they're competitors,

3   you're going -- you're going to charge your competitor a

4   lot of money for -- to use your patent because they're

5   taking sales away from you.

6         And so it's very important to understand how the

7   two parties are related to each other when you're trying

8   to figure out how they would bargain with each other.

9      Q.  So we're going to turn to those factors in more

10  detail later, but the -- the competitor -- the

11  relationship of the party factor, is that factor five of

12  the *Georgia-Pacific* factors?

13     A.  Yes, that's No. 5.

14     Q.  And under factor five, would you also consider

15  whether or not the parties are in a business

16  relationship?

17     A.  Yes, it's very important.  It's critical

18  actually.

19     Q.  Okay.  Now, based on Dr. Rao's report, his

20  testimony and what you've said in your report, has

21  Dr. Rao taken into account the commercial relationship

22  of the parties?

23     A.  No.  He -- Dr. Rao basically said that

24  infringement began in 2010, and so that's when we should

25  start analyzing the negotiations without the context of

11-2686  - Sprint v TWC   2.28.2017 AM Session                    2472

1   the relationship that began in 2003.

2       Q.   And did Dr. Rao tell the jury about the

3   relationship of the parties?

4       A.   No.

5       Q.   What year did Dr. Rao begin his hypothetical

6   negotiation analysis?

7       A.   He said that the negotiation would be in 2010.

8       Q.   And in what year did Time Warner Cable's

9   relationship with Sprint begin?

10      A.   2003.

11      Q.   Okay.  And that was the time of the agreement we

12  just looked at on the timeline?

13      A.   That's right.

14      Q.   So that's seven years earlier than the 2010 date

15  that Dr. Rao relied upon; correct?

16      A.   That's right.

17      Q.   Now, I'd like to take you back to the 2003 time

18  in the agreement.  In 2003, was Sprint a sole provider

19  of services to -- connection services or voice services

20  to Time Warner Cable?

21      A.   No.  I think this has been explained actually by

22  other witnesses.  But just to recap, there were three

23  providers that are providing services for Time Warner's

24  customers.  There's Pine Tree, that's the green notation

25  here; MCI, which also entered into a deal with Time

2473

1   Warner in 2003; and then Sprint.  Those were the three

2   providers of VoIP services.

3       Q.  So in the 2003 time period, the market was

4   divided -- or shortly after, once they launched the

5   service, the market was divided between Sprint, MCI and

6   Time Warner Cable, in terms of interconnect services for

7   Time Warner Cable?

8       A.  Yes.

9       Q.  Okay.  So did that change at some point in time?

10      A.  Yes.

11      Q.  How did it change and when?

12      A.  Well, in 2006, Verizon bought MCI, and so that

13  was -- that posed a problem for Time Warner Cable

14  because Verizon is another supplier of phone services.

15  And so if Verizon owns MCI, then Time Warner Cable is

16  having to purchase phone services from its competitor,

17  and that leaves Time Warner Cable vulnerable.  You don't

18  usually like to have to buy a service that you're

19  depending on from someone that you're competing with.

20          So that prompted Time Warner Cable to renegotiate

21  its deal with Sprint and to transfer all the customers

22  that were being supplied by MCI over to Sprint.  And

23  that took some time, and they did it sort of city by

24  city or market by market, as they say.  But eventually

25  there was a transition so that the MCI customers -- the

1   customers that were supplied by MCI then were supplied

2   by -- by Sprint.

3       Q.  And is that reflected in Exhibit 200, which was

4   the July 2006 agreement between Time Warner Cable and

5   Sprint?

6       A.  Yes.  This is an amendment of their 2003

7   agreement that provides for the transfer of the

8   MCI-supplied customers to Sprint.

9       Q.  So when -- when Sprint entered into the 2003

10  agreement with Time Warner Cable, did it contemplate

11  that in 2006 it was going to get all the business?

12      A.  No.  That was a surprise, because that was

13  prompted by Verizon's acquisition of MCI, and no one

14  could have predicted that back in 2003.

15      Q.  So did there come a time later on when Time

16  Warner Cable, in fact, began to consider going it alone

17  and informed Sprint?

18      A.  Yes.  So the 2006 agreement was going to expire

19  starting in 2010, in October 2010.  So in 2009, Time

20  Warner Cable began to figure out what it was going to do

21  when that agreement expired, and it let Sprint know that

22  it was seriously thinking about going it alone.

23          And so the parties began to negotiate over

24  whether the 2006 agreement would be renewed when it

25  expired in 2010 or whether Time Warner Cable would, in

1   fact, Go It Alone.

2      Q.  So first off, to be clear, Time Warner Cable

3   didn't cancel the contract or terminate the contract; is

4   that right?

5      A.  No, that's right.  The agreement was supposed to

6   expire in October of 2010.

7      Q.  By its own terms; right?

8      A.  That's my misunderstanding, yes.

9      Q.  And for the parties who were negotiating, were

10  there price discussions?

11     A.  Yes.

12     Q.  What happened with those discussions?

13     A.  We heard a large part about that.  Both

14  Mr. Delargy and Mr. Banyas talked about it.  Originally

15  Sprint had a relatively high price, in the 9- or

16  10-dollar range per line.  And then in May 2009, Sprint

17  dropped its price to $6 per line.  That was -- that was

18  the most -- the last offer.

19     Q.  And did you -- have you reviewed the deposition

20  testimony of Mr. Elfman?

21     A.  Yes.

22     Q.  And were there any other discussions regarding

23  Sprint's position on pricing from Mr. Elfman?

24     A.  Yes.  Well, Sprint was very anxious to keep the

25  Time Warner business, and so the testimony was that

```
1   Sprint was willing to go even lower than $6, to $5.50,
2   or even lower if necessary, to keep the Time Warner
3   business.
4       Q.   Now, as of the 2009 time frame, did Sprint --
5   could Sprint have had any expectation of continuing to
6   provide services in any renewed contract at the original
7   contract price?
8                   THE COURT:  Pardon me.
9                   MR. STRAND:  Objection.
10                  THE COURT:  Don't answer if you would.
11                  MR. STRAND:  Objection.  Calls for
12  speculation about what Sprint thought.  This witness is
13  not qualified.  It lacks foundation and calls for
14  speculation.
15                  THE COURT:  You can rephrase.
16                  MR. GOTTS:  Yes.
17                  THE COURT:  I'll sustain the objection as
18  stated.
19                  MR. GOTTS:  Fair enough.
20  BY MR. GOTTS:
21      Q.   You -- and you've testified, sir, that the --
22  Sprint had already proposed to drop its price to $6, and
23  considered dropping it even further; correct?
24      A.   That's my understanding, yes.
25      Q.   And that was as of 2009?
```

1       A.   Yes.

2       Q.   So as of 2009, based upon your review of the

3   facts, do you believe Sprint was expecting to be able to

4   continue the contract at the contract price in 2009?

5            MR. STRAND:   Objection.   Relevance as to

6   what this witness believes.   He's an expert economist.

7            THE COURT:   Overruled.

8            THE WITNESS:   The point is they had already

9   lowered their price.   And so the original deal was at

10  9-something, and now they said we're willing to cut it

11  to 6.   And so that's -- that's the live issue.   What

12  they had originally wanted to get or what they charged

13  in the past is no longer relevant because what matters

14  is what the current offer on the table is.

15  BY MR. GOTTS:

16      Q.   And there's been a lot of discussion, including

17  cross examination of Mr. Delargy and Mr. Banyas,

18  regarding comparisons to the contract price.   What price

19  is that?

20      A.   Well, it varied over time, but it was in the 9-

21  or 10-dollar range per line.   Under the 2006 agreement,

22  it was under -- in the 9- or 10-dollar range.   And then

23  the parties were negotiating to see how much lower it

24  would go, or whether Time Warner Cable would just Go It

25  Alone entirely.

11-2686 - Sprint v TWC   2.28.2017 AM Session                    2478

1      Q.  So the contract price is not that $6 price or

2   that 5.50 or lower price; correct?

3      A.  No, no.  Sprint knew that it couldn't keep Time

4   Warner's business at $9, so it was going to have to cut

5   the price, and they were just bargaining over how low to

6   go.

7      Q.  Why was Sprint, to your understanding, willing to

8   drop its price?

9      A.  Well, because remember, Time Warner Cable is

10  spending hundreds of millions of dollars with Sprint to

11  supply these services, and that's very valuable.  In

12  addition to that, at this time Sprint thought that

13  there's a possibility that it could enter into a

14  wireless deal.  Remember, this is a wire line, a

15  landline deal.

16      There was also the possibility of a wireless deal

17  that -- and so it would be better, from Sprint's

18  perspective, if you could -- if it could get Time

19  Warner's wireless and landline business.

20      Q.  And could you very briefly explain to the jury

21  what sort of wireless deal we're talking about?

22      A.  Well, the wireless deal would be to allow Time

23  Warner Cable to become a wireless phone provider, sort

24  of a virtual -- like a virtual network, I think is what

25  it's called, where Time Warner Cable, like Verizon or

1  Sprint, is able to offer a Time Warner Cable cell phone

2  and provide wireless services, and Sprint would be the

3  one actually providing the service, just with the Time

4  Warner name on it.

5      Q.  Do you understand that to be referred to as a

6  MVNO?

7      A.  Yes, virtual network operations, I think -- or

8  operator, or something like that.

9      Q.  Right.  And that was something that was, based on

10  the record you reviewed, of high strategic priority to

11  Sprint; is that right?

12     A.  Yes.  They wanted -- Sprint's providing services

13  to Time Warner.  They want to keep doing it.  They want

14  to expand their relationship.  And so if they can keep

15  Time Warner's VoIP business and add to that the wireless

16  business, then that's obviously to their benefit.

17     Q.  So what did Time Warner Cable ultimately decide

18  to do?

19     A.  Well, ultimately Time Warner Cable said, no,

20  actually we want to Go It Alone anyway.  Thank you for

21  your offer, but we're going to let the agreement expire

22  and negotiate a transition agreement that allows these

23  markets to transition from being provided by Sprint to

24  being provided by Time Warner Cable itself.

25     Q.  And that happened in October 2010; is that right?

11-2686  - Sprint v TWC   2.28.2017 AM Session          2480

1      A.  Yes.

2      Q.  And just as a point of reference, do you

3  understand the patents expired -- or expired May of

4  2014?

5      A.  Yes, that's right.

6      Q.  So the -- the period, what we call the damages

7  period here, is from October 2010 until the expiration

8  of the patents in May of 2014; is that fair?

9      A.  Yes, that's what Sprint is accused -- that's what

10  it calls infringement.

11      Q.  So, sir, I think you indicated that Dr. Rao has

12  assumed the hypothetical negotiation begins in 2010;

13  correct --

14      A.  Yes.

15      Q.  -- October 2010?

16          Have you made an assumption as to when the

17  hypothetical negotiation should be viewed to occur?

18      A.  Yes.  Well, I'm -- I'm responding to Dr. Rao.  I

19  believe the negotiation should be when the parties

20  actually negotiated in 2003.  That's when they began

21  their relationship.

22      Q.  Now, sir, are you giving -- let me ask you this:

23  What is the time period, as you understand it, in these

24  sorts of analyses, as to when you're supposed to frame

25  the hypothetical negotiation?

1     A.  You want to have the hypothetical -- hypothetical

2   negotiation occur immediately before the accused

3   infringer begins to use the invention that's being

4   asserted in the case.

5     Q.  And are you --

6           MR. STRAND:  Excuse me, Your Honor.

7   Objection.  It misstates the law and invades the

8   province of the court.

9           THE COURT:  Sustained.

10          MR. STRAND:  May I get an instruction asking

11  the jury to disregard that statement?  It's just wrong

12  as a matter of law.

13          THE COURT:  Members of the jury, you are

14  instructed to disregard the witness's statement

15  concerning the hypothetical negotiation.

16  BY MR. GOTTS:

17    Q.  Sir, do you understand the hypothetical

18  negotiation is to be commenced just prior to the

19  commencement of infringement?

20    A.  Yes.

21    Q.  And is that the analysis you've applied in this

22  case?

23    A.  Yes.

24    Q.  So for purposes of determining the time that is

25  just prior to the commencement of infringement, are you

11-2686 - Sprint v TWC   2.28.2017 AM Session                2482

 1   offering any opinions on the question of infringement?

 2      A.  No, I have no opinion about infringement at all.

 3      Q.  Okay.  So what are you basing your time frame of

 4   2003 on?

 5      A.  So Dr. Rao said his assumption was that Sprint's

 6   patents are what he called blocking patents.  What he

 7   meant by that was -- and what he said was that the only

 8   way to connect to the PSTN was by using the Sprint

 9   patents.  And so if that's true, then you have to look

10   at when Time Warner began to connect to the PSTN.  And

11   they began to connect to the PSTN in 2003.  So if I'm

12   going to take Dr. Rao's assumption about infringement

13   and I'm applying it consistently, then I have to be

14   starting in 2003, when Time Warner Cable began to

15   connect to the PSTN.

16      Q.  Okay.  So, sir, if we could turn to the next

17   slide.

18            THE COURT:  I'm sorry -- oh, I'm sorry.

19   You're still on hypothetical negotiation.

20            MR. GOTTS:  I was -- I am, but it's --

21            THE COURT:  No, I was -- if you were

22   switching to the next topic on your previous slide, I

23   was going to break here, but if you want to -- still

24   going on hypothetical negotiation?

25            MR. GOTTS:  Yeah, but that's going to go for

1    a while, so I think this would be a good breaking point.

2    It's a new topic.

3              THE COURT:  Excellent.  Members of the jury,

4    I'll remind you of the admonitions.  We'll be in recess

5    for 15 minutes, start a little bit before 11:00.

6         Mr. Rempel, please take charge of the jury.

7         Mr. Putnam, you may step down, and we are in

8    recess for 15 minutes.

9              (Recess.)

10             THE COURT:  If we're ready to proceed, we'll

11   bring in the jury.

12             MR. GOTTS:  Yes, sir.

13             (The jury entered the courtroom, after which

14   the following proceedings were had.)

15             THE COURT:  You may be seated.  Mr. Gotts,

16   you may resume your examination.

17             MR. GOTTS:  Thank you, Your Honor.

18   BY MR. GOTTS:

19     Q.  Dr. Putnam, when we left off, we had discussed

20   the hypothetical negotiation which proceeded in 2003, in

21   your opinion; right?

22     A.  Yes.

23     Q.  And you said it would be informed by what was

24   going on in the real world in 2003?

25     A.  That's right.

11-2686  - Sprint v TWC   2.28.2017 AM Session          2484

1      Q.  Have you prepared a slide to explain how you

2   believe the negotiation -- actual real-world

3   negotiations in the 2003 time frame would have informed

4   the hypothetical negotiation?

5      A.  Yes.

6      Q.  Is that -- is that what's up on the screen now?

7      A.  Yes.

8      Q.  Could you walk us through that, please.

9      A.  Sure.  So on the left-hand side of the screen, we

10  have Sprint and TWC sitting at the table and bargaining.

11  And this happened -- this actually happened in 2003.

12  Time Warner says to Sprint that they want to launch a

13  VoIP service and that they are going to use Pine Tree

14  and MCI and Sprint to supply their VoIP services.  And

15  Sprint says, okay, we just want 52 percent of your

16  business.  We want about half of your business or a

17  little more than half, and that will be fine with us.

18  And that's the deal that the parties actually entered

19  into in 2003.

20     Q.  So you're not saying they actually said that?

21          MR. STRAND:  Excuse me, counsel.  May we

22  approach side-bar, Your Honor?

23          THE COURT:  You may.

24          (The following proceedings were had at the

25  bench by court and counsel.)

1              MR. STRAND:  I object to this on the grounds

2    that it completely and utterly misstates both the record

3    of this case and the law of this case.  There has not

4    been one scintilla of testimony that anyone at any time

5    in 2003, on behalf of either Time Warner Cable or

6    Sprint, in any way negotiated, discussed, anything about

7    the Pine Tree and MCI use, zero.

8         In addition, it directly contradicts this court's

9    order that the 2003 and later the 2006 agreement did not

10   relate to the use of the patents.  So the witness is

11   testifying in a counterfactual way based upon both the

12   evidence and the law of the case.  Therefore I object.

13   If we start down this path, we're going to create a

14   morass of confusion.

15              THE COURT:  Where are you going with this?

16   I honestly think what I've heard so far, his analysis is

17   fundamentally flawed, but I don't know where you are

18   actually going.

19              MR. GOTTS:  So, Your Honor, first of all, I

20   was about to ask the question -- they didn't actually

21   say those things.  That wasn't the point.  The point was

22   the analysis, Your Honor, is as follows:  In 2003, at

23   the -- the negotiation table Sprint accepts a deal with

24   knowledge of Pine Tree and MCI, and accepts -- and says,

25   as long as I'm getting half the market, they're

1    satisfied.  And that is the deal that was struck.  And

2    then we're going to extrapolate that deal.

3              THE COURT:  There is no evidence that that

4    occurred.  There's evidence that they were given a

5    certain chunk of the business --

6              MR. GOTTS:  Yes.

7              THE COURT:  -- for which they were willing

8    to accept a certain fee for a particular thing, and that

9    is providing that service.  Now, I -- if he wants to

10   base his opinion of royalty, as he did, on what they got

11   paid, that's fine.

12        But turning that into, well, they sat there and

13   knew that all these other people were doing these things

14   and they accepted that, you know, I don't think there's

15   really -- there's evidence -- there was evidence of

16   knowledge of other things going on, but not a conscious

17   decision that says, well, you give me 52 percent, I'll

18   do that.  That isn't how it happened.  They wound up

19   with 52 percent.  That isn't how it happened.

20             MR. GOTTS:  Let me just respond, Your Honor.

21   I'll go to the next slide which explains actually the

22   circumstances.  He was really just trying to set up the

23   formulation.

24             MR. STRAND:  Your Honor, then I have the

25   following objection, that there are multiple, multiple

 1   statements in his report that they "bargained," they

 2   "agreed," and they "contracted to the deal" that he's

 3   just trying to describe.  To the extent now that we try

 4   to move it into a, oh, no, it wasn't really that, it was

 5   what everybody knew, it was outside the scope of his

 6   report and therefore objectionable.

 7             THE COURT:  Let's see where he goes.

 8             MR. STRAND:  Do you want me to hop up or

 9   come back over here?

10             THE COURT:  I want you to hop up if he gets

11   to a point you can get me to sustain an objection.

12             MR. STRAND:  Thank you, Your Honor.

13             (Thereupon, the proceedings continued in

14   open court.)

15   BY MR. GOTTS:

16     Q.  So, Dr. Putnam, we're going to go to the next

17   slide, okay?

18     A.  Sure.

19     Q.  And if you could turn to Slide 6.  Dr. Putnam,

20   does Slide 6 reflect the state of play in 2003 with

21   regard to Sprint, MCI and Pine Tree?

22     A.  Yes.

23     Q.  And in 2003, under the 2003 to two thousand --

24   2003 deal, in that two -- that year period for that

25   deal, what was the expectation as to the portion of the

11-2686  - Sprint v TWC   2.28.2017 AM Session                2488

1    marketplace that Sprint was going to cover?

2       A.   Well, based on the division of the markets, there

3    were three suppliers of the Time Warner markets.   There

4    were three suppliers; Pine Tree, MCI and Sprint.   And

5    the customers in the Sprint markets accounted for about

6    52 percent of all of Time Warner Cable's customers.

7       Q.   And Sprint accepted that deal?

8       A.   Yes.

9            MR. STRAND:   Excuse me, Mr. Gotts.   I

10   object, Your Honor.   There was --

11           THE COURT:   There's no evidence of a

12   conscious division of the market.   There is evidence

13   that Time Warner Cable contracted with three separate

14   entities to do certain kinds of things, the result of

15   which may have been Sprint obtaining "x" percentage of

16   the market.   But to characterize that as "a deal" in the

17   sense of it being a group of people sitting around a

18   table saying, you get 52 percent, you get "x" percent,

19   you get "y" percent, misstates what happened.

20        I have no problem with the expert witness,

21   however, explaining why he would take this information

22   and treat it as if it happened that way.   But what

23   concerns me is that isn't the evidence in the case that

24   there was such a conscious -- you know, everybody around

25   the table dividing it up.

11-2686 - Sprint v TWC   2.28.2017 AM Session                2489

1           MR. GOTTS:  May I respond, Your Honor?  I --

2    the question I asked was one with knowledge.

3           THE COURT:  I know, but the witness has

4    again interjected this notion as if there were a bunch

5    of people sitting around the table.

6           MR. GOTTS:  I understand.  Okay.

7           THE COURT:  So he needs to take his opinion

8    not based upon facts that there is no evidence for in

9    the record either at trial or before trial.

10          MR. GOTTS:  I understand.  I didn't

11   understand the concern.  I do understand now, Your

12   Honor.  I'll try.

13          THE COURT:  You may proceed.

14   BY MR. GOTTS:

15    Q.  Dr. Putnam, at the time of the 2003 agreement,

16   based on evidence that you've reviewed in this case, was

17   Sprint also aware that MCI and Pine Tree were going to

18   be providing services in the marketplace?

19    A.  Yes.

20    Q.  Okay.  And the -- and Sprint entered into the

21   agreement for the share that it accepted, with knowledge

22   that Sprint -- that MCI and Pine Tree would be servicing

23   other portions of the market; right?

24          MR. STRAND:  Your Honor, I object.  There

25   was no agreement accepting a share.

 1            THE COURT:  I think, as stated, that's a

 2    fair question by Mr. Gotts, so I will overrule that

 3    objection.

 4            MR. GOTTS:  Thank you, Your Honor.

 5            THE WITNESS:  So just so I can be clear and

 6    try to avoid misstating it, what I analyzed was in the

 7    markets that Sprint actually contracted for in 2003, if

 8    you were to look at all of Time Warner's customers, what

 9    was the share that -- of those customers that Sprint

10    ended up with?  The contract itself doesn't say you get

11    52 percent.  The contract says you get these markets,

12    whatever markets they are.

13         And then I look at all of Time Warner's books and

14    say, well, okay, how many customers were in those

15    markets, and what share of all of Time Warner's

16    customers did Sprint actually get.  And so I'm the one

17    that calculated the 52 percent, not the parties when

18    they bargained for it.

19    BY MR. GOTTS:

20      Q.   Okay.  Thank you for that clarification.

21         Now, if we go to the next slide, Slide 7, can you

22    please tell us what that illustrates?

23      A.   Sure.  So, first of all, we want to ask two other

24    questions.  One was what was this deal that Sprint

25    actually got?  In other words, they accepted a deal in

1    which their share of Time Warner's customers was

2    52 percent.  Now, over this entire period over the

3    lifetime of the patents, what was their actual share of

4    Time Warner's customers?  That's something, again, I

5    calculated.  And that share changed, because remember,

6    in 2006, that's when Sprint and Time Warner Cable

7    renegotiated their agreement and when Sprint began to

8    take over the markets that were formerly served by MCI.

9         So Sprint's share went up from the 52 percent in

10   the first three years to the vast majority, basically

11   everything except for Pine Tree, by 2010.  So this was a

12   great benefit to Sprint.

13        Then in 2010, that's when the parties entered

14   this transition agreement; the 2006 agreement expired.

15   TWC decided to Go It Alone, that's when Sprint says that

16   TWC began to infringe and Sprint's share of TWC's

17   customers began to decrease because market by market TWC

18   took over from Sprint.  So that we see by February 28th,

19   2014, Sprint's share has gone down to zero and Time

20   Warner is serving all of its customers by itself.  And

21   then that goes on for a couple of months until May when

22   the patents expire.

23        So if we ask the question:  What was the deal

24   that Sprint actually got?  What share of Time Warner

25   Cable's customers in retrospect -- I mean, did Sprint

1    actually get?  That share was 67 percent.  So in

2    retrospect, Sprint got a much better deal than the share

3    of customers that was implied by the 2003 agreement.

4         Q.  So how do you use this 2003 agreement to inform

5    your opinions regarding the hypothetical negotiation

6    between TWC and Sprint in 2003?

7         A.  Okay.  It goes like this:  So the parties are now

8    sitting down in 2003 and they're bargaining over the

9    entire life of the patents from 2003 through 2014.

10        Q.  In the hypothetical negotiation?

11        A.  In the hypothetical negotiation, yes.  And so

12   this is -- we're imagining this, but they want to solve

13   this problem once and for all, okay.

14            Time Warner Cable doesn't have a license, but it

15   needs a license, and so they're bargaining for this

16   license, and they're going to need this license in 2010

17   when they Go It Alone, okay.

18            So the question is, what are they willing to pay

19   for this and what would Sprint accept in this

20   hypothetical negotiation for the right to use Sprint's

21   patents starting in 2010.

22            We know for a fact that Sprint was willing to

23   take a deal, a certain share of the market, which

24   implied 52 percent of Time Warner Cable's customers.

25            Time Warner Cable says, we're going to give you a

1   much better deal than that, including our Go It Alone

2   project.

3              MR. STRAND:  Excuse me, Doctor.  I have a

4   continuing objection to the term "deal."  There was no

5   deal.

6              THE COURT:  Well, there was a deal between

7   Time Warner Cable and Sprint.  I believe the witness now

8   is giving his opinion about the economic reality of that

9   deal.  He is not attempting to say that there was, as a

10  matter of fact, a carving up of the market deal.

11     I will permit him to give his opinion about the

12  economic realities of what he believes is the essence of

13  what occurred.  And I think it's clear to the jury that

14  there was no, as a matter of fact, carve-up deal among

15  four entities.

16             MR. STRAND:  Now, and then, Your Honor, I

17  further object it is outside the scope of his expert

18  report which concludes there was a deal.  So we're now

19  outside the scope of the report.

20             THE COURT:  Substantively is there any

21  difference in what he's going to say, construing it the

22  way I have told him he has to construe it?

23             MR. STRAND:  Absolutely.

24             THE COURT:  Well, then let's talk about it.

25             (The following proceedings were had at the

```
 1   bench by court and counsel.)
 2            MR. GOTTS:  I'm not sure what he's --
 3   counsel is referring to.  This is exactly the analyses
 4   the expert has done throughout.  He said there was no
 5   implied license, and he said, you know, based upon the
 6   -- what happened in the real world, is what would inform
 7   what -- you know, what sort of compensation they would
 8   be looking for in 2010.
 9            THE COURT:  How does it change?
10            MR. STRAND:  Here's what we have, Your
11   Honor:  I say, as the predicate he has opined, he's
12   based his opinion on the fact that there was a
13   negotiation, an agreement and a contract.  "The economic
14   implication of these contracts is that Time Warner has
15   already paid not only for the paying uses but also for
16   the non-paying uses," "contracts;" "had already
17   bargained not only over the patent in question but also
18   over the right to use it in a non-paying fashion,"
19   "bargained," "an exchanged contractual discussion
20   between two parties."  That is factually not correct.
21   That is -- that is the premises for his conclusion.
22        Now he wants to morph that into, oh, what are the
23   economic realities of the situation.  Where the rubber
24   hits the road on that is in 2006 --
25            THE COURT:  Now, Mr. Gotts, let's -- let's
```

 1   talk about that a little farther.  Now, is he going to

 2   testify that by entering into the contract they obtained

 3   rights?

 4              MR. GOTTS:  No, absolutely not.

 5              THE COURT:  Which is the implication of that

 6   sentence.

 7              MR. GOTTS:  Yeah, but he's only reading you

 8   that sentence --

 9              THE COURT:  Right.  That's something I

10   assume is history based upon the court's ruling.

11              MR. GOTTS:  Absolutely.

12              THE COURT:  I'm assuming what he's going to

13   testify to is his opinion about the economic reality of

14   what it is Sprint and Time Warner Cable actually

15   bargained for, but looking at it from a hypothetical

16   perspective as to how that would have informed a

17   reasonable royalty, beginning with infringement in 2010.

18   That's -- that's what it sounds like he's testifying to.

19              MR. GOTTS:  Yes, Your Honor.

20              THE COURT:  All right.  Now, if that's what

21   he does, I don't think that changes the substance of his

22   bottom line.

23              MR. STRAND:  We'll go with it.  In 2006,

24   he's going to argue that the agreement was unforeseeable

25   based upon the prior agreement.

 1                  THE COURT:  He may be full of baloney.

 2                  MR. STRAND:  He is.

 3                  THE COURT:  It's up to you to point that out

 4    to the jury, but that is within the scope of his

 5    report --

 6                  MR. STRAND:  All right.

 7                  THE COURT:  -- as properly put in

 8    perspective that he is recreating, in an opinion sense,

 9    what he believes the economic realities are.  As long as

10    we don't confuse the jury about the fact of some

11    agreement, it's fine for him to give his opinion about

12    this, just as it was fine for Rao to give his opinion

13    based upon a *Vonage* verdict that had some, shall we say,

14    interesting issues to it, which were able to be pointed

15    out on cross examination.

16                  MR. STRAND:  All right.

17                  THE COURT:  That's the point we're doing

18    here.  The people who are supposably informed in this

19    area, these experts who are massaging these numbers as

20    they were asked to do, and the other side is having an

21    opportunity to sort that out.

22                  MR. STRAND:  Okay.

23                  THE COURT:  I think that's where we are.

24                  MR. STRAND:  Thank you.

25                  (Thereupon, the proceedings continued in

11-2686  - Sprint v TWC   2.28.2017 AM Session                2497

1   open court.)

2   BY MR. GOTTS:

3       Q.  Give me a moment to figure out where we left off

4   when your answer was --

5       A.  Sure.

6       Q.  -- stopped, if we could.

7           That's a little bit difficult.  Let me --

8               THE COURT:  I don't remember where you were

9   either, so...

10  BY MR. GOTTS:

11      Q.  Yeah.  One moment, please.  So I believe we were

12  talking about Slide No. 7 and how the -- the negotiation

13  -- sorry -- the agreement in 2003, and what happened as

14  a result, as depicted in Slide 7, informs your

15  hypothetical negotiation analysis.

16      A.  Yes.

17      Q.  Okay.  And from an economic perspective?

18      A.  That's right.

19      Q.  Okay.  If you could then please explain that.  It

20  might rehash a little bit, but let's start again because

21  we were broken up in the middle.

22      A.  Sure.  So just to recap, over this entire period,

23  when you actually look -- do the analysis, as I did in

24  my report, there's this fluctuation in the share of

25  TWC's customers that Sprint actually had.

1        And over the entire period of the life of the

2    patents, Sprint's share was 67 percent.  Okay.  And that

3    includes the time period from 2010 through May 5th,

4    2014, when TWC decided to Go It Alone, and that's what

5    Sprint calls infringement, and that's what the parties

6    are bargaining over.  They're bargaining over that back

7    in 2003 when they start their relationship.  Okay.

8        Q.  So just to clarify, in 2003, the agreement was to

9    extend until 2006.  That's as shown in Slide No. 6; is

10   that right?

11       A.  I think actually it was supposed to go through

12   2008, but then they renegotiated in 2006.  So, yes,

13   that's right.

14       Q.  Right.  And based upon that agreement, what was

15   the economic reality?

16       A.  Well, again, if you look at Sprint's actual share

17   of TWC's customers, that turned out to be 52 percent,

18   and that's shown by the lower red dotted line on

19   Slide 7.

20       Q.  And if you look at the entire period from 2003

21   through the damages period in May 2014, which share of

22   the business did Sprint obtain?

23       A.  67 percent.

24       Q.  So greater than the 52 percent that they got

25   under the 2003 agreement; is that right?

1      A.  That's right.

2      Q.  So as -- from an economic perspective, what

3  conclusions do you reach with regard to the hypothetical

4  negotiation in 2003, based upon those circumstances?

5      A.  Well, the conclusion is this:  What TWC has to

6  offer is a better deal than what Sprint was willing to

7  accept.  What TWC has to offer is a deal in which, over

8  this entire time period, including the Go It Alone

9  period, Sprint will get 67 percent of TWC's customers.

10         So what that means is that the additional royalty

11  that you would have to pay for the right to Go It Alone

12  would be small or even zero, and the reason why is

13  because Time Warner Cable is offering a better deal than

14  the deal that Sprint actually accepted in 2003 for the

15  right to Go It Alone, including the patent rights.

16         So the additional royalty beyond the hundreds of

17  millions that Time Warner is already agreeing to pay

18  Sprint over this time period would be very small or

19  non-existent.

20      Q.  And to be clear, sir, are you suggesting that in

21  2003 there was any sort of license granted to Time

22  Warner Cable?

23      A.  No, there was no license.  That's why in 2003,

24  the parties have to bargain for a license for Time

25  Warner Cable to Go It Alone in 2010, but they're taking

1    into account all the money that Time Warner Cable is

2    already paying Sprint between 2003 and 2014.

3        Q.  So based upon the 2003 agreement and

4    negotiations, what is your opinion as to how that would

5    impact the royalty that would have been agreed to in a

6    2003 hypothetical negotiation?

7        A.  If there was going to be any additional royalty

8    at all, it would be small because Sprint is already

9    getting a much better deal than the deal it showed that

10   it was willing to accept in 2003.

11       Q.  And have you considered, whether or not if the

12   jury were to disagree with you regarding the 2003

13   hypothetical negotiation date and to accept Dr. Rao's

14   2010 hypothetical negotiation date, how would -- how

15   would your analysis change with regard to the

16   hypothetical negotiation based upon the agreements?

17       A.  Well, I did ask that question, and I ran the

18   numbers again.  Suppose that you just forgot the

19   left-hand side of this slide and started in 2010, you

20   forgot about all the money that Time Warner Cable had

21   paid to Sprint from 2003 to 2010, and you said, let's

22   just have them bargain in 2010, then would they be

23   getting half of Time Warner's business?  And the answer

24   is yes.

25           When you take into account the fact that in 2010

 1    Sprint has almost all of Time Warner's business, so it's

 2    getting its money up front, and you also take into

 3    account the fact that the connections to the PSTN are

 4    decreasing over time, which means that Sprint's patents

 5    are being used less and less over time, taking those two

 6    factors into account, Sprint is still getting more than

 7    52 percent of Time Warner Cable's business.  And so if

 8    the deal -- if 52 percent was acceptable in 2003, then

 9    it must be acceptable in 2010.  And so you still don't

10    need to pay any additional royalty given the monies that

11    you -- that Time Warner Cable is already paying to

12    Sprint for the markets that Sprint is servicing.

13        Q.  Okay.  Sir, have you created a demonstrative

14    which we're going to use to keep track of the various

15    real-world evidence that you're considering in

16    connection with your opinions?

17        A.  Yes.

18        Q.  So why don't we put up Slide 8.  Does that -- can

19    we call this scenario you talked about the hypothetical

20    negotiation scenario?

21        A.  Yes.  Bargaining back either in 2003 or 2010, the

22    amount of the royalties that are required to compensate

23    Sprint additionally would be small.

24        Q.  Okay.  That's reflected now in Slide No. 8; is

25    that correct?

11-2686  - Sprint v TWC   2.28.2017 AM Session          2502

1      A.  That's right.

2      Q.  Okay.  So let's turn now, sir, that -- did you

3  consider other instances of real-world evidence in order

4  to valuate the hypothetical negotiation and valuation

5  Sprint would place on the patents in 2003?

6      A.  Yes.  As we've said, it's important to consider

7  things that happened in the real world in actual

8  negotiations to understand what would happen in the

9  hypothetical negotiation.

10     Q.  So if we turn to the next slide, does this slide

11 list the various of real-world instances that you

12 considered in connection with your opinions?

13     A.  Yes.

14     Q.  And the first one says, Sprint's licensing offer

15 to Cisco.  Do you see that?

16     A.  Yes.

17     Q.  First of all, who is Cisco?

18     A.  Cisco is one of the manufacturers of the gateways

19 and the switches that have been the subject of the

20 technical testimony and that Time Warner Cable purchases

21 from, in order to construct the network that Sprint

22 accuses of infringement.

23     Q.  And you reference Sprint's licensing offer to

24 Cisco.  What was that?

25     A.  Yeah, so back in 1998, Sprint offered to license

1    its entire VoIP portfolio to Cisco.  And it offered to

2    do that for $125 million.  That would give Cisco the

3    right to sell the gateways and switches and other

4    equipment to its customers like Time Warner, and they'd

5    be licensed to use all of Sprint's patents.

6        Q.  And you computed that 125,000 (sic); is that

7    correct?

8        A.  125 million, that's right.

9        Q.  I'm sorry.  Now, did that negotiation include the

10   patents at issue in this case?

11       A.  Yes, it did.

12       Q.  Did it include others?

13       A.  It was all of Sprint's VoIP patents.  There was

14   eventually about 130 in the portfolio.

15       Q.  And did you prepare a slide that explains your

16   analysis of the Cisco licensing offer?

17       A.  Yes.

18       Q.  So why don't we turn to Slide No. 11.  Is this

19   your work here?

20       A.  Yes.

21       Q.  Okay.  Could you just walk the jury through the

22   general approach that you took towards using the Cisco

23   offer and applying it in this case to valuate the

24   reasonable royalty?

25       A.  Sure.  So our goal is to take this offer to --

1    that Sprint made to Cisco and eventually come up with a

2    royalty for the particular patents that are at issue in

3    this case.  And so we have to make some modifications to

4    that offer because it didn't quite fit the

5    circumstances.

6          So the first modification is we have to consider

7    the value of the offer if it had been made in 2003, when

8    the hypothetical negotiation is, rather than 1998.  That

9    increases it up to about 224 million.  Then we have to

10   look at -- that's -- that's for the right for Cisco to

11   sell its equipment to everybody.

12         But what is Time Warner Cable's share of Cisco's

13   sales?  Well, it's about a quarter.  So that means that

14   Time Warner's share of that license is about 56 million.

15   That would mean that Time Warner Cable had received the

16   right to practice the Sprint patents via its Cisco

17   equipment, but Time Warner Cable, in turn, buys its

18   equipment from other people, okay, not just from Cisco.

19         So we have to increase that to allow for all the

20   purchases that Time Warner Cable makes, not just the

21   Cisco purchases.  That takes you to about 145 million.

22         Now, that equipment that Time Warner Cable would

23   have bought is only being used during the infringement

24   period.  Okay.  We need a license not for the entire

25   life of the equipment but only for the period from 2010

1   through 2014.  So the share of that equipment is about

2   14 percent, when you take into account the decreasing

3   use of the equipment, because fewer and fewer

4   connections are being made to the PSTN over this time.

5        That leaves you with $20 million as the price to

6   pay for the use of the equipment to use Sprint's patents

7   during the damages period.  That's for the entire Sprint

8   portfolio of patents.

9        For the particular patents at issue in this case,

10  I have calculated that their share of that portfolio is

11  between 19 and 49 percent, which implies that a license

12  for these particular patents during the damages period,

13  based on Sprint's offer to Cisco, would be between about

14  4 million and about 10.2 million.

15  Q.  Did Sprint and Cisco actually enter into this

16  agreement based upon this offer?

17  A.  No.  This is just an offer.  It's like the asking

18  price of a house.  It's not the final price of the

19  house; it's the asking price.

20  Q.  Is that relative to the hypothetical negotiation

21  or reasonable royalty analysis, in your opinion?

22  A.  Yes.  The parties would know that Sprint had

23  offered this to Cisco, and they would bear this in mind

24  in trying to figure out the value to TWC.  If TWC were

25  the one that was licensing rather than Cisco, TWC

1    shouldn't be paying more than Cisco paid.

2        Q.  Is this a separate analysis from the hypothetical

3    negotiation analysis you spoke of earlier?

4        A.  Well, it's one of the things -- it is separate

5    because this is actually -- this really happened.  The

6    offer to Cisco really happened in 1998.  I'm trying to

7    adjust that offer to make it comparable to the

8    circumstances of the hypothetical negotiation in 2003 so

9    that it covers just these patents as the hypothetical

10   negotiation would, just for 2010 to 2014 as the

11   hypothetical negotiation would, and all of TWC's

12   equipment, not just its Cisco equipment.

13       Q.  So if we turn to Slide No. 12, have you included

14   the Sprint offer to Cisco on your chart of real-world

15   evidence?

16       A.  Yes.  So you can see, based on that analysis, the

17   range of payments would be between 4 million and 10

18   million.

19       Q.  Okay.  So let's turn now to the next slide, and

20   the next item of real-world evidence that you

21   considered, and this one's entitled, TWC's Purchase of

22   VoIP or VoIP Equipment.  Do you see that?

23       A.  Yes.

24       Q.  And I wonder if you could turn now to Slide 14

25   and describe for us your analysis of the TWC purchase of

1  VoIP equipment, starting with what you were analyzing.

2      A.   Sure.   Typically when you buy something, whether

3  it's something complicated like a gateway switch or

4  something simple like a gas grill, if there's patents in

5  it, then you would expect the manufacturer to have

6  obtained a license so that you can use the product that

7  you buy.   It's often the case that what's called the

8  royalty base for calculating the value of that license

9  is expressed as a percentage of the value of the

10  equipment that's purchased.

11        So in this case, during this period, Time Warner

12  Cable purchased about $167 million of the gateway

13  switches and -- gateways and software switches -- soft

14  switches that go into making up the network, and that

15  would be the basis for executing a royalty.

16      Q.   So the 167 million in Slide 14, is that what

17  you're calling the royalty base?

18      A.   Yes, that's the royalty base.   And then you

19  multiply that by a royalty rate to get a royalty

20  payment.

21      Q.   Now, have you done that analysis in Slide 15?

22      A.   Yes.

23      Q.   Okay.   Could you walk us through that, please.

24      A.   Sure.   So as I said, over this entire period,

25  they purchased about $167 million worth of equipment.

1    Of that, about 54 million was purchased during the

2    damages period.  That equipment is being used in some

3    ways that Sprint accuses and in some ways that Sprint

4    does not accuse.

5         So if it's used in a market that Sprint is

6    serving during this time period -- because remember,

7    Sprint is serving some of the markets during this time

8    period as they roll off -- then it's not accused of

9    infringement.  And then once the market rolls off, then

10   it is accused of infringement.  So you average that out,

11   it's about 43 percent.  That means that about

12   $23 million of infringing purchases during this period

13   -- or allegedly infringing, and you need to multiply

14   that by a royalty rate.

15        So I looked at other agreements in this industry

16   that had royalty rates based on the value of equipment

17   purchases, to see what the parties would have expected,

18   how they would have thought about this in their

19   negotiations.  It turns out it's a very wide range

20   because some inventions are not worth very much and some

21   inventions are worth a great deal.  The range is about 2

22   to 35 percent that you see in actual contracts in the

23   industry.

24        If you multiply that royalty rate times the

25   royalty base of 23 million, you get an equipment

1    payment, a royalty payment of about half a million to

2    about 8.2 million.

3        Q.   And to be clear, that range of royalties, those

4    are royalties applied to components that are used in a

5    system, not to the overall revenues generated by a

6    system; is that right?

7        A.   Yeah, these are -- this is not based on customers

8    or lines or subscribers.  This is based on the boxes,

9    the big electronic boxes that you buy and then string

10   together that create the network, not on customer

11   revenues.

12       Q.   Okay.  And based upon your analysis, did you come

13   up with a range of what you believe would be the

14   reasonable royalty that would inform the overall

15   hypothetical negotiation here?

16       A.   Yes.  So in the hypothetical negotiation, Sprint

17   and Time Warner Cable are going to be looking at the

18   purchases that -- of equipment that Time Warner Cable

19   made and considering a possible range of royalties, and

20   they would be aware of the results of a calculation like

21   this, when trying to decide on the amount that they

22   would agree to.

23       Q.   So if we turn to Slide 16, which is our chart

24   that's recording the evidence, have you included the

25   values for the TWC purchase of VoIP equipment on your

1    real-world evidence chart?

2       A.   Yes.  As it shows here, the range is between

3    about 500,000 and about 8 million.

4       Q.   Okay.  So let's turn next to what you call the

5    Arthur Andersen valuation.  And can you tell us, sir,

6    what that is?

7       A.   Yes.  In 1999 --

8       Q.   Actually, did you prepare a graphic that explains

9    this calculation?

10      A.   I did.

11      Q.   Okay.  Is that showing now?

12      A.   That's right.  That's Slide 18.

13      Q.   I didn't want to interrupt.  Please proceed.

14      A.   That's fine.  So Sprint actually wanted to know

15   the value of its VoIP portfolio, so it hired a

16   consultant to try to figure that out, and -- which is

17   very common.  It's like hiring a house appraiser to

18   figure out what your house is worth.

19           So they hired Arthur Andersen, who is a

20   well-known valuation firm, and that was in 1999.  And

21   about that time Andersen said they thought Sprint's

22   portfolio for use by everybody in the industry was worth

23   about $77 million.  Again, we have to make some

24   adjustments to that.  So its value in 2003 would be

25   about 125 million.

1        Then the question is, what is Time Warner Cable's

2   share of that total value, based on Time Warner's share

3   of subscribers in the entire industry.  Time Warner's

4   share is a little under 8 percent.  So that means that

5   Time Warner's share of the total value of Sprint's

6   portfolio is about -- is just under $10 million.  That's

7   for the entire portfolio.

8        Again, we have to narrow that down to the patents

9   that are at issue in this case.  Again, my calculation

10  is that they're worth somewhere between 19 and

11  49 percent of the entire value of Sprint's portfolio.

12  That implies a valuation for the patents at issue in

13  this case, based on the Arthur Andersen valuation, of

14  about 1.9 to 4.8 million.

15  Q.  And this was a valuation that was obtained by

16  Sprint for -- that included the patents that are at

17  issue in this case?

18  A.  Yes, it was like an appraisal that they had done.

19  Q.  And have you -- turn to Slide 19.  Have you

20  recorded your assessment of the --

21       Well, stepping back.  Did you -- how does the 1.9

22  to 4.8 million dollars in Slide 18 inform your

23  reasonable royalty analysis?

24  A.  Well, again, the parties are aware of this in the

25  hypothetical negotiation, and this is another data point

1    that they consider when trying to decide how much TWC

2    should pay for the Sprint patents.

3        Q.  And have you entered that on your chart in Slide

4    No. 19?

5        A.  Yes.

6        Q.  Okay.  And that's under the heading title, Arthur

7    Andersen; correct?

8        A.  That's right.

9        Q.  Let's turn next to the next analysis that you did

10   relating to CableLabs.  Do you see that?

11       A.  Yes.

12       Q.  Tell us, what did you consider relevant to the

13   hypothetical negotiation in connection with CableLabs?

14       A.  CableLabs is the organization that sponsors the

15   PacketCable standard, which I think the jury has heard

16   about.  It is a standard that's used by cable companies

17   for their VoIP services.  And in 2004, Sprint wanted to

18   join CableLabs.  It wanted to do that because they

19   thought it would give them access to develop future

20   business opportunities.  They wanted to supply services

21   to cable companies as they were doing for Time Warner

22   Cable.

23           As a condition of joining CableLabs, however,

24   CableLabs required that if you are going to join, you

25   had to be willing to license your patents for zero.  You

1   had to be able to give them away for free.  And so that

2   was the deal, if Sprint joined CableLabs, it would have

3   had to accept in order to get access to these business

4   opportunities.

5   Q.  So what does that -- what do the CableLabs

6   application, where Sprint indicated a willingness to

7   license its patents for free if it was given

8   participation rights, what does that tell you about

9   Sprint's valuation internally of its patents relative to

10  business opportunities?

11  A.  Well, this is -- this is consistent with the

12  other evidence.  Sprint is willing to set a price of

13  zero or close to zero on its patents if it can get

14  access to business opportunities to sell services.

15  Sprint doesn't place a high value on its patent rights

16  when there's a business opportunity that's available to

17  it.

18  Q.  Okay.  Have you entered on Slide 21 -- have you

19  entered the CableLabs information on your chart?

20  A.  Yes.

21  Q.  And what are you indicating there?  What is the

22  impact of CableLabs on your assessment of the

23  hypothetical negotiation for the reasonable royalty?

24  A.  Well, again, we're looking at something outside

25  of the hypothetical negotiation to tell us about

 1   behavior within the hypothetical negotiation, and this

 2   indicates that because Sprint places a low value on its

 3   patent rights in the context of a business relationship,

 4   then therefore the -- in the hypothetical negotiation,

 5   that's how we would expect Sprint to behave.  And as

 6   we're tracking the real-world evidence, we say, well,

 7   the value can't be very high if Sprint is willing to

 8   reduce it to zero when a business opportunity is

 9   available.

10       Q.  And did Sprint place a high value, based on your

11   review of the evidence, on its business opportunities

12   with Time Warner Cable?

13       A.  No.

14       Q.  Did Sprint place a high value -- did Sprint place

15   a high value on its business opportunities with Time

16   Warner Cable?

17       A.  I'm sorry, maybe I misunderstood.  It placed a

18   high value on the business opportunity.  It did not

19   place a high value on the patents.

20       Q.  And what sort of business opportunities did --

21   based on the evidence, was Sprint interested in, with

22   regard to Time Warner Cable?

23       A.  Well, obviously they were providing the VoIP

24   services for which they eventually generated $3 billion,

25   and then there was also the prospect of the wireless

1    services that they were negotiating for in 2009, trying

2    to expand their relationship with Time Warner Cable.

3        Q.   Okay.  So let's turn to the next slide, Slide

4    No. 22, and you reference here the Sprint-Mediacom

5    license.  Did the Sprint-Mediacom license -- was that

6    another real-world event or evidence that impacted or

7    was considered by you in connection with the

8    hypothetical negotiation?

9        A.   Yes.

10       Q.   Could you explain that to the jury, please?

11       A.   Sure.  So Sprint and Mediacom entered into a

12   deal, and the deal said that if Mediacom would buy

13   $5 million worth of services every year from Sprint,

14   then Sprint would license its patents for free.  So,

15   again, this sort of illustrates the same point that, in

16   the context of a business relationship, Sprint was

17   willing to license its patents for nothing in order to

18   take advantage of that business opportunity.

19       Q.   And what do you glean from that relative to the

20   hypothetical negotiation in this case?

21       A.   It's sort of the same thing as with the CableLabs

22   example.  The value that Time Warner and Sprint would

23   attach to Sprint's patents is small in the context of

24   the business relationship, because they could point to

25   this real-world experience that Sprint had with Mediacom

 1   and say, in a business relationship, you are willing to

 2   value your patents for nothing in order to maintain the

 3   relationship.  That should be the price that we would do

 4   -- agree to in the context of our business relationship.

 5        Q.  And, sir, have you entered this onto your chart

 6   of evidence on Slide No. 23?

 7        A.  Yes.

 8        Q.  And what have you noted there?

 9        A.  Again, it's the same thing that the value of --

10   the value implied by this real-world experience relative

11   to the hypothetical negotiation ought to be small.

12        Q.  Now, I'd like to turn to the next slide, which is

13   Slide No. 24, which is a list of *Georgia-Pacific* factors

14   we spoke of earlier.  Remember you referenced Factor

15   No. 5; right?

16        A.  Yes.

17        Q.  So Slide No. 24, does that refer to all 15 of the

18   *Georgia-Pacific* factors?

19        A.  Yes.

20        Q.  In connection with your analysis of the

21   hypothetical negotiation, have you reviewed and

22   considered the *Georgia-Pacific* factors to determine

23   which and to what extent they're relevant?

24        A.  Yes, I did.

25        Q.  I don't want to go through each and every one of

1   these, but are there any particular *Georgia-Pacific*

2   factors that you consider to be of particular relevance

3   or interest to the analysis that you did in a

4   hypothetical negotiation in this case?

5      A.   Yes.  So I think the jury's actually heard about

6   the most important ones.  For No. 5, it's the commercial

7   relationship between the licensor and the licensee.

8   That's obviously very important here.

9         No. 15 is what we call the basis of the

10  hypothetical negotiation, what would they have agreed to

11  if they'd been reasonably and voluntarily trying to

12  reach an agreement.

13        We've also discussed Factor 4, which is the

14  licensor has established policy and marketing program.

15  We're talking about how did Sprint approach this -- how

16  did Sprint approach licensing its patents when it was

17  involved in a business relationship with somebody.

18        And we've talked about Factor 11, which is the

19  extent to which the accused infringer, in this case Time

20  Warner, has made use of the invention.  And that's

21  important because over the period from 2010 through

22  2014, the connection -- the calls that connect to the

23  PSTN are decreasing.  They start out well over half of

24  the calls connect to the PSTN.  But by the end of the

25  period, less than a quarter of the calls connect to the

1    PSTN.  So Time Warner Cable is using the invention less

2    and less over this time period.

3         So these are some of the more important factors.

4    Q.   Okay.  Now, based upon your hypothetical

5    negotiation analyses, your other real-world evidence and

6    your *Georgia-Pacific* analysis, have you formulated an

7    opinion as to what you believe the reasonable royalty

8    would be in this case?

9    A.   Yes.

10   Q.   And what's that opinion?

11   A.   Well, if you look at the real-world evidence, the

12   chart that I showed previously, the range of possible

13   values is somewhere between $500,000 and $10 million.

14   The -- the average of that is going to be much less.

15   It's actually going to be less than 5 million,

16   particularly when you take into account the small

17   entries that we considered small here, the CableLabs

18   deal, and the Sprint-Mediacom license, where Sprint

19   showed that it's actually willing to license for

20   nothing.

21        So the real-world evidence tells me the numbers

22   should be substantially less than 10 million, but it

23   can't be any more.

24   Q.   Let's shift gears now.  Slide 25 to Dr. Rao's

25   opinions.  Have you considered Dr. Rao's opinions in

1   formulating any opinions of your own relative to his --

2   his analyses?

3       A.   Yes.

4       Q.   Okay.  So let's turn first -- have you -- to the

5   next slide.  Have you considered Dr. Rao's analysis with

6   regard to his assumption as to the October 2010

7   hypothetical negotiation date?

8       A.   Yes.

9       Q.   And can you tell me, do you have an opinion as to

10  whether Dr. Rao's October 2010 hypothetical negotiation

11  date is correct?

12      A.   I do.

13      Q.   And what's your opinion, sir?

14      A.   Well, I think it's -- I think it's not correct.

15      Q.   Why is that?

16      A.   And the reason why, I remember Dr. Rao said that

17  he's assuming that Sprint's patents are blocking

18  patents.

19      Q.   What does that mean for the jury, by the way?

20      A.   Yeah, so he says that he understands from

21  Dr. Wicker that the only way to connect to the PSTN is

22  by using Sprint's patents.  And so if that's true, I

23  have to accept that assumption.  If that's true, then

24  Time Warner Cable's connections to the PSTN began when

25  Time Warner Cable began offering VoIP services back in

 1   2003.  So as I understand it, that means the

 2   hypothetical negotiation date should not be 2010, when

 3   Time Warner decided to go it alone, but in 2003, when

 4   Time Warner Cable decided to offer VoIP services and

 5   connect to the PSTN.

 6       Q.  Do you understand whether or not Dr. Rao has any

 7   opinion whether the damages in this case on the

 8   assumption that the hypothetical negotiation date is

 9   anything other than 2010?

10       A.  No.  He said that that was the only date for

11   which he had an opinion.

12       Q.  I'd like to turn next, sir, to the *Vonage*

13   verdict.  There was a lot of -- Dr. Rao testified quite

14   a bit about the *Vonage* verdict.  Were you here for that?

15       A.  Yes.

16       Q.  Do you have an opinion as to the reliability or

17   propriety of using the *Vonage* verdict, as Dr. Rao has

18   used in his analysis?

19       A.  Well, I think, as an economic matter, I think

20   it's completely improper to rely on a verdict.

21       Q.  And why is that?

22       A.  Well, first of all, because what you want to look

23   at is the behavior of people when they're negotiating

24   over something.  We said that actual negotiations inform

25   our analysis of the hypothetical negotiation.  The

1  *Vonage* verdict is not an agreement between people.  It's

2  something that's imposed on them by the court.

3       So as a -- as a threshold matter, it can't be

4  fair market value because it's not the product of a

5  voluntary, informed, arm's length exchange between

6  parties.

7  Q.  Are there any other respects in which you believe

8  the *Vonage* verdict should not be properly relied upon?

9  A.  Right.  So apart from the fact it's not an

10  agreement, it's also, as Dr. Rao acknowledged, junk --

11  based on junk science; it's based on this rule called

12  the 25 percent rule, which said a patentee should get

13  25 percent of an infringer's profit if -- if the

14  infringer's proven to be infringing.

15       And there is simply no basis in economics for

16  that.  It's -- it was a theory that was dreamed up, you

17  know, back in the '50s by a lawyer, and it has no basis

18  in economic analysis whatsoever.  So it is, as Dr. Rao

19  said in his article, junk science.

20  Q.  And when did you reach the conclusion that the

21  25 percent rule, as used in -- to arrive at the *Vonage*

22  verdict, was junk science?

23  A.  Well, I've been doing patent valuation, you know,

24  since the 1980s, and so when I started doing litigation,

25  I saw that people said there's a 25 percent rule.  I

 1   said, That's crazy.  That doesn't make any sense.

 2   There's no -- there's no basis in economics to support

 3   this.

 4       Q.  Have you ever used the rule?

 5       A.  No.  I don't use this for valuation.  It's how

 6   could one patent -- particularly in a complex system,

 7   how could one patent be worth 25 percent of a firm's

 8   profits?

 9       Q.  There came a time the appellate court finally

10   prohibited use of the rule; is that right?

11       A.  That's right.

12       Q.  Were your concerns with the rules prior to that

13   appellate decision?

14       A.  Yes, that was in early 2011, I think.  I've

15   always thought it was -- it made no sense.

16       Q.  Do you think you're alone in that respect?

17       A.  No.  I think anybody with any economic training

18   -- I mean, first of all, it's commonsense.  One patent,

19   in general, can't be worth 25 percent of profits.  That

20   would happen by accident, if it happened at all.

21           And, secondly, there's no economic literature to

22   support it.  So as a trained economist, I would say, you

23   know, this is just -- has no foundation whatsoever.  So

24   I -- I never thought it was -- made any sense.

25       Q.  So you have indicated the *Vonage* verdict was not

1    an agreement between the parties, but did Sprint reach

2    an agreement with Vonage regarding its patents at any

3    point in time?

4        A.   They did.   After the verdict, then the parties

5    sat down, and they actually bargained, and then there

6    was a settlement agreement which settled the litigation

7    and gave Vonage a license not only for the damages

8    period in that case which extended through, I don't

9    know, 2007 -- or 2005 -- 2007 I guess, but it also

10   extended for the life of the Sprint patents through

11   2014.   So that agreement is actually something that

12   could be used.

13       Q.   That's actually something the parties did agree

14   to; right?

15       A.   Right.   That's a real-world, and that is a -- has

16   the attributes of fair market value.   So it's a willing

17   -- or more willing anyway, informed, arm's length

18   exchange.

19       Q.   So a couple of questions on that.   First of all,

20   do you understand that Dr. Rao calculated that the

21   settlement was about $0.20 on a dollar; is that right?

22       A.   Yes.   The verdict was based on a royalty rate of

23   about 5 percent, but the settlement Dr. Rao calculated

24   implied a royalty rate of a little over 1 percent.

25       Q.   Right.   And Dr. Rao suggested in his examination

1    or cross examination that the *Vonage* verdict would still

2    have been relevant to a hypothetical negotiation in

3    2010, because the parties would know that that verdict

4    was out there, right, and they would use that as a

5    benchmark?

6        A.  Yes.

7        Q.  If -- if you're TWC, aware of the *Vonage* verdict,

8    do you think that TWC would have also asked what

9    happened after the verdict?

10       A.  Well, I can't speak for them, you know,

11   factually.  But, in other words, imagine you're in this

12   negotiation and Sprint says, Well, you know, there's the

13   *Vonage* verdict, and we think you should pay the same

14   amount.

15           And so then TWC might say, Well, what did you

16   actually do about the *Vonage* verdict?  Is that -- did

17   they end up paying what the court told them to pay?

18           And Sprint would say, Well, actually, no, they

19   didn't pay 5 percent.

20           They actually paid 1 percent.

21           And TWC would say, Wait, you're telling me that

22   they're your competitor and you sued them, and you

23   settled with them for -- you sue them and they gave you

24   5 percent in court.  You settled with them for

25   1 percent, but you're saying that me, your customer,

1    should pay 5 percent?

2         That's crazy.  That's -- so the -- in the

3    hypothetical negotiation, if you were going to consider

4    the *Vonage* situation at all, at a minimum you would look

5    at the settlement between Sprint and Vonage, not the

6    verdict.  And then you would have to take account of the

7    fact that unlike Vonage, TWC is Sprint's customer not

8    its competitor, and that means that the rate should be

9    even less.

10   Q.  Have you even -- have you seen evidence in the

11   record that Sprint went further and actually considered

12   or referred to Time Warner Cable as its cable partner?

13   A.  Yes, that was the terminology that the parties

14   used.

15   Q.  So more than just a customer in Sprint's mind;

16   right?

17   A.  Yes.  They had to work together jointly in order

18   to supply VoIP services to TWC's customers, that's

19   right.

20   Q.  So have you done an analysis to -- of the *Vonage*

21   settlement to see how that would apply if applied to

22   Time Warner Cable under the circumstances of the

23   relationship?

24   A.  Yes.  It's another real-world data point we

25   should take into account, the parties would have taken

1   into account.

2       Q.   And if we turn to Slide 28, is this the analysis

3   that you prepared?

4       A.   Yes.

5       Q.   Could you walk the jury through that, please.

6       A.   Sure.  So when Sprint and Vonage settled the

7   agreement, settled their litigation, they did it for the

8   life of the patent license for 2002 to 2014.  And

9   Vonage's -- the present value of Vonage's sales over

10  that year were about 5.3 million.  So that means, on

11  average, the royalty rate that Vonage paid is about

12  1.43 percent for the rights to use all of Sprint's

13  portfolio.

14          So what we want to do is we want to apply that to

15  Time Warner's sales to compare apples to apples.  But in

16  order to do that, we have to look at Time Warner's

17  actual usage during the 2010 to 2014 time period.  And

18  remember, one of the big differences -- another one of

19  the big differences between Vonage and Time Warner Cable

20  is that Vonage is 100 percent -- well, let me back up.

21          Sprint accused a hundred percent of Vonage's

22  calls.  Okay.  But Sprint doesn't accuse a hundred

23  percent of Time Warner Cable's calls because not all of

24  them connect to the PSTN.

25          When you adjust for Time Warner Cable's lower

 1    usage, Time Warner Cable's accused sales are about a

 2    billion dollars during the infringement period.  When

 3    you multiply that by the royalty rate of 1.43 percent,

 4    you get a total payment for the Sprint portfolio of

 5    about $14.3 million.  That's for the entire portfolio.

 6            Again, we have to specialize it to the patents

 7    that are at issue in this case.  Again, their value is

 8    about 19 to 49 percent of the entire Sprint portfolio,

 9    which gives you a range of about 2.8 to 7.1 million

10    dollars.

11    Q.  And, sir, if we turn to Slide 29, have you now --

12    have you entered the *Vonage* settlement calculation you

13    just entered into on your chart of real-world evidence?

14    A.  Yes.  And you can see it fits very comfortably

15    within the other real-world data points we've been

16    discussing previously.

17    Q.  So I'd like to touch briefly on two other

18    agreements that Dr. Rao referenced in his examination

19    when he was on the stand and in his report.  One of

20    those is the Paetec agreement and the VoiceGlo

21    agreement.  Did you consider those agreements?

22    A.  I did.

23    Q.  And have you considered whether or not those two

24    agreements would be considered comparable or reliable

25    benchmarks for the reasonable royalty in this case?

1    A.   I did.

2    Q.   And what's your conclusion?

3    A.   Well, I don't think they are.  First of all,

4    these are not agreements with your partner.  They're --

5    they're agreements with your competitor.  So they're

6    different under *Georgia-Pacific* factor five because your

7    commercial relationship is different.

8         Secondly, these are very small firms.  In the --

9    in the Paetec agreement, I believe that the total

10   payment that Sprint received for its patents was

11   $30,000.  And the VoiceGlo agreement is a little bit

12   bigger, but it's not anything like the hundreds of

13   millions of dollars that Time Warner Cable is paying.

14   Q.   Do you have that reversed perhaps?  Do you think

15   it was 30,000 for VoiceGlo?

16   A.   You may be right.  I remember the 30,000.

17   Q.   Thank you.

18   A.   That was the -- that was the important one.  The

19   important point is these are small agreements with

20   Sprint competitors.  They are not large agreements with

21   a Sprint customer.

22   Q.   Okay.  Thank you.

23        So let's shift gears now to some of the various

24   profit or financial analysis that Dr. Rao did.  Have you

25   looked at some of those?

1      A.   Yes.

2      Q.   So if we turn to Slide 31, do you recognize Slide

3  31 as Rao's demonstrative No. 931, which includes a

4  number of profits and other numbers that he tallied?

5      A.   It's got a bunch of numbers on it, yes, that's

6  right.

7      Q.   Let's first talk about the right-hand side of

8  that, and it says, Time Warner.  And underneath, it

9  says, $1.37.  Just to be clear, Time Warner -- Time

10  Warner Cable never agreed to a $1.37 royalty; is that

11  right?

12      A.   Yeah.  I have to say I -- this slide was

13  completely confusing to me because the $1.37 comes from

14  the *Vonage* verdict, okay.  And that's what Dr. Rao says

15  damages should be.  This is not a number that Time

16  Warner accepts.  And for the reasons that I said, Time

17  Warner would never agree that it should pay the rate

18  that a jury imposed on Vonage in a trial.

19          Time Warner would have pointed, at a minimum, to

20  the settlement amount which is far less.  And then Time

21  Warner would have said, But we're your customer and

22  they're your competitor.  So the $1.37 has nothing to do

23  with the relationship with Time Warner itself.

24      Q.   Let's focus on the left-hand side, and there's a

25  series of computations Dr. Rao has included.  For

1   starters, I want to focus on the top two numbers; right?

2      A.   Yes.

3      Q.   And those are TWC's, according to Dr. Rao --

4   TWC's expected profits and actual profits, which were in

5   his case -- his view attributable to the invention, the

6   patent invention; is that right?

7      A.   That's what he says, yes.

8      Q.   So the analysis for both of those was similar;

9   and in the interest of time, I'm going to focus on the

10  expected profits number, which is the 12.82 number.  Do

11  you see that?

12     A.   Yes.

13     Q.   Do you agree the analysis was the same for both

14  numbers?

15     A.   Yes, it was.

16     Q.   So let's turn to the next slide in the -- in the

17  presentation, Slide No. 32.  Do you recognize this as

18  the demonstrative that Dr. Rao used to calculate the

19  12.82 expect -- Time Warner expected profits

20  attributable to the invention?

21     A.   Yes.

22     Q.   Okay.  So let's take a closer look at some of

23  this.  If you look, first of all, on the left-hand side,

24  you see there's a number 36.01; right?

25     A.   Yes.

1     Q.  And do you understand that was a number that was

2    calculated by Miss Hammer?

3     A.  Yes.

4              THE COURT:  That was -- she was the

5    accounting expert; right?

6              THE WITNESS:  That's right.

7    BY MR. GOTTS:

8     Q.  And that's supposed to be an incremental free

9    cash flow; right?

10    A.  That's what she said, yes.

11    Q.  On incremental free cash flow, is that the same

12   thing as we've heard about E-B-I-T-D-A, EBITDA?

13    A.  EBITDA, no, that's not the same thing.

14    Q.  Remember Miss Hammer said those were like apples

15   and oranges; right?

16    A.  You can't compare them.  They treat capital

17   differently.

18    Q.  It would be apples and oranges?

19    A.  Apples and oranges, exactly.

20    Q.  So let's look at the left-hand column.  Do you

21   agree, sir, first with the 36.01 incremental free cash

22   flow that Miss Hammer has calculated?

23    A.  No.

24    Q.  Why not?

25    A.  Well, Miss -- we heard -- the main reason is

1    because we heard the testimony of Mr. Banyas and Mr. --

2    remind me --

3        Q.   Delargy?

4        A.   -- Delargy -- thank you -- Mr. Delargy this

5    morning about Sprint's -- about the costs of providing

6    VoIP services.  And they both pointed out that

7    Miss Hammer omitted significant categories of costs from

8    her analysis of free cash flow, which is just a form of

9    profit.

10          But if you leave out costs, then you're going to

11   overestimate the profit.  So this number can't be right,

12   and it's overstated.

13       Q.   In fact, do you recall Miss Hammer testified that

14   if the costs weren't right, her number would be wrong?

15       A.   I think it's just the math.  That's right.

16       Q.   Okay.  Let's turn to the next slide.  So can we

17   put an "x" through that one?  You believe that number's

18   incorrect?

19       A.   Yes, it's completely unreliable, that's right.

20       Q.   So let's turn next to the -- what Dr. Rao refers

21   to as the cable company normal profit.  Do you see that?

22       A.   Yes.

23       Q.   And he calculated 11.16 for that?

24       A.   Yes.

25       Q.   And he used that Morgan Stanley analysis from

1    2002, with data points from Cox and Comcast; is that

2    right?

3        A.   That's what he said, yes.

4        Q.   Okay.  Can you tell us, do you have an opinion as

5    to whether this is a reliable analysis of so-called

6    normal profit for a cable company?

7        A.   Yes.  It's not reliable, and the reason why it's

8    not is, first of all, it's from -- remember Dr. Rao was

9    in 2010.  Okay.  That's where he's locating the

10   negotiation.  This data is back from 2002.

11       It's from two companies.  They have wildly

12   different profit rates.  One has a 22 percent rate.  One

13   has a 39 percent rate, which is highly diversion, so

14   that by itself is not reliable.  And the companies that

15   he's using -- it's only two points.  And the companies

16   he's using are not even voice companies; they are

17   circuit-switched companies.  So you're not subtracting

18   out the normal profit for a company like Time Warner.

19   You're subtracting out the normal profit for a company

20   that is not like Time Warner.

21       So it doesn't make any sense, and you can't trust

22   that number either.

23       Q.   Was Time Warner Cable ever in the circuit switch

24   business as you know -- as you understand it?

25       A.   No.

1    Q.  Commercially?

2    A.  No.

3    Q.  Okay.  So is it fair to put an "x" through this

4    one as well, sir?

5    A.  Yes.

6    Q.  Okay.  Now let's turn next to the items of price,

7    profit attributable to PC-to-PC calling features.  Do

8    you see that?

9    A.  Yes.

10   Q.  And Dr. Rao has attributed zero to that.  He

11   decided to put it there and attribute zero to it.

12   A.  Yes.

13   Q.  Do you agree with that?

14   A.  No.

15   Q.  Can you tell us why?

16   A.  Sure.  Dr. Rao -- so PC-to-PC calling means the

17   ability of one computer to call another computer.  In

18   other words, that's what -- something that is called

19   IP-to-IP calling.  In other words, a call that doesn't

20   touch the PSTN.  And he said the ability to call another

21   device that doesn't touch the PSTN, the value of that is

22   zero.  Okay.  And he bases that on things like Skype.

23   Skype is a service that allows you to call another

24   device, and Skype is free.  But that's not the correct

25   analysis.

1          Skype is free, but they're not providing you with

2     a connection.  They're saying, give -- you've got a

3     connection, we're not going to charge you for a call.

4     They're also showing you advertising and finding others

5     ways to make money.

6          But the most important point is that Time Warner

7     Cable itself also provides IP-to-IP calling.  And, in

8     fact, during the 2010 to 2014 time period, the majority

9     of its calls are IP-to-IP.  Okay.  So to say that the

10    value of being able to call IP-to-IP without touching

11    the PSTN is zero is completely false.  That's -- that

12    undermines more than half of the calls that Time Warner

13    Cable charges its customers for.  They pay real money.

14    They don't pay zero.

15    Q.  So, sir, is it fair to put an "x" through that

16    one, in your opinion?

17    A.  Yes.

18    Q.  And then if we go to the end, what impact does

19    this have on the overall reliability of the $12.82

20    number that Dr. Rao has calculated for the profits Time

21    Warner Cable would have expected that are attributable

22    to the invention?

23    A.  Well, it's just arithmetic.  If you start out

24    with the wrong numbers, you're going to end up with the

25    wrong number, and so you can't trust the last number

 1   either.

 2       Q.   Should we put an "x" through that one?

 3       A.   Yes.

 4       Q.   Let's go back to Dr. Rao's demonstrative slide,

 5   and the same analysis applies, I think you said, for

 6   both the 12.82 and the 11.25 number; is that true?

 7       A.   Yes, he did exactly the same thing.

 8       Q.   Let's take a look at another number on his chart.

 9   That's the $1.84 number; right?

10       A.   Yes.

11       Q.   And Miss Hammer actually calculated that one, as

12   I recall; is that right --

13       A.   Yes.

14       Q.   -- and he used it.  That is -- is that intended

15   to be the number of Sprint's expected profits, based

16   upon the so-called last offer, the $6 offer; is that

17   right?

18       A.   Yes.

19       Q.   Have you done a calculation of Sprint's expected

20   profits attributable to the invention on your own -- of

21   your own?

22       A.   I have, yes.

23       Q.   You testified to this in your deposition; is that

24   right?

25       A.   I did.

1     Q.   Okay.  Sir, and based on your calculation, what

2   did you conclude was the profits that are attributable

3   to the invention -- expected profits of Sprint in 2010

4   that were attributable to the invention?

5     A.   Well, if you do Miss -- if you do Miss Hammer's

6   analysis, just take the numbers that she used, you

7   should make three modifications, okay.

8          First of all, she started in the wrong time

9   period.  She started in 2009.  But in 2009, Sprint's

10   prices were higher.  Okay.  So she averaged in numbers

11   that are too high.  That means Sprint's expected profits

12   are too high.

13          We have to start in 2010 when -- when Dr. Rao

14   says the parties should be negotiating.  If you start

15   then, you get a lower number.

16          Secondly, we know that in 2010, the $6 number

17   that Miss Hammer relied on was not right.  The -- Sprint

18   was willing to go to 5.50, and so that's the number you

19   should analyze, in terms of Sprint's own expected

20   profits based on the offer they were willing to make.

21          And then the third thing you should do is you

22   should do what Dr. Rao did, which is to subtract the

23   normal profit from the business, which he said is

24   12 percent.  He calculated that as 12 percent of revenue

25   in this case.

1           If you make those three adjustments to the $1.84

2  number, you come up with $0.23.  That would be Sprint's

3  expected profit on -- immediately before, when Dr. Rao

4  says the hypothetical negotiation is.

5     Q.  And you heard the testimony of Dr. -- I'm sorry,

6  Mr. Elfman.  Was Sprint prepared to go even lower if --

7  so long as it remained profitable?

8     A.  Yes.  They wanted to keep the business, and they

9  were hoping to get the wireless deal from Time Warner

10  Cable, and so they were prepared to drop the price below

11  5.50 if necessary.

12     Q.  So long as they remained some number that's

13  positive?

14     A.  Yes, that's right.

15     Q.  I'd like to turn to another set of numbers on the

16  chart -- I'm sorry.  Thanks for reminding me.

17           Did you enter the cost savings -- no, no, pull

18  that back.  This is actually a different one.  I'm

19  sorry.  We'll do that next.

20           Turning to another number on the chart, on the

21  demonstrative chart, which is the number for Time Warner

22  Cable's expected and actual savings, do you see that?

23  It's 3.79, based upon the last offer according to

24  Dr. Rao, and 5.32, based upon the last offer according

25  to Dr. Rao.  Do you see that?

1       A.  Yes.

2       Q.  Did you do your own analysis of the expected Time

3   Warner Cable cost savings?

4       A.  I did.

5       Q.  And what is your analysis -- and did you do that

6   for the entire VoIP business, assuming that Time Warner

7   Cable did Go It Alone over the period from 2010 to 2014?

8       A.  Yes.

9       Q.  And you did the entire VoIP business for what

10  reason?

11      A.  Well, the reason why is because two things are

12  happening.  When -- why -- why does Time Warner Cable

13  want to Go It Alone?  Okay.  There are several reasons,

14  but one of them is potential cost savings.  Okay.

15          But when Time Warner Cable switches a customer

16  from Sprint to Go It Alone, then they get -- then they

17  get -- they may get cost savings for that customer.  Of

18  course, they incur additional costs too.  But the other

19  thing that happens is the number of customers being

20  supplied by Sprint goes down and, under the contract,

21  that means that the rate that Time Warner Cable pays

22  goes up, because Sprint has said the more customers you

23  give us, the lower the rate you pay.

24          So when Time Warner Cable pulls customers out of

25  Sprint and starts to supply them itself, then Sprint

1    starts charging a higher rate.

2         So if you want to look at the cost savings from

3    going it alone, you can't just look at the Go It Alone

4    customers only.  You have to look at the effect on the

5    entire business.  Dr. Rao didn't do that.

6    Q.   And did you, in your report, do an analysis of

7    the overall cost savings to Time Warner Cable they would

8    have expected for the VoIP business from the period of

9    2010 to 2014?

10   A.   Yes.  It was similar to the analysis that

11   Mr. Banyas discussed today, based on Sprint's best offer

12   -- last best offer, and also on the 5.50 that Sprint was

13   willing to go to.

14   Q.   Okay.  What did you conclude, when you calculated

15   the potential cost savings from 2010 to 2014, based upon

16   the -- the pricing that was -- Sprint was prepared to

17   offer during that time period?

18   A.   Well, it's actually relative to Sprint's final

19   offer.  It was actually slightly more expensive for Time

20   Warner Cable to Go It Alone than it would have been to

21   accept Sprint's offer.  So Time Warner Cable actually

22   incurred some costs.  It didn't save costs.  It incurred

23   some costs by going it alone, but it nevertheless

24   preferred to do that.

25   Q.   And you reference Mr. Banyas' analysis.  Is this

1   consistent with what he explained on the stand earlier

2   today?

3       A.   It's exactly.  Used the same numbers and came to

4   virtually the same conclusion, that's right.

5       Q.   So do you agree with Dr. Rao's numbers of 5.32

6   and 3.79, which were TWC's actual expected cost savings,

7   as he analyzed them?

8       A.   No.  These are -- these are incorrect.  The

9   numbers should be zero or negative.

10      Q.   I'd like to turn to the two last sets of numbers

11  on Dr. Rao's chart, that's the Sprint's expected profits

12  number and Sprint's actual profits number.  Do you have

13  any opinions relative to the relevance of those numbers?

14      A.   They're not relevant.  They -- Sprint's expected

15  profit from its entire line of business is irrelevant to

16  how it would have approached the negotiation.  What you

17  -- what you care about is Sprint's expected profits

18  based on its last offer.

19          That's the bottom number on this chart, and

20  that's what I've already said.  When you actually use

21  the number, compute the numbers properly it's $0.23.

22  Sprint's expected profit for the entire line of

23  business, not taking into account its own price

24  reduction, is not relevant to anything.

25      Q.   What's your numbers, based on your analysis and

1    your review of Dr. Rao's analysis, to be the most

2    relevant numbers for consideration in the context of the

3    hypothetical negotiation?

4        A.   Well, if you're going to use these numbers, which

5    are really about analyzing the entire business and not

6    these particular patents -- but if you're going to use

7    these numbers, then the two numbers you would care about

8    would be Sprint's expected profit, which would be $0.23,

9    and Time Warner Cable's expected savings, which are

10   going to be slightly negative.  That's the range that

11   you're operating in.

12       Q.   Okay.  So we turn to the next slide.  Have you

13   entered into the slide the TWC potential cost savings

14   that we've been talking about --

15       A.   Yes.

16       Q.   -- the negative number?

17            Is that the item on the far right?

18       A.   That's the last item on there, yes.  That's not a

19   benefit.  That's actually a cost to going it alone.

20       Q.   Okay.  So with a view towards the data you

21   collected on Slide 38, the real-world evidence, the

22   hypothetical negotiation, and the *Georgia-Pacific*

23   factors, could you please tell us what your overall

24   opinion is as to the appropriate range of royalty in

25   this case?

1       A.   Sure.  I've looked at as much real-world evidence

2    as I can find.  I've tried to analyze each one of these

3    circumstances properly.  I've tried to see what's the

4    range of numbers the parties could come up with.  That

5    range is -- based on actual evidence, is between half a

6    million and about 10 million.

7           There are several reasons to believe that it's

8    actually at the lower end of that range.  In particular,

9    Sprint's own treatment of its patents, as well as the

10   negotiating position of Time Warner with respect to

11   Sprint's final offer, which basically means that Time

12   Warner Cable was indifferent, as Mr. Banyas said,

13   between staying with Sprint and going it alone.

14          So overall, I would say it can't be any more than

15   10 million and should be substantially less.

16      Q.   And have you compared that on your slides to the

17   $139.8 million that Dr. Rao has calculated?

18      A.   Yes.

19      Q.   Is that on Slide 39?

20      A.   Yes.  Just for comparison purposes, you can see

21   how these numbers stack up.

22      Q.   Okay.  We've entered Dr. Rao's figure on Slide

23   39.  Is that an accurate depiction of the relative

24   numbers?

25      A.   Yes.  One of these things is not like the other.

1            MR. STRAND:  Thank you, sir.

2            THE COURT:  All right.  Shall we take our

3    noon recess now?

4            MR. STRAND:  At your pleasure, Your Honor,

5    whichever works for you.  I don't think I can get done

6    in 10 minutes.

7            THE COURT:  Okay.  Why don't we take our

8    recess and resume at 20 after 1:00.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  You may step down.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  And, members of the jury, I'll

13   remind you of those admonitions.  We'll resume at 20

14   after 1:00.

15        Counsel, stay here for just a moment, if you

16   would, please.

17               (The jury left the courtroom, after which

18   the following proceedings were had.)

19           THE COURT:  All right.  You may be seated.

20   Am I correct in my understanding that this is the final

21   witness for Time Warner Cable?

22           MR. GOTTS:  Indeed, Your Honor.

23           THE COURT:  All right.  And then Dr. Wicker

24   is the only witness on rebuttal for Sprint; is that

25   correct?

1          MR. WEBB:  I believe so, Your Honor.  And

2    our anticipated length of his testimony for direct is

3    about 90 minutes, give or take.

4          THE COURT:  All right.  Chance we get wound

5    up this afternoon?

6          MR. WEBB:  As far as we're concerned, and

7    our sincere hope is yes.

8          THE COURT:  All right.  We'll see you at

9    1:20.  Pardon me, Mr. Shulman.

10          MR. SHULMAN:  Yes.  You asked last Friday,

11    when you mentioned that you wanted to hear argument on

12    enhanced damages as well, how much more time we wanted

13    for that, and I think 15 minutes would be plenty.

14          THE COURT:  Okay.  Great.  Great.  Just --

15    we won't have the jury.  We can kind of play it by ear.

16    That's fine.  That's a good range to shoot for.  You

17    know, three hours wouldn't have been good.

18    Fifteen minutes, that's...

19          MR. SHULMAN:  I don't have three hours'

20    worth of stuff to talk about.

21          MR. WEBB:  As luck would have it, we do have

22    more things we would like to talk about.

23          THE COURT:  So maybe 17 minutes.

24          MR. WEBB:  Yeah.  One other thing, Your

25    Honor.  There are some issues with respect to some

1   demonstratives that Dr. Wicker plans to use.  So maybe

2   if we come back a few minutes early to take it up with

3   Your Honor.

4            THE COURT:  Sure.  Is it something I should

5   be looking at, or something you need to --

6            MR. WEBB:  Rob?

7            MR. SHULMAN:  The lawyer who will address

8   this for us is not in the courtroom.

9            THE COURT:  Ten after.

10            MR. SHULMAN:  Okay.

11            MR. WEBB:  Would you like the demonstratives

12   and identify the ones that are at issue?

13            THE COURT:  Well, not if there's not

14   somebody here to give me a high-level position from Time

15   Warner.

16            MR. CAMPBELL:  Your Honor, one other

17   housekeeping matter.

18            THE COURT:  Yes.

19            MR. CAMPBELL:  We're working hard to cut the

20   Rule 50 brief down below 30 pages.  We're at 33 right

21   now.  May we have leave to file a brief 34 pages?

22            THE COURT:  What do you think?

23            MR. WEBB:  I strongly object.

24            THE COURT:  Well, I guess I'll let you.

25            MR. CAMPBELL:  Very well.  Thank you.

1          THE COURT:  All right.

2          (Recess.)

3

4

5                          CERTIFICATE

6      I certify that the foregoing is a correct

7  transcript from the record of proceedings in the

8  above-entitled matter.

9      DATE:  February 28, 2017

10

                    /s/Kimberly R. Greiner
11                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25